IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-862

OREGON-CALIFORNIA TRAILS ASSOCIATION, a nonprofit corporation;
ROSEBUD SIOUX TRIBE, a Sovereign Tribal Nation;
WESTERN NEBRASKA RESOURCES COUNCIL, a nonprofit corporation;
PRESERVE THE SANDHILLS, LLC, a nonprofit corporation;
WHITETAIL FARMS EAST, LLC, a limited liability corporation;
HORSESHOE BAR RANCH, LLC, a limited liability corporation;

      Petitioners,

    v.

MATT HOGAN, in his official capacity as the Regional Director of the Mountain-Prairie Region of the U.S. Fish and Wildlife Service;
DOUG BURGUM, in his official capacity as the Secretary of the U.S. Department of the Interior;
BRIAN NESVIK, in his official capacity as the Director of the U.S. Fish and Wildlife Service;
TRAVIS VOYLES, in his official capacity as the Vice Chairman (Exercising the Authority of the Chairman) of the Advisory Council for Historic Preservation;

      Respondents.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

## INTRODUCTION

1.     Petitioners once again challenge Federal Respondents' unlawful and arbitrary approval of an enormous, destructive proposed transmission line—known as the "R-Project"—in the Nebraska Sandhills, an area that, as described by the Nebraska Legislature, "provide[s] an irreplaceable habitat for millions of migratory birds and other wildlife every year and serve[s] as the home to numerous ranchers and farmers," as

well as to "priceless" Tribal, historic, cultural, and archeological artifacts. Specifically, this case challenges the U.S. Fish and Wildlife Service's ("FWS") invocation of Executive Order ("EO") 14156, which declares a national energy emergency, in approving the use of emergency alternative procedures under Section 106 of the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108. In so doing, FWS bypassed the critically important safeguards Congress created to ensure that such projects would avoid, minimize, and mitigate irreversible damage to historic properties after comprehensive consultation with affected Tribes and other consulting parties, *before* federal agencies issue licenses or permits authorizing construction.

2.     In 2020, this Court (Judge Martinez) found that, in authorizing the R-Project, FWS violated the NHPA, 54 U.S.C. §§ 300101-307108; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347; and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. *See generally Or.-Cal. Trails Ass'n v. Walsh* ("*OCTA*"), 467 F. Supp. 3d 1007 (D. Colo. 2020) (Martinez, J.). As a result of those serious legal violations, the Court vacated FWS's incidental take permit ("ITP") and remanded to FWS for further consideration under each of the applicable statutory and regulatory frameworks.

3.     On February 10, 2026 (and notifying the public the following day), FWS issued a new ITP to the Nebraska Public Power District ("NPPD"), authorizing imminent construction of the R-Project. In support of the ITP, FWS issued a Record of Decision and Final Supplemental Environmental Impact Statement ("FSEIS") to conclude FWS's

supplemental NEPA process, and Findings and Recommendations, a Biological Opinion, and a Habitat Conservation Plan to conclude FWS's ESA process.

4.     In contrast to FWS's ostensible compliance with NEPA and the ESA by issuing documents that purported to consider and address relevant issues required by those laws and their implementing regulations, FWS ran roughshod over the obligations imposed by the NHPA and its regulations. In response to an eleventh-hour request from NPPD to exempt the R-Project from the requirements imposed by Section 106 of the NHPA, FWS (through its parent agency, the U.S. Department of the Interior ("DOI")) granted NPPD's "emergency" request and thus adopted far less protective "alternative" procedures for NHPA compliance. This "emergency" exemption from the NHPA's obligations resulted in a February 10, 2026 document—prepared unilaterally by FWS, without any consultation with affected Tribes or other consulting parties—that sets forth certain requirements NPPD must follow during construction to comply with the NHPA.

5.     FWS fatally erred in its decision to waive the mandatory Section 106 procedures and to instead approve emergency alternative NHPA procedures for the R-Project. For instance, because there is no natural disaster or imminent threat to national security or human life, FWS arbitrarily assumed (without actually substantiating) that the R-Project responds to a genuine emergency within the meaning of the NHPA and its regulations, and therefore warrants departing from the NHPA's requirements. Likewise, even if EO 14156 established a legitimate emergency within the meaning of the NHPA—a highly questionable proposition—FWS's decision to invoke those procedures here is arbitrary and capricious because the R-Project was never intended to respond to

3

any emergency, whether nationally or within NPPD's service area; rather, NPPD has sought FWS approval of the R-Project for over a decade for reasons having nothing to do with the purported "energy emergency" animating EO 14156, let alone for the purpose of responding to a natural disaster or an imminent threat to national security or human life.

6.      Compounding FWS's serious legal errors in approving NPPD's request for emergency alternative NHPA procedures—without any demonstration of an actual emergency warranting alternative procedures—is FWS's reliance on the Advisory Council on Historic Preservation's ("ACHP") blanket, indefinite extension of the use of alternative procedures via guidance issued on February 25, 2025, lasting the entire duration of the energy emergency declared in EO 14156. Not only does the NHPA fail to confer statutory authority for the ACHP to waive the statute's requirements for the type of "emergency" set forth in EO 14156, but an indefinite extension of emergency alternative procedures is also inconsistent with the ACHP's own regulations that limit the use of emergency alternative procedures to thirty days from the declaration of an emergency. Thus, even if the ACHP had statutory authority to waive the NHPA's requirements for emergencies not involving natural disasters or imminent threats to national security or human life—and it does not—at minimum, the ACHP was required to formally modify its existing regulations, subject to notice-and-comment rulemaking, to effectuate the new, substantive regulatory change relied upon here by FWS that indefinitely extended the use of alternative procedures beyond thirty days from the issuance of EO 14156. Because the ACHP failed to satisfy the basic procedural

4

safeguards that apply to legislative rules of this kind, the ACHP has also violated the NHPA, its implementing regulations, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and FWS has acted arbitrarily, capriciously, and contrary to law by relying on the ACHP's unlawful, arbitrary guidance.

7.    Exacerbating FWS's and the ACHP's serious legal errors related to FWS's invocation of EO 14156 for the R-Project are the alternative procedures FWS ultimately adopted and imposed as requirements on NPPD, which subvert the core purposes of the NHPA and its regulations. Whereas before FWS's invocation of emergency procedures FWS was in the midst of a nearly three-year consultation process with Tribes and other consulting parties working to identify affected historic properties, assess the severity of effects to those properties, and determine the measures necessary to avoid, minimize, and mitigate the R-Project's effects, FWS and NPPD have now unilaterally decided what constitutes NHPA compliance without regard to the NHPA's legal requirements or the specific, repeated objections of Tribes and other consulting parties during the consultation process prior to its termination.

8.    For example, in the absence of alternative procedures, FWS could only comply with the NHPA by ensuring good faith government-to-government consultation with affected Tribes at all stages of the Section 106 process; by identifying all affected resources, assessing effects to them, and considering alternatives to avoid, minimize, and mitigate effects prior to authorizing R-Project construction; by allowing extensive participation by Tribes and other consulting parties in each of the remaining steps of the NHPA process (resource identification, effects analysis, and resolution of effects); by

adhering to the dispute resolution process set forth in the NHPA and its regulations if effects cannot be resolved to the satisfaction of all consulting parties; and by issuing notices to proceed with construction only after FWS has satisfied these obligations.

9.      In sharp contrast, FWS's alternative procedures jettison all of these statutory and regulatory safeguards and requirements. For instance, FWS has excused NPPD from any further efforts to identify affected Tribal, historic, and cultural resources, let alone to analyze the effects to such resources (many of which are unknown or unevaluated) and then resolve any adverse effects by considering alternatives to avoid, minimize, or mitigate the R-Project's effects. Likewise, the alternative procedures adopted unilaterally by FWS and NPPD excluded the participation of (and consultation with) Tribes and other consulting parties, not only in the development of the alternative procedures but also in the unfinished steps of the Section 106 process. FWS also eliminated the ability of Tribes and other consulting parties to join and/or enforce a Programmatic Agreement ("PA") governing implementation of FWS's and NPPD's NHPA obligations, and stripped Tribes and other consulting parties of their dispute resolution rights in the event that all parties could not agree on the necessary measures to resolve adverse effects to Tribal, historic, and cultural resources. For these and other reasons, FWS's alternative procedures do not provide for government-to-government consultation with affected Tribes, let alone good faith consultation.

10.      FWS's decision to invoke emergency alternative NHPA procedures, FWS's reliance on the ACHP's indefinite extension of such procedures, and the alternative NHPA procedures that FWS adopted in lieu of the ordinary Section 106

procedures, all violate the NHPA, its implementing regulations, and the APA, and are arbitrary, capricious, not in accordance with law, in excess of statutory and regulatory authority, and without observance of procedure required by law. 5 U.S.C. § 706(2).

11.     The Court should, as the presumptive remedy for these violations, "set aside" FWS's decision invoking emergency alternative NHPA procedures, FWS's decision setting forth the alternative procedures NPPD must follow, FWS's ITP that is predicated upon FWS's decisions to invoke an emergency and to authorize project construction without full compliance with the NHPA, and FWS's Record of Decision and FSEIS that discuss only a limited subset of Tribal, historic, and cultural resources and that analyze FWS's purported efforts to comply with Section 106 of the NHPA. *Id.*

12.     The Court should, as the presumptive remedy for these violations, also set aside the ACHP's unlawful and arbitrary guidance that contravenes the express language of the NHPA and its implementing regulations, and which was not the subject of notice-and-comment rulemaking and related procedures required by the APA.

**<u>JURISDICTION AND VENUE</u>**

13.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 (federal question).

14.     Venue in this Court is proper under 28 U.S.C. § 1391(e)(1) because Respondent Matt Hogan (the Responsible Official) is in Denver, because the decisions to approve the ITP and adopting emergency alternative NHPA procedures were made in this jurisdiction, and because FWS conducted and finalized its NHPA process in this jurisdiction. Venue is also proper, in light of the fact that this Court (Judge Martinez) had

7

jurisdiction over, and resolved on the merits, a prior case challenging FWS's original approval of this same project.

## PARTIES

15.     Petitioner Oregon-California Trails Association ("OCTA") is a 1500-member national nonprofit organization headquartered in Independence, Missouri. OCTA is comprised of eleven chapters throughout the western United States, including in Colorado and Nebraska.

16.     OCTA's mission is to protect the Historic Emigrant Trail legacy by promoting research, education, preservation activities, and public awareness of the trails, and to work with others to promote these important causes. The number one objective of OCTA is to preserve the Historic Emigrant Trails and to preserve and promote the stories of the emigrant experience. Although mitigation is part of the preservation process, OCTA's primary goal is to preserve these unique and iconic trails and resources (not merely mitigate harm to them). Whether a direct, physical impact to the trail itself or merely an impact of visual effects, emigrant trails are not a renewable resource; once they are gone, they are gone.

17.     The R-Project, as proposed, will have a devastating impact on pristine trail segments of the Oregon-California National Historic Trail and the Mormon Pioneer National Historic Trail through both direct effects and indirect effects associated with the transmission line itself and the wind energy infrastructure it is intended to facilitate in close proximity to these national historic trails. The areas of these trails that will be significantly affected by the R-Project are generally evocative of a rural, pristine setting

8

that emigrant pioneers would have encountered hundreds of years ago during westward expansion. The character of these areas, the trails themselves, as well as the historic feel and setting of the trails, will be fundamentally and irreversibly altered by an enormous modern transmission line and related wind energy infrastructure.

18.     OCTA was an official consulting party to FWS's NHPA Section 106 consultation process from 2023 until FWS abruptly terminated that process in early 2026, deciding instead to invoke emergency alternative procedures under the NHPA. During the consultation process, OCTA repeatedly informed FWS and NPPD of its serious, unresolved concerns with NPPD's proposal to build the R-Project in very close proximity to emigrant trails and related historic and cultural resources of national significance. In OCTA's view, FWS and NPPD failed during that consultation process to take seriously the concerns identified by OCTA and other consulting parties, and FWS then compounded those problems by terminating the Section 106 process before the consulting parties could meaningfully consult and participate in the resource identification, effects analysis, and effects resolution phases of the consultation process. In all of these ways, OCTA and its members have been, and continue to be, irreparably harmed both by the serious failures in process that FWS bypassed in adopting emergency alternative procedures, and by the actual, imminent harm to the emigrant trails and related historic and cultural resources that are at the core of OCTA's mission to preserve and protect from highly destructive actions like the R-Project.

19.     Petitioner Rosebud Sioux Tribe, of the Sicangu Lakota people, is a federally-recognized Indian tribe with a governing body recognized by the Secretary of

9

the Interior. In addition to the Rosebud Sioux Tribal reservation lands, the Tribe maintains deep historical, cultural, and spiritual connections to the larger ancestral territories of the Oceti Sakowin (Seven Council Fires) consisting of the Lakota, Dakota, and Nakota peoples. The proposed corridor of NPPD's R-Project cuts through the heart of areas defined as Lakota territory under the 1851 Fort Laramie Treaty and within Article 11 of the 1868 Treaty. Multiple historic documents (Nicollet 1839, Warren 1855 & 1856, Bettelyoun and Waggoner 1999), Tribal Winter Counts (Mallery 1893, Cohen 1939), and Tribal oral histories describe the Nebraska Sandhills as the hunting grounds of the Sicangu (aka Brule) Lakota and many cultural sites significant to the Sicangu Lakota are located in this area. The Lakota language has specific names for certain areas of this country and for important cultural plants unique to the Sandhills. The proposed R-Project will have a significant adverse effect on this cultural landscape.

20.    The unique and fragile Sandhills are known in the Lakota language as Casmu Makoce and are protected under the 1851 and 1868 Fort Laramie Treaties. The Tribe stands in defense of its treaty rights and is committed to protecting its sacred lands and waters, embodying the principle: "You do not own this land, the land owns you." The following excerpt from the 2011 Rosebud Sioux Tribe Vision Statement defines the values of the Sicangu Lakota used as a guide in Tribal decisionmaking to ensure that all decisions made today will benefit the next seven generations:

> Whatever the Creator created for us from Mother Earth and Father Sun is for our security and protection, and for us to live healthy with, so we shall be diligent to take care of it in the future. This is the water of life, our lands, and our air.

10

The Water of Life is paramount. This water is sacred and without it we cannot live healthy. The aquifers are where the Thunder-Being's store their water and the springs are where it comes out. The Spring People are our relatives, and are the Guardians who have always lived in and around the springs. The coming generations will have clean water that will benefit them equally, and first, and they will develop environmentally safe and sustainable economies from it. This way Grandmother Earth and everything that grows and lives on the land and beneath it will be healthy. With this in mind, our Grandfathers negotiated the 1868 Ft. Laramie Treaty boundaries to be water.

On and under Grandmother Earth, the Creator made for us all things; sub-surface resources, the crawling, the plants, the animals, the winged, the humans, and that which we cannot see, to be relatives. The coming generations will happily grow and live healthy on our lands, educate themselves, take care of it, and pray in peace. They will benefit equally, and first, from our lands and develop environmentally safe and sustainable economies from our collective resources. We shall strive to reclaim our treaty lands and resources and utilize Lakota Customary Law, Treaty Law, Federal Environmental Law, and the United Nations Declaration on the Rights of Indigenous Peoples and other Human Rights instruments to protect our People and resources.

The air we breathe is sacred and comes from the Creator. We will continue to pray to and be good relatives to all that is between the earth and the sky, and unto the stars. The Thunder-Beings dwell in the clouds and watch over us from above. The winged dwell there. The right to clean air belongs to the coming generations, and we shall diligently protect it for them so they will benefit from it equally, and first, and develop environmentally safe and sustainable economies from it. We shall protect our solar and wind energy, and regulate any outside transmissions and aircraft crossing our air space with Treaty and International Law.

In the future we shall not do any projects or use chemicals which will contaminate or harm the quality of our water, lands, or air. (Leland Little Dog, Rosebud Sioux Tribe Integrated Resource Management Plan 2011).

21.    The construction of the R-Project, and the detrimental, irreversible effects it would have on the Tribe and its people, would be in direct conflict with these defined Rosebud Sioux Tribal values. The Ogallala Aquifer underlies the entire proposed project

11

area and the effects of constructing a pole every 1350 feet, which involves digging down into the sand 25 to 45 feet for each pole, and pouring concrete into each hole to support each massive tubular steel monopole, would have a devastating effect on this pristine section of the aquafer. According to the Rosebud Sioux Tribe Hydrologist, Syed Huq, "each pole will be a conduit for contaminants to move from the surface down towards the Ogallala Aquifer"; "[f]reshly cast concrete exposed to water can release hydroxyl ions and cause pollution, also hydroxide leaching is possible." All of this concrete can also affect groundwater flow. According to the Tribe's Water Resources Office, the R-Project "has the potential to adversely impact the Ogallala Aquifer in Nebraska and the hydrologically connected Ogallala Aquifer underneath the Rosebud Reservation." To the Rosebud Sioux Tribe, water is a Traditional Cultural Property. Water is used in ceremony, water is medicine, water is life.

22.    The Rosebud Sioux Tribe's Tribal Historic Preservation Office ("THPO") has participated extensively in the NHPA 106 consultation process since first becoming aware of the R-Project in 2021. Consultation on the R-Project has been deceptive from the beginning. At the start of this project, in 2014, FWS sent a letter to the President of the Rosebud Sioux Tribe informing him that FWS was planning to issue an ITP to relocate an endangered species of burying beetle that will be affected by a transmission line. This was deceptive in that FWS centered its communication on the beetle take permit rather than the actual project that entails the construction of a massive 345kV transmission towers, power lines, and associated industrial wind energy development projects. No correspondence was ever sent to the Rosebud Sioux Tribe's THPO, which

has been in existence since 2004. The Rosebud Sioux Tribe's THPO was not made aware of the R-Project until 2021—two years after FWS first issued an ITP to NPPD.

23.     Since 2021, the Rosebud Sioux Tribe THPO has spent innumerable hours in consultation meetings (in person and online) and submitting written responses, all of which were ignored by FWS and NPPD as they plowed ahead with their desired plans regardless of the concerns repeatedly expressed by the Rosebud Sioux Tribe and other Tribal Nations. During these "consultations," many of the participating Tribal Nations, including the Rosebud Sioux Tribe, commented on the inadequacy of the cultural site inventories completed without Tribal participation, the Tribes' insistence on the necessity to complete the standard Section 106 process rather than using a "phased approach" through a PA that would allow NPPD to start construction before the Tribes have had an opportunity to conduct appropriate inventories for Tribal resources including Traditional Cultural Properties, and FWS continuing to use documents that the Tribes have repeatedly deemed premature, inaccurate, misleading, and deceptive in their contents to push through the process with inaccurate and misleading data.

24.     The Tribe is committed to protecting its Tribal, historic, and cultural resources from the significant, permanent, and irreparable adverse effects of the proposed construction, operation, and maintenance of the R-Project transmission line and resulting industrial wind energy developments that the R-Project is intended to facilitate. The potential adverse effects that the R-Project would have on this Traditional Cultural Landscape would be devastating and irreversible. This Traditional Cultural Landscape includes important cultural sites, culturally important plants and animals, and

13

sacred water resources. The Sicangu Nation would be severely harmed by the adverse effects to these historic properties and the transformation of this largely undisturbed area would forever destroy the integrity of this cultural landscape for future generations.

25.     By filing this action, Petitioner Rosebud Sioux Tribe does not waive its sovereign immunity and does not consent to suit as to any claim, demand, offset, or cause of action of the United States, its agencies, officers, agents, or any other person or entity in this or any other court.

26.     Petitioner Western Nebraska Resources Council ("WNRC") is a nonprofit organization formed in 1983 that is dedicated to preserving the quality of watersheds and native biomes while maintaining the lifestyle of Western Nebraska. WNRC members and staff work to accomplish its mission by educating the public and policymakers and through hands-on work throughout Nebraska. WNRC concurs with the scientific consensus that stressed ecosystems are capable of slipping rapidly from a seemingly steady equilibrium into catastrophic ecological change, significantly adding to climate disruption that is already negatively affecting this region through floods, livestock and crop losses, and other ecological disruptions. WNRC, its members, and its staff recognize that the Nebraska Sand Hills, and its essential ecosystem functions that sustain Nebraskans, will be impaired and compromised as a result of the unlawful R-Project routing and imminent construction activities associated with the R-Project. In particular, the R-Project will cause substantial, permanent fragmentation, which cannot later be mitigated, by scarring the landscape with an intrusive transmission line that changes the character of this ecosystem for WNRC's members, biological diversity,

14

historic and cultural resources, and other unique and iconic features of this internationally recognized treasure.

27.     Petitioner Preserve the Sandhills, LLC was organized to preserve and protect the Nebraska Sandhills, one of the most fragile natural resources in our country. Through education and positive actions, Preserve the Sandhills hopes to preserve and protect the Sandhills from high-voltage power lines, wind turbines, and commercial solar development. The organization works to promote the growth of agriculture in the great state of Nebraska, preserve the natural beauty of the Sandhills including its hills, valleys, rivers, streams, wetlands, wildlife, migratory birds, and open vistas, and protect some of the darkest night skies in the western hemisphere—not only for the present generation, but for future generations. Preserve the Sandhills provides education to its members, politicians, and others, in order to demonstrate the impact of proposed projects and how extremely destructive they are to the fragility of the Nebraska Sandhills. The R-Project threatens to irreversibly destroy or impair important resources in the Nebraska Sandhills, including land, birds and other wildlife, tourism that our area largely depends upon, local businesses, the Ogallala Aquifer, livestock, the local ranching industry, and the families and communities that live in the Sandhills. Preserve the Sandhills has dozens of members and supporters, most of whom will be directly and adversely impacted by the proposed R-Project during its construction and operation.

28.     Petitioner Whitetail Farms East, LLC, which is operated by a landowner and conservationist, owns real estate that will be directly and adversely affected by the R-Project. The affected property owned by Whitetail Farms East, LLC is heavily used by

15

migratory waterfowl and other wildlife that will be devastated by the R-Project. This project will have serious adverse impacts on this property and the enjoyment thereof by the owner and operator of Whitetail Farms East, LLC and others. These impacts include: creating a barrier along the east side of the property that must be accounted for every time anyone passes along that part of the property; negatively impacting its use by migratory waterfowl and other wildlife; permanently destroying the current viewshed leaving the 345-kV transmission line as the dominant feature of the landscape; and introducing permanent, constant noise generated by a 345-kV transmission line. Such adverse impacts could be avoided by an alternate route along an existing electrical transmission corridor owned by NPPD, or by moving the R-Project to a different location within the routing corridor.

29.     Petitioner Horseshoe Bar Ranch, LLC is a company that owns and operates a family-owned 500-head cow/calf operation in the heart of the Nebraska Sandhills. The headquarter property is bisected by four miles of the Dismal River, which is a continuously flowing groundwater-derived river. This pristine riparian habitat is a virtual wildlife haven frequented by swans, ducks, geese, and eagles. The Dismal River was also extensively utilized by Native American Tribes; artifacts are frequently found in proximity to the river, including on the property owned and operated by Horseshoe Bar Ranch, LLC. Approximately 6000 acres of the headquarter property bordering the Dismal River have been placed in a perpetual conservation easement administered by the Nebraska Land Trust. The R-Project will cause significant, irreversible negative physical and visual impacts on the integrity of this perpetual conservation easement and

16

the wildlife that benefit from it, and will also cause negative impacts on livestock grazing. It also will have a tremendous visual impact on a very nearby Scenic Overlook on Highway 83, as well as the Dismal River which it will cross on an adjoining property. Alternate routing would avoid this environmentally, historically, and culturally sensitive area and the plentiful wildlife, Tribal, historic, and other resources located there.

30.     All of Petitioners' injuries, which are permanent and irreversible, result directly from Respondents' actions challenged in this lawsuit that fail to comply with the NHPA, its implementing regulations, and the APA. Because the area in which NPPD wishes to build the project is occupied by species listed under the ESA that will be harmed or otherwise taken by NPPD as part of R-Project construction and operation, NPPD cannot lawfully build the project without first obtaining an ITP that is issued in compliance with all federal laws. Consequently, FWS's decision to approve an ITP is both a "but for" and a proximate cause of the effects of the R-Project that threaten to irreversibly, irreparably harm Petitioners' and their members' interests in imminent, concrete ways.

31.     A Court order vacating the ITP, ROD, and related agency decisions challenged in this case (including the ACHP's guidance) pending further administrative review, or an injunction halting FWS's implementation of the ITP or NPPD's construction and operation activities pursuant to the ITP and related decisions, will redress Petitioners' injuries by preventing harmful project construction and adverse effects to historic properties, and by ensuring that FWS and the ACHP comply with the NHPA, its regulations, and the APA before NPPD may construct the R-Project.

32.    Respondent Matt Hogan is the Regional Director of the Mountain-Prairie Region of FWS. He is sued in his official capacity. Respondent Hogan has ultimate authority for the actions of FWS's Mountain-Prairie Region, including for the FWS actions challenged in this lawsuit.

33.    Respondent Doug Burgum is the Secretary of the Interior. Respondent Burgum is sued in his official capacity. In that capacity, Secretary Burgum has supervisory responsibility over FWS's actions, and thus has ultimate responsibility for the actions of FWS, including for the FWS actions challenged in this lawsuit.

34.    Respondent Brian Nesvik is the Director of the U.S. Fish and Wildlife Service. He is sued in his official capacity. Director Nesvik has ultimate responsibility for the actions of FWS, including for the FWS actions challenged in this lawsuit.

35.    Respondent Travis Voyles is Vice Chairman of the ACHP, currently exercising the authority of the ACHP Chairman. He is sued in his official capacity. Respondent Voyles has ultimate responsibility for the actions of the ACHP, including for the ACHP actions challenged in this lawsuit.

## BACKGROUND

## I.    RELEVANT STATUTES AND REGULATION

### A.    The National Historic Preservation Act

36.    Congress enacted the NHPA in 1966, with the express intent that "the historical and cultural foundations of the nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People." Pub. L. 89-665, 80 Stat. 915 (1966). Congress intended that the

18

NHPA will "insure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation," particularly in response to proposals to expand "industrial developments" in historically and culturally valuable areas. *Id.*

37.    Section 106 is the central provision of the NHPA. It requires that federal agencies, "prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. The term "undertaking" is broadly defined to mean "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency," and relevant here, expressly includes activities "requiring a federal permit, license, or approval." *Id.* § 300320; *accord* 36 C.F.R. § 800.16(y). "Historic property" is likewise broadly defined to include "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308. The goal of the Section 106 consultation process is "to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties." 36 C.F.R. § 800.1(a).

38.    The NHPA also established the ACHP, an independent agency with the authority to promulgate binding regulations to implement Section 106. *See* 54 U.S.C §§ 304101-304102, 304108. Relevant here, those regulations provide that agencies "must complete the Section 106 process *prior to* the approval of . . . the undertaking or *prior to* the issuance of any license." 36 C.F.R. § 800.1(c) (emphases added). Although agencies may authorize "nondestructive project planning activities before completing

compliance with section 106," they may do so only where "such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." *Id.* Agencies must also "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." *Id.*

39.    "Consultation" under Section 106 is "the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process." 36 C.F.R. § 800.16(f). The responsible agency official must ensure that the process provides stakeholders— including the State Historic Preservation Officer ("SHPO"), local governments, Tribes, and other interested parties (referred to as "consulting parties")—a reasonable opportunity to identify concerns about historic properties, advise on their identification and evaluation, articulate views on the undertaking's effects, and participate in resolving adverse effects. *Id.* § 800.2(a), (c).

40.    The Section 106 consultation process involves a detailed, four-step review. First, the agency must determine and document the area of potential effects ("APE") for the undertaking. 36 C.F.R. § 800.4(a)(1). The APE is "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." *Id.* § 800.16(d). The agency must then identify all historic properties within the APE that may be affected, using an appropriate level of effort based on the undertaking's scale and context. *Id.* § 800.4(b). The agency must

evaluate the historic and cultural significance of those properties and determine whether
they are listed, or eligible for listing, in the National Register of Historic Places
("NRHP"). *Id*. § 800.4(c). If so, the agency must assess the effects of the undertaking on
historic properties and determine whether any effects are adverse effects. *Id.* § 800.5.
Where adverse effects are found, the agency must consult to resolve them by
developing avoidance, minimization, or mitigation measures memorialized in a
Memorandum of Agreement ("MOA") or other binding instrument. *Id*. § 800.6. Thus,
"Section 106 review comprises four steps: initiation, identification, assessment [or
evaluation], and resolution." *United Keetoowah Band of Cherokee Indians v. FCC*, 933
F.3d 728, 745 (D.C. Cir. 2019) (citation and quotation marks omitted)).

41.     While federal agencies owe important, mandatory consultation duties to all
duly designated consulting parties during the Section 106 process, agencies owe
special, heightened duties to Native American Tribes, which are sovereign nations. For
this reason, incorporating the knowledge, views, and expertise of Tribes is central to the
NHPA and its Section 106 process.

42.     The regulations implementing Section 106 remind agencies of the "unique
legal relationship" between the federal government and "Indian tribes set forth in the
Constitution of the United States, treaties, statutes, and court decisions." 36 C.F.R. §
800.2. Accordingly, "[c]onsultation with Indian tribes should be conducted in a sensitive
manner respectful of tribal sovereignty," and also "must recognize the government-to-
government relationship between the Federal Government and Indian tribes." *Id.* In
particular, agencies:

> shall ensure that consultation in the section 106 process provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects.

*Id.* The agency must "make a reasonable and good faith effort to identify Indian tribes . . . that shall be consulted in the section 106 process," and "shall consult with a representative designated by such Indian tribe . . . regarding undertakings occurring on or affecting historic properties" of interest to the Tribe. *Id.* Additionally, to ensure a meaningful process that recognizes the relationship between the United States and Native American Tribes, "[c]onsultation should commence early in the planning process, in order to identify and discuss relevant preservation issues." *Id.*

43.     The Section 106 process requires agencies to "consult with any Indian Tribe . . . that attaches religious or cultural significance" to historic properties that may be affected by an undertaking. *Id.* § 800.4; *see also* 54 U.S.C. § 302706 (requiring agencies "in carrying out [their] responsibilities under [Section 106]," to "consult with any Indian tribe . . . that attaches religious and cultural significance to [historic properties that may be affected by the undertaking]"). "This requirement applies regardless of the location of the historic property." 36 C.F.R. § 800.4. In other words, consultation under Section 106 must occur regarding sites with "religious and cultural significance," even if they occur on ancestral or ceded land outside of a Tribe's reservation boundaries. *Id.*

44.     Agencies are also directed to "seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on

historic properties, the likely interest of the public in the effects on historic properties, confidentiality concerns of private individuals and businesses, and the relationship of the Federal involvement to the undertaking." *Id.* § 800.2.

45.     Where an agency determines that an undertaking "has the potential to cause effects on historic properties," it must initiate the Section 106 process, *id.* § 800.3—i.e., Step 1 of the process. At that step, the agency must "[d]etermine and document the area of potential effects" ("APE") of the undertaking. *Id.* § 800.4(a)(1). The APE is defined by regulation to include the area "within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties." *Id.* § 800.16(d). The size and scope of the APE "is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* The agency must determine the APE in consultation with the SHPO, and must seek information about such sites from consulting parties, individuals, or organizations "likely to have knowledge of . . . historic properties in the area," including Tribes. *Id.* § 800.4.

46.     Once the APE is delineated, the agency moves to Step 2 in the Section 106 process—identifying historic properties in the APE. There, the agency must "make a reasonable and good faith effort" to identify all historic properties within that area, in consultation with the SHPO and "any Indian tribe . . . that might attach religious and cultural significance to properties within the area of potential effects." 36 C.F.R. § 800.4(b). The agency must also identify properties within the APE that have not been

previously evaluated for eligibility for inclusion on the NRHP, but nevertheless meet the criteria for inclusion. *Id.* § 800.4(a)(4), (c).

47. "Where alternatives under consideration consist of corridors or large land areas . . . the [agency] may use a phased process to conduct identification and evaluation efforts." *Id.* § 800.4(b)(2). Final identification and evaluation of historic properties may also be deferred "if it is specifically provided for" in a PA, MOA, or other binding document specified in the regulations. *Id.* Under those circumstances, the agency "should establish the likely presence of historic properties within the [APE] for each alternative . . . through background research, consultation and an appropriate level of field investigation," and taking into account the views of the SHPO, Tribes, and other consulting parties. *Id.* The regulations require that the agency "proceed with the identification and evaluation of historic properties" as specific aspects of an alternative are "refined or access is gained." *Id.* Thus, even when an agency uses a phased approach, the identification of historic properties must take place prior to construction once more information about the pertinent area and any resources becomes available.

48. The NHPA authorizes the Secretary of the Interior to maintain the NRHP as a list of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering and culture." 36 C.F.R. § 60.1. "Site" is defined by regulation to broadly include "the location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself maintains historical or archeological value regardless of the value of any existing structure." *Id.* § 60.3. "Thus, a property may be defined as a

24

'site' as long as it was the location of a significant event or activity, regardless of whether the event or activity left any evidence of its occurrence." Nat'l Park Serv., NAT'L REG. BULLETIN NO. 38, *Guidelines for Evaluating and Documenting Traditional Cultural Properties* 9 (1998) [hereinafter NAT'L REG. BULLETIN NO. 38]. Moreover, "[a] culturally significant natural landscape may be classified as a site, as may the specific location where significant traditional events, activities, or cultural observances have taken place." *Id.* Accordingly, traditional cultural properties ("TCPs"), also sometimes referred to as traditional cultural places, are eligible for inclusion in the NRHP.

49.     A TCP is "defined generally as one that is eligible for inclusion in the [NRHP] because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." *Id.* Such properties may include "traditional cultural landscapes," which are large-scale historic properties of religious and cultural significance to Native American Tribes, "comprised of multiple, linked features that form a cohesive 'landscape.'" Advisory Council on Historic Pres., NATIVE AMERICAN TRADITIONAL CULTURAL LANDSCAPES ACTION PLAN (2011).

50.     Once historic properties within the APE are identified, the agency must evaluate the historic significance of such sites and determine whether they are potentially eligible for listing under the NRHP, before an agency can complete Step 2 of the Section 106 process. 36 C.F.R. § 800.4(c). When "assessing the eligibility of historic properties that may possess religious and cultural significance" to a Tribe, the agency must "acknowledge" the Tribe's "special expertise." *Id.* Where the agency determines

25

that a property meets the NRHP criteria and the SHPO agrees, "the property shall be considered eligible for the National Register for section 106 purposes." *Id.* Where the agency determines that the NRHP criteria are not met and the SHPO agrees, "the property shall be considered not eligible." *Id.* In the event of a disagreement between the agency and the SHPO, the agency must refer the determination to the Secretary of Interior. *Id.* "If an Indian tribe . . . that attaches religious and cultural significance to a property off tribal lands does not agree" with the agency's determination, "it may ask the [ACHP] to request the agency official to obtain a determination of eligibility" from the Secretary of Interior. *Id.*

51.    In Step 3 of the NHPA Section 106 process, the agency analyzes the effects to historic properties identified during Step 2. Thus, once the agency identifies historic properties that may be affected by the undertaking, the agency must "notify all consulting parties, including Indian tribes . . . , [and] invite their views on the effects and assess adverse effects" of the undertaking on those properties. 36 C.F.R. § 800.4.

52.    As at Step 2 in the process, the agency must at Step 3 consult with the SHPO and "any Indian tribe . . . that attaches religious and cultural significance to identified historic properties," and determine whether the undertaking will have "adverse effects" on the identified historic properties. 36 C.F.R. § 800.5. An adverse effect is defined by regulation to include situations "when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the [NRHP] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* In making

26

its determination, the agency must consider "all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the [NRHP]." *Id.* "Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.*

53.     If, as a result of the review of the undertaking's effects to historic properties at Step 3 of the process, the agency determines (in consultation with Tribes and other consulting parties) that there will be no adverse effects, then the agency's NHPA obligations are fulfilled and it may move forward with authorization and implementation of the undertaking. However, "[i]f an adverse effect is found, the agency . . . shall consult further to resolve the adverse effect[s]." *Id.* § 800.5.

54.     To resolve adverse effects on historic properties—i.e., Step 4 of the Section 106 process—the agency must "consult with the SHPO/THPO and other consulting parties, including Indian tribes . . . , to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6. The ACHP may participate in this resolution process. *Id.* If all of the Tribes and other consulting parties "agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement." *Id.* This MOA "evidences the agency['s] compliance with section 106 and [its implementing regulations] and shall govern the undertaking." *Id.* The agency shall ensure that the undertaking is carried out in accordance with the MOA.

27

55.     In the event that the parties are not in agreement about how to resolve adverse effects to historic properties—because "further consultation will not be productive"—the agency, SHPO, or the ACHP may terminate the consultation. *See* 36 C.F.R. § 800.7(a). Before consultation formally terminates, however, the agency must notify consulting parties; consulting parties are allowed to "provide their views" to the ACHP within a time period specified by the ACHP; the ACHP must be provided at least 45 days to supply comments to the agency; and the agency must make a final termination decision, supported by "the rationale for the decision and evidence of consideration of" the ACHP's comments. *Id.* § 800.7.

56.     As an alternative way of complying with Section 106, an agency, the ACHP, Tribes, and other consulting parties may enter into "programmatic agreement"— i.e., a PA—"to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." 36 C.F.R. § 800.14. Such agreements are suitable for "when effects on historic properties are similar and repetitive or are multi-State or regional in scope;" "when effects on historic properties cannot be fully determined prior to approval of an undertaking;" or when "nonfederal parties are delegated major decision-making responsibilities," among other situations. *Id.* § 800.14(b)(1). Whenever an agency proposes to use a PA in furtherance of its Section 106 compliance, the agency "shall ensure that development of the [PA] includes appropriate government-to-government consultation with affected Indian tribes." *Id.* § 800.14(f).

57.     The Section 106 implementing regulations identify three categories of signatories to PAs developed to identify and resolve the adverse impacts of a complex project. First, the agency, SHPO/THPO, and ACHP are "signatories" and "have sole authority to execute, amend or terminate the agreement." 36 C.F.R. § 800.6. Second, the agency may invite additional parties, including any Tribe that "attaches religious and cultural significance to historic properties located off tribal lands," to sign as "Invited Signatories." *Id.* These parties "have the same rights with regard to seeking amendment or termination" of the agreement as the signatories. *Id.* Finally, the agency may invite all consulting parties to sign as "Concurring Signatories." *Id.* The refusal of any Invited or Concurring Signatory to sign the agreement "does not invalidate" the agreement. *Id.*

58.     Where an agency opts to use a PA to govern the remainder of the Section 106 process, it still must refrain from authorizing project construction until all reasonable efforts have been made to identify resources, assess and determine adverse effects, and resolve effects, consistent with its Section 106 duties. *See* 54 U.S.C. § 306108 (requiring that the process be completed "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license"). To this end, agencies using a PA for a particular project must condition their subsequent issuance of a notice to proceed—or a similar legal authorization—contingent on the licensee first demonstrating full compliance with the terms of the PA (and thus Section 106). *See Tohono O'odham Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1195-96 (9th Cir. 2025) (discussing the import of a notice to proceed that is required before construction

may occur, and explaining that "[t]he requirements set forth in the PA must be satisfied before a notice to proceed is issued").

59.     In light of the paramount importance of preserving and protecting Tribal, historic, and cultural resources, Congress created only one exception in the NHPA for when an agency may waive the statute's mandatory requirements. Congress authorized the ACHP to "promulgate regulations under which the requirements of this subchapter (except section 306108 [i.e., Section 106]) may be waived in whole or in part in the event of a major natural disaster or an imminent threat to national security." 54 U.S.C. § 306112.

60.     The ACHP has promulgated a waiver regulation, which by its terms applies only to "an emergency undertaking [proposed] as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or another immediate threat to life or property." 36 C.F.R. § 800.12(b). If an undertaking meets these criteria, an agency may either: (1) "[f]ollow[] a [PA] developed pursuant to § 800.14(b) that contains specific provisions for dealing with historic properties in emergency situations"; or (2) notify the ACHP, the SHPO, "and any Indian tribe . . . that may attach religious and cultural significance to historic properties likely to be affected prior to the undertaking and affording them an opportunity to comment within seven days of notification." *Id.* 800.12(b)(2).

61.     Although Congress carved out an important exception by prohibiting the ACHP from waiving strict compliance with one provision of the NHPA (i.e., 54 U.S.C. §

306108—i.e., Section 106), the ACHP's emergency waiver regulation encompasses precisely those procedures contained in Section 106 that cannot be waived.

### B.    Executive Order 13175

62.    Issued in November 2000, EO 13175 directs federal agencies to engage in meaningful government-to-government consultation with Tribes, provide regulatory and statutory waivers to Tribes to increase flexible policy approaches at the Tribal level, and use consensual mechanisms for developing regulations on issues relating to Tribal self-government, Tribal trust resources, or Tribal treaty and other rights.[1]

### C.    Administrative Procedure Act

63.    Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; when they are issued in excess of statutory authority; or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

64.    An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

---

[1] The full text of Executive Order 13175 can be found at 65 Fed. Reg. 67249 (Nov. 9, 2000), https://www.govinfo.gov/content/pkg/FR-2000-11-09/pdf/00-29003.pdf.

65.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

66.     The APA also requires federal agencies to follow specific procedures before issuing a rule. Those procedures include: (1) publication of notice of the proposed rule in the Federal Register, 5 U.S.C. § 553(b); (2) a period for interested individuals to comment on the proposed rule, *id.* § 553(c); and (3) publication of the adopted rule not less than thirty days before its effective date, *id.* § 553(d). Whether those procedures apply depends on whether a rule is legislative (i.e., substantive), or instead interpretative. If a rule is legislative, which facilitates a change in existing law, the agency must use formal notice-and-comment procedures. Such procedures do not apply to interpretive rules, which merely explain, but do not add to, the substantive law that already exists.

## II.     FACTUAL BACKGROUND

67.     This Court's prior opinion provides a detailed factual background on the R-Project leading up to the Court's decision in 2020. *See OCTA*, 467 F. Supp. 3d at 1016-19. The Court's opinion also contains extensive discussion of NHPA issues in the context of FWS's original ITP (issued in 2019), including the legal violations the Court found in connection with the NHPA and FWS's arbitrary and capricious PA that preceded FWS's issuance of the original ITP. *See id.* at 1069-73. Below, Petitioners

supplement the Court's previous discussion with those facts that are essential to the specific legal violations alleged in this Petition for Review.

**A.    After the Court's Decision, FWS and NPPD Slow-Walked Renewed Section 106 Consultation for Several Years to the Detriment of Tribes and Other Consulting Parties**

68.    Although this Court vacated FWS's original ITP and remanded to FWS for further decisionmaking in June 2020—including to come into compliance with the NHPA—FWS and NPPD did not move swiftly in responding to the Court's order. Rather, FWS waited over two years, without explanation, before notifying Tribes, the SHPO, and other consulting parties (on August 25, 2022) that FWS was even contemplating renewed Section 106 consultation for the R-Project.

69.    During the two years between the Court's order and FWS's notification that it was reinitiating Section 106 consultation, Petitioner Rosebud Sioux Tribe learned about the R-Project for the first time and notified FWS that it had been impermissibly excluded from the original Section 106 consultation and PA that preceded FWS's issuance of the 2019 ITP. Specifically, on September 17, 2021, the Tribe sent a letter to FWS, notifying the agency that the original ITP process, culminating in the 2019 ITP that this Court vacated, "was completed without proper consultation with the Rosebud Sioux Tribe." The letter explained that the "long history of use and occupation of the Sandhills was not even acknowledged" by FWS in the original EIS or PA.

70.    In that same letter, the Tribe explained that "[t]he location of this proposed project falls within the 1851 Fort Laramie Treaty area and within Article 11 of the 1868 Treaty area, within the area specifically inhabited by the Sicangu Lakota, now of the

Rosebud Sioux Reservation." In addition, "[m]ultiple historic documents (Nicollet 1839, Warren 1855 & 1856, Bettelyoun and Waggoner 1999), Tribal Winter Counts (Mallery 1893, Cohen 1939), and Tribal oral histories describe the Nebraska Sandhills as the hunting grounds of the Sicangu (aka Brule) Lakota and many cultural sites significant to the Sicangu Lakota are located in this area"; "[w]inter counts describe Sicangu battles, catching wild horses and hunting in the Sandhills." Further, the letter explained that "[t]he Lakota language has specific names for certain areas of this country and for important cultural plants unique to the Sandhills." As a result, the letter concluded that "[t]he proposed project will have an adverse effect on this cultural landscape and this was not taken into consideration in the review process."

71.     That letter also criticized the fact that "[t]he Rosebud THPO was not consulted and [TCPs] were not even addressed in [the previous] cultural resource survey." The Tribe made clear that "[t]he Rosebud Sioux Tribe Historic Preservation Office must be included in the evaluation of cultural and historic resources in this area and a TCP survey must be conducted to address areas of cultural concern to the Sicangu Lakota."

72.     Correspondence from December 2022 indicates that despite FWS's notification of renewed Section 106 consultation in August 2022, NPPD had yet to submit a renewed ITP application by December 2022.

73.     On July 10, 2023—more than three years after this Court's order remanding to FWS for new decisionmaking—FWS formally initiated a renewed Section 106 process. Nothing in FWS's public record explains the three-year delay by FWS and

34

NPPD in initiating a renewed Section 106 consultation process that was plainly necessary before FWS could issue a new ITP in compliance with the NHPA.

**B.    FWS's Renewed Section 106 Process Results in Repeated Objections from Tribes, the SHPO, and Other Consulting Parties**

74.    From the beginning of the renewed Section 106 consultation process in July 2023, which for the first time included many new Tribes (including Petitioner Rosebud Sioux Tribe), Tribes raised serious concerns with FWS's and NPPD's previous efforts to identify relevant resources prior to FWS's issuance of the original ITP, which excluded the involvement of many Tribes that were only recently added to the Section 106 consultation process for the R-Project.

75.    As reflected in a June 12, 2024 letter from FWS, several meetings with Tribes in late 2023 and early 2024 resulted in serious "concerns about the Section 106 process" expressed by "[s]everal Tribal Nations." The letter explained that "[a] primary concern expressed by Tribal Nations was the need for cultural resource inventories by TCSs [Tribal Cultural Specialists] that focus on [identifying] properties of traditional religious and cultural importance within the [APE]." The meeting notes from this period (i.e., late 2023 and early 2024) also document the serious disagreements between Tribes on one hand, and FWS and NPPD on the other hand, focusing primarily on the lack of early, meaningful participation in the Section 106 process by the Tribes, the lack of good faith government-to-government consultation with the Tribes, and disputes about the proper mechanisms and survey methodologies for identifying Tribal, historic, and cultural resources in the R-Project's APE. FWS evaded the Tribe's concerns, pointing to FWS's purported lack of authority under the ESA or other laws to require

NPPD to consider, let alone adopt, routing alignment changes to the R-Project. Despite these disagreements, FWS "acknowledged that efforts to identify historic properties to date have been inadequate since these efforts lacked involvement from Tribal Nations."

76.    On March 1, 2024, Petitioner Rosebud Sioux Tribe submitted comments to FWS in response to FWS's Draft Supplemental EIS ("DSEIS"). The Tribe explained that because "the Tribes have not yet had an opportunity to conduct their cultural site surveys," FWS's issuance of the DSEIS prior to the completion of those surveys to identify relevant resources "is a violation of Section 106 of the [NHPA]." The Tribe described the four steps of the Section 106 process, and explained that FWS "is only in Step 2, Identifying Historic Properties, until the Tribes have completed their surveys," but FWS is impermissibly "attempting to jump from Step 2 to Step 4 [i.e., resolving adverse effects]." The Tribe explained that, in its experience with similar projects, companies such as NPPD only "care about getting projects completed in their preferred locations, without regard for the devastating, permanent, environmental and cultural site impacts this project will have"; "[o]nce this destruction is done—it can never be undone."

77.    Other consulting parties also raised vehement objections to the proposed R-Project route alignment and the significant, irreversible effects the transmission line would have on historic resources of national significance. For instance, Petitioner OCTA submitted comments both at the DSEIS scoping stage (on December 22, 2022) and as part of a coalition at the DSEIS comment stage (on May 8, 2024), pointing out the adverse effects that would decimate the setting and feel of various historic emigrant trails, the wagon ruts that mark the westward expansion of our nation, and important

36

features along those trails like O'Fallon's Bluff. OCTA concluded that "[t]he R-Project proposed route would permanently degrade, destroy, and impair the unique and iconic historic and cultural resources located in the path of the R-Project," noting that this "destruction would likely be irreversible, since much of the construction and maintenance activity associated with the R-Project would have a permanent effect on swales, ruts, and other aspects of these iconic resources." OCTA reached this conclusion based on past experience, which demonstrates that "[i]t does not take much human-caused disturbance to result in irreparable consequences" when ground-disturbing activities occur in this fragile Sandhills ecosystem.

78.    On August 2, 2024, FWS submitted a final cultural resources inventory report to Tribes and other consulting parties. On October 11, 2024, FWS submitted a draft finding of effect report to Tribes and other consulting parties for their review. According to FWS, these reports were "limited to an analysis of historic properties located or revisited during the 2015–2019 cultural resource surveys conducted in support of the project." In other words, because they were limited to the information known in 2019, the cultural resources inventory report and the draft finding of effect report did not include updated resource identification or an analysis of the effects on those resources, and instead relied on outdated information from several years before FWS allowed many of the Tribes to participate in that process. For this and other reasons, FWS explained in its Section 106 summary that "[c]omments from Tribal Nations and Consulting Parties indicated that the Draft FOE report was premature and

37

that the findings of effect on historic properties should not be made until all identification efforts (e.g., surveys) and evaluations are completed."

79.    As one example of Tribal concerns in response to the draft finding of effect report, Petitioner Rosebud Sioux Tribe submitted a letter on November 6, 2024 heavily criticizing FWS's handling of the Section 106 process to date. The Tribe explained that the draft report "is **premature, inaccurate, misleading and deceptive in its contents**." Highlighting what has been a repeated pattern with this project," the Tribe explained that "[t]his project is still in Step 2 (Inventory) of the Section 106 process," but FWS is, with the draft report, "attempting to jump to Step 3 (Assessing Effects)." After explaining FWS's many NHPA missteps with respect to the R-Project (and disagreeing with FWS's effects findings for several specific historic properties), the Tribe explained its expert view, based on dozens of other Section 106 processes, that "[t]his is not good faith consultation," including because FWS is "bulldozing ahead with this project regardless of what is said in the repetitive meetings with Tribes." Thus, the Tribe "request[ed] that this draft document be discarded and a new, accurate, complete and comprehensive Finding of Effect document be produced at the completion of the cultural sites inventory (both archaeological and tradition[al] cultural properties surveys) and that it includes all direct effects from this proposed project in one document."

80.    On November 15, 2024, Petitioner Rosebud Sioux Tribe sent another letter to FWS, this time urging FWS not to use a phased identification approach in which FWS would issue an ITP to NPPD before all historic and cultural resources are identified, thus allowing the R-Project to be built in segments, with resource

38

identification completed in each segment before construction, but thus allowing earlier segments to be built before all resources along the remainder of the proposed route have been identified. The Tribe explained that it "is strongly opposed to a phased identification approach for cultural resources on this project," and that "[i]t is critical that the full effects that this proposed project would have on all cultural resources must be fully determined and evaluated by the Tribes prior to any issuance of an [ITP]." In addition, the Tribe reminded FWS that "[t]he part of this proposed project that crosses the pristine northern section of the Ogallala Aquifer is part of a Traditional Cultural Landscape with archaeological sites spanning 10,000 years and unique plants and animals that still thrive in this last, relatively undisturbed, remnant of this fragile ecosystem." Hence, the Tribe concluded that this unique landscape is "too important to try to fast-track" the R-Project's Section 106 process and ITP approval.

81.     On November 18, 2024, the Nebraska SHPO concurred in the Tribal concerns and comments. For example, in the SHPO's expert view, FWS "has rushed the Section 106 Process." In particular, the SHPO agreed with the Tribes that "it is clear that *the initial cultural resource inventory is incomplete,* so distributing a Finding of Effect (FOE) is premature." The SHPO also concurred that "[d]iscussion of Assessed Effects (i.e., Step 3 of the Section 106 Process) and Mitigation Strategies (i.e., Step 4 of the Section 106 Process) should only occur after the Identification of Historic Properties and Traditional Cultural Properties (i.e., Step 2 of the Section 106 Process) has been completed sufficiently."

39

82.    On November 21, 2024, FWS hosted a meeting with Tribes and other consulting parties. There, the Tribes once again "expressed continued disagreement with the phased approach to the Section 106 process." FWS later explained that "[t]he problem in [the Tribes'] view was that this was a segmented approach that opened the door to pushing the project forward one segment at a time, reducing options for avoidance." In response, FWS "stated that it would not approve construction if doing so would prevent appropriate Section 106 processes from occurring for that portion of the line." The Tribes "reiterated opposition to the phased approach and expressed the view that all surveys by TCSs should be completed before [any] construction began."

83.    On January 9, 2025, FWS responded to Petitioner Rosebud Sioux Tribe's two letters from November 2024. There, FWS acknowledged that "the 2014 to 2019 efforts, and subsequent reports prepared using data from those efforts, do not reflect the special expertise and traditional knowledge of Tribal Nations, as previous surveys did not include Tribal Cultural Specialists (TCS)." FWS also "acknowledge[d] that there are outstanding efforts related to identifying, evaluating, assessing, and resolving adverse effects to historic properties and places of traditional religious and cultural importance to Tribal Nations." Although FWS agreed "that surveys by TCSs must be completed in the APE for direct, physical effects," FWS (via DOI) denied the Tribes' requests "that these surveys be conducted within the [broader] APE for visual effects."

84.    In that same letter, FWS explained that it "has proposed to amend the [2019] PA to sunset upon execution of a new PA, which is currently in development in consultation with Tribal Nations and consulting parties." It noted that a "PA is a process

40

document that enables the signatories to agree on the process and obligations remaining under Section 106 following the execution of the PA"; "[i]mportantly, a PA does not mark an endpoint in the Section 106 process," but rather "it outlines how the responsible parties will conduct outstanding efforts for identification, assessment of effects, resolution of adverse effects, and post-review discoveries, and how the ACHP, SHPO, Tribal Nations, and other consulting parties will be consulted and informed throughout the process."

85.     Despite the Tribes' (including Petitioners Rosebud Sioux Tribe's) repeated requests for FWS not to utilize a phased, segment-by-segment approach to resource identification and effects resolution—thereby allowing R-Project construction to occur in phases, before resources are identified in all other segments—FWS stated that it nonetheless would be developing a PA that "will contain stipulations for a phased finding of effect process." But FWS committed that "[t]his finding of effect process, as outlined in the PA, should take place sufficiently in advance of construction to ensure feasibility of avoidance and minimization measures."

86.     In that letter, FWS also "acknowledge[d] that Tribal Nations possess special expertise in assessing the eligibility of historic properties and properties of traditional religious and cultural importance to them and that traditional knowledge is an integral part of that special expertise." Thus, it stated that "[f]or the purposes of Section 106, this traditional knowledge is used for identifying, evaluating, assessing, and resolving adverse effects to historic properties and places of religious and cultural significance to Tribal Nations." FWS also recognized that "there are outstanding efforts

41

related to identifying, evaluating, assessing, and resolving adverse effects to historic properties, to include traditional cultural landscapes and properties of traditional religious and cultural importance to Tribal Nations."

### C.     President Trump Issues EO 14156, the ACHP Issues Its New Emergency Waiver Guidance, and DOI Also Issues Guidance

87.     On his first day in office (January 20, 2025), President Trump issued EO 14156, titled "Declaring a National Energy Emergency."[2]

88.     Claiming authority under "the National Emergencies Act (50 U.S.C. 1601 *et seq.*)," EO 14156 states President Trump's view that "[t]he energy and critical minerals . . . identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs," so much so that it purportedly "causes and makes worse the high energy prices that devastate Americans" and worsens "our Nation's diminished capacity to insulate itself from hostile foreign actors."

89.     Pointing to those ostensible threats, EO 14156 states that "[t]he policies of the previous administration have driven our Nation into a national emergency, where a precariously inadequate and intermittent energy supply, and an increasingly unreliable grid, require swift and decisive action"; "[w]ithout immediate remedy, this situation will dramatically deteriorate in the near future due to a high demand for energy and natural resources to power the next generation of technology." The EO states, without further

---

[2] The full text of EO 14156 can be found at https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/. It is also published in the Federal Register. *See* 90 Fed. Reg. 8433 (Jan. 29. 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02003.pdf.

explication, that this purported energy emergency "poses an imminent and growing threat to the United States' prosperity and national security." Although the EO explains that these "problems are most pronounced in our Nation's Northeast and West Coast," EO 14156 nonetheless "declare[s] a national emergency."

90.     To address the purported national energy emergency, EO 14156 calls upon "[t]he heads of executive departments and agencies" to "identify and exercise any lawful emergency authorities available to them . . . to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands." To this end, EO 14156 specifies that heads of agencies "shall identify and use all lawful emergency or other authorities available to them to facilitate the supply, refining, and transportation of energy in and through the West Coast of the United States, Northeast of the United States, and Alaska." EO 14156 clarified that it "shall be implemented consistent with applicable law."

91.     On February 25, 2025, the ACHP issued guidance purporting to advise federal agencies on actions responding to the national energy emergency declared in EO 14156.[3]

92.     While explaining that "[i]t is the federal agency's responsibility to determine whether a proposed undertaking is subject to EO 14156 and responsive to the declared emergency," "agencies should follow the terms of any applicable Section 106 agreement that contains emergency provisions, when such agreements exist." In the

---

[3] The full text of the ACHP's February 19, 2025 guidance can be found here: https://www.achp.gov/Section_106_and_Energy_Emergency.

absence of a PA, MOA, or other agreement that contains emergency provisions, the ACHP advised that "agencies can avail themselves of the expedited emergency provisions in Section 800.12(b)(2) of the Section 106 regulations, which require, "prior to the undertaking," notice to, and an opportunity to comment within seven days by, the ACHP, Tribes, SHPO, and (if time allows) other consulting parties.

93.    With respect to undertakings that initiated a Section 106 process prior to the issuance of EO 14156, the ACHP's energy emergency guidance stated that "[a]gencies should exercise reasonable application of this advice to proposed undertakings currently undergoing Section 106 review and consultation." Thus, the ACHP advised that "[f]or reviews close to completing consultation, for instance, agencies should continue the process to obtain the relevant concurrence of the consulting parties on an effect finding or to finalize and execute a Section 106 agreement resolving any adverse effects"; "[h]owever, an agency may determine the expedited review process is warranted for a proposed undertaking for which a Section 106 review has been initiated." In the event an agency does the latter, "the agency should clearly articulate the rationale for the change in its approach to compliance and share that information with the consulting parties."

94.    While acknowledging that "Section 800.12 only applies for 30 days following an emergency declaration," the ACHP nevertheless decided, "pursuant to Section 800.12(d), [to] hereby extend[] the applicability of the Section 106 emergency provisions to run for the duration of the Presidential declaration" contained in EO 14156. The only rationale given by the ACHP for this departure from the plain text of the

agency's regulations is that "[s]uch an extension is consistent with the National Emergencies Act, where an emergency declaration remains in effect until rescinded by the President or through a concurrent resolution by Congress." The ACHP did not point to any place in the NHPA where Congress conferred such authority.

95.     Although not addressed by the ACHP's February 25, 2025 guidance, prior (and still-operative) ACHP guidance more generally applicable to all natural disasters and other emergencies specifies that "[t]he emergency situations section of the Section 106 regulations applies only to undertakings that will be implemented in response to the disaster or emergency within 30 days after the disaster or emergency has been formally declared by the appropriate authority or, in the case of another immediate threat to life or property, within 30 days after such an event occurs."[4]

96.     On April 23, 2025, DOI issued its own NHPA emergency guidance in response to EO 14156, titled Emergency Process for Section 106 Compliance.[5]

97.     DOI's guidance points to 36 C.F.R. § 800.12, stating that it allows for "an ad hoc process for undertakings responding to an emergency declaration when there is no formal emergency procedure or an applicable PA." The guidance notes that this modest, ad hoc approach "involves complying with certain minimal requirements, but . . . allows for expedited approval of undertakings that respond to the emergency."

---

[4] The full text of the ACHP's emergency procedure guidance can be found here: https://www.achp.gov/digital-library-section-106-landing/role-section-106-disaster-response-frequently-asked-questions.

[5] The full text of DOI's emergency procedure guidance can be found here: https://www.doi.gov/sites/default/files/documents/2025-04/alternative-procedures-section-106-compliance-2025-04-23-signed_1.pdf.

98.    In its guidance, DOI pointed to the ACHP's separate guidance, noting that "[t]he ACHP's guidance implicitly interprets its Section 106 regulations regarding emergencies, identified in the regulations as a 'disaster or emergency declared by the President . . ., or another immediate threat to life or property,' 36 C.F.R. § 800.12(b), as applying to the energy emergency declaration." In addition, DOI emphasized that the ACHP's "guidance also extends the time in which an agency may use the emergency provisions for an applicable undertaking relating to EO 14156 from 30 days to a period coinciding with the duration of the emergency declaration."

**D.    The R-Project Section 106 Process Continues, Despite EO 14156**

99.    For more than seven months after President Trump issued EO 14156— and for six months after the ACHP issued its energy emergency guidance (and for four months after DOI issued its guidance)—FWS, NPPD, Tribes, and other consulting parties continued with the Section 106 process.

100.    During that time frame (between January 20, 2025 and August 21, 2025), Petitioners are not aware of correspondence from FWS (or any other entity) indicating that EO 14156 might apply to the R-Project, let alone attempting to demonstrate that the R-Project satisfies the stringent regulatory criteria for emergency procedures—i.e., that the R-Project is "an essential and immediate response to a disaster or emergency declared by the President . . . or another immediate threat to life or property." 36 C.F.R. § 800.12(b). Rather, Tribes and other consulting parties were led to believe during this time frame that the Section 106 process would be completed consistent with the procedures contained in the NHPA and its implementing regulations.

101.    On May 2, 2025, FWS emailed consulting parties a revised draft PA for their review and comment, along with a comment matrix in which FWS responded to comments from consulting parties submitted between January and March of 2025.

102.    In response to the revised draft PA, consulting parties submitted comments. For instance, Petitioner OCTA reiterated its "objection to the proposed location of the NPPD transmission line and associated infrastructure that will have a direct effect on the Oregon-California National Historic Trail and the Mormon Pioneer National Historic Trail and other cultural resources in the O'Fallon's Bluff region." It reminded FWS that "OCTA has consistently requested that, if the project moves forward, the transmission line and associated infrastructure be moved further east of its present proposed location to avoid harm and destruction of these historic resources." After summarizing the foreseeable, permanent effects to several historic trails and related properties, OCTA concluded: "There is no question that the present alignment of R-Project transmission lines and associated infrastructure will have both direct and indirect effects on the historic significance of the region."

103.    Likewise, Petitioner Rosebud Sioux Tribe submitted comments, reiterating that a phased resource identification and effects resolution process through a PA "is not appropriate for this important project and [we] stand by our request that the **Standard 106 Process** [be] followed." The Tribe explained that a PA is "used as a shortcut to streamline and expedite the Section 106 process in certain instances," such as when "the agency cannot fully determine how a particular undertaking may affect historic properties prior to approving a project." But, "[a] PA is **not** appropriate in the case of the

47

R-Project where the agency is fully capable of determining how this proposed undertaking will affect historic properties prior to approving the project." Accordingly, the Tribe explained that "[t]hjs route must be fully inventoried, and site significance evaluated, prior to any approvals or permits being issued as some adverse effects to significant sites cannot be mitigated." The Tribe also explained once again that "**Tribes have been opposed to this phased process from the beginning and have stated such many, many, times**"; "**[t]his decision to bulldoze ahead with a phased approach was not 'made in consultation with Tribal Nations' as stated in this PA.**"

104.    On July 15, 2025, FWS emailed Tribes and other consulting parties in an effort to short-circuit aspects of the Section 106 process. Although NPPD had not submitted a request for emergency alternative procedures under the NHPA for the R-Project, nor had FWS determined that EO 14156 or the ACHP's regulations apply to the R-Project to invoke emergency alternative procedures, FWS pointed to EO 14156 in notifying the Tribes that FWS unilaterally "made the decision to no longer require intensive pedestrian surveys by TCSs throughout the entire APE for Physical Effects." Instead, FWS decided "that intensive pedestrian surveys be utilized [only] in areas of high probability for properties of traditional religious and cultural importance" within the APE for Physical Effects. FWS set forth a process by which Tribes would "identify areas of high probability for properties of traditional, religious, and cultural importance, and develop survey methodology by TCSs for these areas"; FWS would supply that information to NPPD; and then NPPD and a consultant would work with Tribes to "develop documentation of the TCS survey logistics . . . in Tribal Participation Plans."

48

105.    In that same email, FWS stated that it "must prioritize its efforts on completing the programmatic agreement (PA) development in the coming months," which will "memorialize the TCS identification efforts and the process for completing identification, evaluation, assessment, and resolution of effects on historic properties." FWS explained that "[a]fter the PA is executed, [FWS] will continue Section 106 consultation pursuant to the terms of the PA."

106.    The following day (i.e., July 16, 2025), FWS submitted a revised draft PA to consulting parties for review. FWS explained in the accompanying email that "this version of the PA will be published as part of the [FSEIS]," although FWS noted that "this version of the PA is not final and is subject to additional revisions pending input from Tribal Nations, Consulting Parties, and the public." Although this PA was never finalized—as explained below—it provides a baseline comparison of what FWS viewed as necessary to comply with Section 106, prior to FWS waiving the normal Section 106 procedures in lieu of emergency alternative procedures.

107.    The revised draft PA stated that FWS "recognizes Tribal Nations as Sovereign Nations and therefore acknowledges its separate and independent trust obligation to engage in government-to-government consultation with Tribal Nations, which is met in part by consultation under Section 106 of the NHPA, and is ongoing throughout Undertaking implementation."

108.    The draft PA explained that "efforts to identify historic properties have not been completed and consultation on identification and evaluation of historic properties, findings of effects on historic properties, and resolution of adverse effects will be carried

49

out in accordance with this Agreement." Thus, the PA proposed "a phased process to identify historic properties (36 CFR 800.4(b)(2)) and assess the effects on those historic properties (36 CFR 800.5(a)(3)), such that the completion of the identification and evaluation of historic properties, findings of effects on historic properties, and consultation concerning measures to avoid, minimize, or mitigate any adverse effects on historic properties may be carried out on a construction segment-by-construction segment basis as part of planning for and prior to a Notice to Proceed (NTP) for a construction segment and Undertaking implementation."

109.    In the revised draft PA, FWS stated that it "acknowledges that Tribal Nations possess special expertise in identifying properties of traditional religious and cultural importance, assessing effects on historic properties, and resolving adverse effects on those historic properties." To that end, the draft PA explained that FWS "has determined that efforts to identify and evaluate properties of traditional religious and cultural importance to Tribal Nations will be completed by Tribal Cultural Specialists (TCS) within identified areas of interest and defined in Tribal Participation Plan(s)." The draft PA also made clear that Tribes and other consulting parties would be consulted by FWS in "making determinations of NRHP eligibility; findings of effects on historic properties, [and] resolving adverse effects through the development of avoidance, minimization, and mitigation measures." The draft PA stated that FWS "will seek, discuss, and consider views of Tribal Nations throughout the Section 106 process as described in this Agreement," and provided a number of specific circumstances where FWS "will coordinate and consult with Tribal Nations." The draft PA also explained that

FWS "will ensure that identification and evaluation of historic properties within the APE of each construction segment, including properties of traditional religious and cultural importance to Tribal Nations, are completed prior to determining effects and resolving adverse effects on historic properties within that construction segment."

110.    The revised draft PA also explained that "[a]voidance is the preferred strategy for resolving effects on historic properties." FWS committed, as part of the draft PA, to consult with Tribes and other consulting parties in the event that adverse effects could not be avoided, to resolve adverse effects by negotiating mitigation measures. As part of the resolution of effects, FWS agreed to consult with Tribes and other consulting parties about all avoidance, minimization, mitigation, and monitoring measures, as well as technical reports analyzing such measures, and committed to a minimum 45-day review period for Tribes and other consulting parties "on all work plans, documents, reports, resource evaluations of significance, HPTP [Historic Properties Treatment Plan], and specifications that are developed under the terms of this Agreement."

111.    The revised draft PA contained important prerequisites that must be satisfied before FWS could issue any notice to proceed with construction on any particular segment of the R-Project. FWS could only issue such notice where: (1) no historic properties are present within the APE for that construction segment; (2) "[h]istoric properties are present within the APE for that construction segment but will not be adversely affected"; or (3) for those segments where there are historic properties that will be adversely affected, FWS may issue a notice to proceed only after the

51

development of an HPTP and implementation of the pre-construction portions of the HPTP for historic properties within that segment of the R-Project APE.

112.    The revised draft PA also explained the dispute resolution process that would govern during the implementation of the PA. "Should the SHPO, Tribal Nation, or any Consulting Party object to an assessment of effects made under Stipulation IV, *Phased Process to Address Historic Properties*, and the objection cannot be resolved, the parties will follow regulations in 36 CFR 800.5(c)(2) to resolve the disagreement." Likewise, "[i]f at any time during the implementation of the measures stipulated in this Agreement, an objection should be raised by SHPO, Tribal Nations, or Consulting Parties concerning evaluations of historic properties, assessment of effects on historic properties, or  proposing treatment measures that have not previously been considered by []FWS, []FWS will determine if the objection is valid, and, if so, it will notify the Signatories and Invited Signatories to this Agreement and consult with the objecting party to seek resolution."

113.    Coincidentally, the revised draft PA contained a section regarding emergency procedures that might arise during implementation of the PA. However, the parties to the PA (including FWS and NPPD) agreed that these procedures would only be triggered "where a situation occurs that requires NPPD to promptly respond" to implement "emergency actions as an immediate and direct response to an emergency situation," in response to "a disaster or emergency is declared by the President or the Governor of Nebraska or if there are other immediate threats to life and property."

52

114.    In the comment matrix that accompanied the July 16, 2025 draft PA, FWS explained that "[b]ased on [FWS's] current understanding, the applicant [i.e., NPPD] is not planning on using alternate procedures" by relying upon EO 14156.

**E.    NPPD Belatedly Seeks to Avail Itself of EO 14156, Not Because of Any Emergency But Instead to Short-Circuit the Section 106 Process**

115.    One month after circulating the revised draft PA and explaining that NPPD was not planning to invoke EO 14156, NPPD notified FWS on August 22, 2025—more than seven months after President Trump declared the purported energy emergency—that NPPD now desired to invoke emergency alternative NHPA procedures pursuant to EO 14156. For nearly five months, however, FWS did not notify the consulting parties of NPPD's request.

116.    In its August 22, 2025 request, NPPD asserted that, if granted by FWS, "[t]he alternative arrangements will enable the long-overdue construction of infrastructure that is necessary to improve delivery of affordable and reliable electricity from NPPD's diverse mix of coal, natural gas, hydropower, nuclear, and renewable generation sources, to respond to the national energy emergency, as declared in Executive Order 14156." NPPD also asserted that the R-Project would "connect[] to the largest coal-fired power plant in Nebraska and will improve delivery of energy from the plant to NPPD customers across the state."

117.    While supplying a list of "interim measures" NPPD has adopted in recent years after this Court's prior opinion, NPPD claimed that it "faces an increased risk of controlled power outages for customers in north-central Nebraska, or worse, as a direct result of delays in the R-Project as customer load levels exceed the available

transmission capacity in that area." However, nowhere in its letter or supporting documentation did NPPD actually quantify this purported risk—risk that NPPD has adequately managed since the R-Project was intended to become operational in 2018, including in the six years since this Court remanded for lawful decisionmaking. Nor did NPPD quantify that risk specifically during the relatively short time period of "18 months" that NPPD believed R-Project construction would be "delay[ed]" if the Section 106 process were to play out in the normal, lawful manner as Congress intended. Thus, while asserting a number of generic long-term risks to grid reliability, nowhere in its letter or supporting documentation did NPPD identify any immediate energy emergency (let alone a threat to life or property) in NPPD's service area to which NPPD must imminently respond, nor did NPPD even purport to demonstrate that the R-Project is an essential and immediate response to EO 14156 or any other emergency.

118.    Rather than demonstrating an actual emergency warranting the waiver of the NHPA's procedures in lieu of truncated alternative procedures, NPPD's letter made clear that availing itself of EO 14156 was simply a pretext to avoid any further consultation with Tribes and other consulting parties, as required by the NHPA, because of its inconvenience to NPPD. In the letter, NPPD asserted that the Section 106 consultation "spiraled out of control with prior administration [DOI] leadership approving an unprecedented tribal survey effort and allowing tribal control over the methodology to be used during the consultation." NPPD criticized FWS's draft PA and the unremarkable fact that it "envisions that *before construction begins*, NPPD must develop and conduct multiple reviews of areas within and beyond those that could be physically

affected by the R-Project with methodologies to be identified by consulting parties and that []FWS will hold a series of review periods on the yet-to-be-developed plans using those yet-to-be-identified methodologies." Hence, instead of seeking to immediately respond to EO 14156 because of a legitimate energy emergency in NPPD's service area, NPPD sought to use EO 14156 to bypass the Section 106 process and exclude Tribes and other consulting parties from the remaining steps in the NHPA process.

119.   On January 13, 2026—i.e., five months after receiving NPPD's request— FWS, through DOI, approved NPPD's use of emergency alternative procedures for the R-Project. FWS explained that "NPPD agreed to implement, to the extent prudent and feasible, measures that avoid or minimize harm to historic properties." Without any demonstration that the R-Project is essential to imminently relieve any emergency nationally or within NPPD's service area—let alone any discussion at all about the existence of any emergency warranting prompt action by NPPD—FWS explained that it had "approved NPPD's use of alternative procedures for compliance with Section 106 of the NHPA for the R-Project in response to the national energy emergency."

120.   By way of approving emergency alternative NHPA procedures, FWS explained its view that it is "directed to comply with the requirements of Section 106 by following an ad hoc process for undertakings responding to an emergency declaration when there are no formal emergency procedures in place." Invoking 36 C.F.R. § 800.12(b)(2), FWS provided a mere seven days for Tribes and the SHPO to comment on FWS's approval of emergency alternative procedures under the NHPA.

121.    In its approval letter, FWS acknowledged some of the agency's shortcomings in the Section 106 process. For instance, FWS explained that "prior field survey efforts," most of which were conducted before FWS's issuance of the 2019 ITP, "did not include Tribal Cultural Specialists," and thus had not yet identified Tribal resources, let alone determined effects to those resources or resolved those effects through consideration of alternatives to avoid, minimize, or mitigate adverse effects. This is precisely why FWS, prior to approving emergency alternative procedures, was "developing a new [PA]," "detail[ing] historic property identification efforts including processes to: 1) address the completion of identification and evaluation of historic properties; 2) develop findings of effects on historic properties; and 3) develop measures to avoid, minimize, or mitigate any adverse effects on historic properties."

122.    Despite the effort of Tribes and consulting parties, where those entities "made progress on the Draft PA for Section 106 compliance," FWS asserted that "[t]he consultation process of developing and executing a PA for the Project, including finalization of the Draft PA, is not feasible due to time constraints associated with the National Energy Emergency." FWS did not articulate the purported time constraints or explain why finalizing and implementing the Draft PA was infeasible.

123.    Along with its letter, FWS included two appendices. The first "includes the measures to which NPPD committed to avoid and minimize harm to historic properties as part of [its] request for use of the alternative emergency NHPA procedures." The second "includes the Tribal Monitoring Program Commitment to which NPPD committed

under the alternative NHPA procedures." No Tribes or consulting parties had any involvement in, or provided input on, either of those appendices.

124.    Despite the very brief seven-day comment period, Tribes and other consulting parties submitted comments strenuously objecting to FWS's approval of emergency alternative procedures in lieu of the mandatory Section 106 process.

125.    For example, Petitioner Rosebud Sioux Tribe submitted comments in which it stated that it "is strongly opposed to the 'alternative procedures' you are proposing and stand by our previous comments, that we have repeatedly expressed to you in writing, in person, and on numerous [Z]oom meetings, that the Standard [NHPA] Section 106 process is the only acceptable action in this case." The Tribe further explained that "[i]t is critical to the Rosebud Sioux Tribe that the full effects this proposed project would have on all cultural resources must be fully determined and evaluated by the Tribes prior to any issuance of an [ITP] by [FWS] across this unique and significant cultural landscape." The Tribe explained its view that "[EO] 14156 does not apply" to the R-Project, and therefore "[t]his is just another in a long line of attempts by NPPD to circumvent the NHPA Section 106 process on this ill-conceived R-Project."

126.    The Tribe further explained that "[t]he adverse effects of this project extend well beyond the seven sites mentioned in your letter, as there are actually 543 significant sites (those listed on the [NRHP] or Eligible [for] listing) already recorded within the area of potential effect and that is before the Tribes have had a chance to conduct our inventories." It also noted that "[a]llowing the Tribes to 'monitor,' or observe, the destruction of significant historic and cultural sites is not an acceptable 'mitigation'

option"; this monitoring is instead "an insulting joke and we wholeheartedly reject it as an 'alternative' to the NHPA Section 106 process." Thus, the Tribe concluded that "these 'alternative procedures' would not meet the obligations of the NHPA and NEPA; they are in fact in direct violation of these laws."

127.    Petitioner OCTA also submitted comments, along with other coalition partners, in response to FWS's January 13, 2026 letter approving the use of emergency alternative NHPA procedures. There, OCTA and its coalition partners: (1) questioned the validity of the national energy emergency declared by President Trump in EO 14156; (2) objected to the ACHP's blanket, indefinite extension of the use of emergency alternative NHPA procedures beyond the regulatory 30-day time limit; (3) criticized the failure of FWS or NPPD to establish a genuine energy emergency specific to the R-Project or NPPD's service area to bring it within the ambit of EO 14156; (4) pointed out the delay by NPPD and FWS in invoking and approving, respectively, the use of emergency alternative procedures many months after the issuance of EO 14156; and (5) emphasizing the arbitrariness of FWS's decision to walk away from a nearly three-year consultation process that was on the verge of finalizing a PA to govern implementation of resource identification, effects analysis, and the resolution of adverse effects over a short time frame relative to the length of the renewed consultation that had already taken place (let alone the time that had elapsed since NPPD first sought an ITP). OCTA explained that "FWS's decision to invoke emergency alternative procedures under the NHPA is deeply troubling and patently illegal."

**F.     FWS Ignores Comments, Proceeds with Emergency Alternative NHPA Procedures, and Issues a New ITP**

128.    On January 29, 2026, FWS issued its FSEIS and various appendices.

129.    In the FSEIS, FWS explained that "[t]o date, surveys have identified 649 NRHP-listed, NRHP-eligible, or unevaluated cultural resources in the APE." The agency explained that "[o]f these resources, six have been individually listed in the NRHP (one listed resource has since been demolished), 132 have been determined eligible for the NRHP (at least one of these resources has since been demolished), and 511 are unevaluated for the NRHP."

130.    The FSEIS explained that Tribal resources—which have not yet been surveyed, let alone identified or analyzed—"can have natural, spiritual, and cultural value." FWS also explained in the FSEIS that "the Rosebud Sioux Tribe described Tribal resources of concern in the project area, including archaeological sites, unique plants, animals, the Sandhills ecosystem, and water, which is an important aspect of Tribal subsistence and cultural practices and is a sacred element that ensures physical and psychological well-being (Larned 2018)." Likewise, "[t]he Rosebud Sioux Tribe described water, specifically the Ogallala Aquifer (which underlies the [R-Project] study area), as a TCP and the proposed project area as part of a Traditional Cultural Landscape." Despite the fact that many significantly cultural resources were not yet identified (let alone analyzed or resolved in terms of adverse effects), the FSEIS stated that "[a]dverse effects on Tribal resources will be addressed through the implementation of alternative procedures for compliance with Section 106 (36 CFR 800.12(b)(2))."

131.    The FSEIS also briefly addressed TCPs. It explained that a "traditional cultural place (formerly, 'property') is a building, structure, object, site, or district that may be eligible for inclusion in the National Register for its significance to a living community because of its association with cultural beliefs, customs, or practices that are rooted in the community's history and that are important in maintaining the community's cultural identity." Thus, the FSEIS noted that "TCPs can be considered historic properties if they are associated with cultural beliefs, customs, or practices of a living community that: (1) are rooted 25 in that community's history; and (2) are important in maintaining the community's cultural identity." Importantly, the FSEIS explained that "[c]onsultation indicates that TCPs to which Tribal Nations ascribe traditional religious or cultural significance are likely to be in the APE." Yet, although FWS had not actually identified any TCPs or defined their boundaries—or analyzed or resolved effects to TCPs—the FSEIS stated, without explanation, that "[a]dverse effects on TCPs will be addressed through the implementation of alternative procedures for compliance with Section 106 (36 CFR 800.12(b)(2))."

132.    Because of the use of emergency procedures, FWS explained in the FSEIS that it would neither finalize the PA that it had worked to develop with consulting parties, nor continue to work on and ultimately finalize the Finding of Effect report after identifying all relevant resources and analyzing the R-Project's effect to them. Rather, FWS walked away from both of those ongoing processes, opting instead to let NPPD implement only those actions to which NPPD unilaterally committed in requesting to invoke emergency alternative NHPA procedures.

133.    On February 11, 2026, FWS notified stakeholders (including some Petitioners) that it had issued an ITP to NPPD the previous day. Along with its findings in support of the ITP (along with several other final documents related to ESA and NEPA compliance, including the Record of Decision that finalized the NEPA process), FWS included on its R-Project website a document containing R-Project terms and conditions adopted by FWS related to the NHPA. This document is titled "U.S. Fish and Wildlife Service Requirements under the National Historic Preservation Act for Endangered Species Act Incidental Take Permit ESPER7357373-0."

134.    In its NHPA Requirements document, FWS stated that "NPPD will be required to implement the measures described in this document to address adverse effects on historic properties." But, in reality, the document is thin on resource identification, let alone effects analysis and resolution of effects through the consideration of alternatives to avoid, minimize, and mitigate adverse effects. In fact, the document qualifies the requirement for NPPD to implement "measures that avoid or minimize harm to historic properties," such that NPPD must only do so "to the extent prudent and feasible," as determined unilaterally by NPPD.

135.    Moreover, FWS let NPPD entirely off the hook for identifying Tribal, historic, or cultural resources—many of which are still unknown in the R-Project proposed route—stating that "[n]o further NHPA identification efforts are required for the R-Project, including the 7% of the R-Project that has not been surveyed to date, under 36 CFR 800.4 due to use of Alternative Procedures and use of the ad hoc process per 36 CFR 800.12(b)(2)." Instead, FWS allowed NPPD to rely merely upon construction

monitoring in a few locations, asserting that FWS "has determined that the construction monitoring program appropriately avoids and minimizes harm to historic properties to the extent prudent and feasible as required under the Alternative Procedures."

136.   FWS stated in the NHPA Requirements document that "[a]voidance of adverse effects is the preferred strategy for resolving effects on historic properties." Yet, after essentially rubberstamping NPPD's pre-approved list of measures that can only minimally reduce (but not avoid or substantially minimize) impacts to known NRHP-listed historic properties, FWS primarily focused its requirements on NPPD-funded mitigation that will do nothing to identify unknown resources, much less avoid or minimize adverse effects to resources. For example, the document requires NPPD to fund an after-the-fact ethnographic and historic context study of currently known historic properties in the APE within five years of ITP issuance (i.e., by February 2031). But, FWS made clear that "[c]onstruction of the R-Project can begin immediately after the issuance of the ITP and prior to completion of this study."

137.   FWS also required a construction monitoring program, ostensibly "to avoid or minimize adverse effects on historic properties." Like other aspects of the NHPA Requirements document, NPPD is only required to implement the construction monitoring program "to the extent prudent and feasible," thereby leaving the determination of what is prudent and feasible to the sole discretion of NPPD.

138.   The construction monitoring program is purportedly "designed to provide an opportunity for Tribal monitors to monitor construction activities in areas that have the potential for properties of traditional religious and cultural importance." Rather than

requiring construction monitoring by Tribes along the entire R-Project route, FWS
required only that NPPD allow such monitoring in five discrete locations described in the
NHPA Requirements document. FWS clarified that "[c]onstruction may proceed in all
areas outside of those designated for the construction monitoring program pursuant to
the conditions of the ITP." Rather than including all Tribes that participated in the
Section 106 consultation, FWS only allowed "[u]p to three Tribal monitors (as
designated by Tribal Nations) [that] will be compensated by NPPD" and are allowed to
monitor construction activities for the R-Project in the five discrete locations identified.

### G.    Status of R-Project Construction

139.    Based on FWS's February 10, 2026 issuance of the ITP, ROD, and NHPA
Requirements document, NPPD may now proceed immediately with construction in the
vast majority of the proposed R-Project route, except in the specific, discrete locations
where Tribal construction monitoring is required (unless NPPD determines that Tribal
construction is not prudent or feasible in any of those locations).

140.    On information and belief, as informed by communications with counsel
for NPPD after the issuance of the ITP, it is Petitioners' understanding that NPPD is
presently engaged in minor pre-construction preparation work at temporary work areas.
Equipment delivery is expected to occur over the next few months. No structure erection
is anticipated before June 2026.

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1: The ACHP's Violations of the NHPA, the NHPA's Implementing Regulations, and the APA

141.    Petitioners hereby incorporate Paragraphs 1-140 by reference.

142.    By authorizing agencies to waive the mandatory procedures required by Section 106 of the NHPA and its implementing regulations in order to implement EO 14156 in response to a purported emergency that is not contemplated by either the NHPA or its regulations as a basis for emergency procedures, and by extending the duration of such emergency procedures indefinitely through the entirety of the EO's declared emergency, the ACHP has acted contrary to law, in excess of statutory authority, and ultra vires.

143.    By waiving the mandatory procedures contained in Section 106 of the NHPA, despite Congress's express prohibition against waiving those specific procedures due to an emergency, *see* 54 U.S.C. § 306112 (directing that the ACHP may promulgate emergency procedure regulations waiving NHPA procedures "except section 306108"—i.e., Section 106), the ACHP has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory authority, in violation of the NHPA, its implementing regulations, and the APA.

144.    By authorizing agencies to use emergency alternative NHPA procedures in connection with EO 14156, despite the lack of "a major natural disaster or an imminent threat to national security," 54 U.S.C. § 306112, the ACHP has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory authority, in violation of the NHPA, its implementing regulations, and the APA.

145.    By authorizing agencies to use emergency alternative NHPA procedures in connection with EO 14156 without first demonstrating that an undertaking was proposed as "an essential and immediate response to a disaster or emergency declared by the President . . . or another immediate threat to life or property," 36 C.F.R. § 800.12(b), the ACHP has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory or regulatory authority, in violation of the NHPA, its implementing regulations, and the APA.

146.    By failing to consider, let alone demonstrate, whether there is a genuine emergency in connection with EO 14156 within the meaning of 54 U.S.C. § 306112 and 36 C.F.R. § 800.12, let alone in the context of individual projects potentially subject to EO 14156 (such as the R-Project), the ACHP failed to consider an important aspect of the problem, failed to articulate a reasoned explanation for its action, and relied on factors Congress did not intend it to consider, and thus the ACHP acted arbitrarily, capriciously, not in accordance with law, and without observance of procedure required by law, in violation of the NHPA, its implementing regulations, and the APA.

147.    By authorizing agencies to use emergency alternative NHPA procedures in connection with EO 14156 for the indefinite duration of the emergency declared in EO 14156, the ACHP violated its own regulations, which limit emergency procedures to thirty days unless a case-specific extension is granted where an imminent risk remains to life or property, 36 C.F.R. § 800.12(d), and thus the ACHP has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory or regulatory authority, in violation of the NHPA, its implementing regulations, and the APA.

65

148.    By failing to provide notice-and-comment rulemaking or other mandatory procedural safeguards in substantively modifying the NHPA's implementing regulations, 5 U.S.C. § 553—both in terms of what qualifies as an emergency and the lawful duration of emergency procedures—the ACHP acted arbitrarily, capriciously, not in accordance with law, and without observance of procedure required by law, in violation of the NHPA, its implementing regulations, and the APA.

### Claim 2: FWS's Violations of the NHPA, the NHPA's Implementing Regulations, and the APA

149.    Petitioners hereby incorporate Paragraphs 1-140 by reference.

150.    By failing to engage in meaningful consultation under Section 106 and/or government-to-government consultation early in the R-Project planning process that complies with the NHPA and its implementing regulations—including the requirements that consultation must commence early in the planning process, that recognize the government-to-government relationship between the Federal Government and Native American Tribes, that are sensitive to the concerns and needs of Native American Tribes, and that provide a reasonable opportunity for Tribes to identify concerns about historic properties and articulate their views on the undertaking's effects on such properties at important steps throughout the Section 106 process—FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

151.    By terminating Section 106 consultation before identifying all historic properties within the R-Project's APE, assessing effects to those properties, or resolving adverse effects through the consideration of measures to avoid, minimize, and mitigate

adverse effects, and by eliminating the ability of Tribes and other consulting parties to consult during those stages of the Section 106 process or to avail themselves of dispute resolution in the event of disputes about how to resolve adverse effects, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

152.     By authorizing R-Project construction activities that will have adverse effects on historic properties without first making a reasonable and good faith effort to identify all such resources (including Tribal resources and TCPs) within the APE, evaluating the potential effects the R-Project may have on historic properties once identified, and resolving the adverse effects on historic properties through the development of avoidance, minimization, and mitigation measures, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

153.     By authorizing R-Project construction activities that will have adverse effects on historic properties prior to the completion of a PA, MOA, or HPTP that directs how adverse effects will be resolved once all historic properties are identified, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

154.     By authorizing R-Project construction activities on the basis of terms and conditions contained in FWS's Requirements document, and by failing to condition such authorization on FWS issuing notices to proceed with R-Project construction only once all historic properties within the APE have been identified, evaluated, and resolved

67

(whether for the entire R-Project or for a specific segment), FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

155.    By authorizing R-Project construction activities on the basis of terms and conditions contained in FWS's Requirements document, and by failing to require NPPD to conduct any further historic property identification efforts, including in the portion of the R-Project route that has not been surveyed to date, despite the NHPA's requirement that "prior to the issuance of any license" FWS "shall take into account the effect of the undertaking on any historic property," 54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.4(b)(2) (the agency must "proceed with the identification and evaluation of historic properties" as specific aspects of an action are "refined or access is gained"), FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

156.    By authorizing R-Project construction on the basis of terms and conditions contained in FWS's Requirements document, and by failing to require any further evaluation prior to construction despite acknowledging the existence of 511 known but unevaluated historic properties in addition to many still-unknown historic properties within the APE, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

157.    By authorizing R-Project construction activities on the basis of terms and conditions contained in FWS's Requirements document that are materially different from the procedures required by the NHPA and its implementing regulations, and by allowing

NPPD to unilaterally avoid compliance with those terms and conditions when NPPD decides any such measure is not "prudent" or "feasible" for NPPD, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

158.    By failing to finalize the draft PA that FWS developed in consultation with Tribes and other consulting parties, and by instead invoking emergency alternative procedures for NHPA compliance that do not remotely substitute for the NHPA's mandatory consultation requirements, dispute resolution mechanisms, the ability of Tribes and other consulting parties to enforce the terms of a PA, and related safeguards provided by a finalized PA, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

159.    By stating that adverse effects to Tribal resources (including TCPs) will be addressed through the implementation of alternative procedures, but by then limiting such efforts in the Requirements document to allowing three Tribal monitors merely to observe construction activities in five discrete locations along the R-Project route, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

160.    By refusing to allow intensive pedestrian surveys by TCSs throughout the entire APE for Physical Effects—let alone the broader APE for Visual Effects—FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

161.    By recognizing that TCPs to which Tribal Nations ascribe traditional religious or cultural significance are likely to exist within the R-Project APE, but by then failing to delineate the boundaries of any such TCP, evaluate effects to TCPs, or resolve adverse effects to TCPs—let alone to satisfy those requirements in consultation with Tribes—FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

162.    By waiving the mandatory procedures required by Section 106 of the NHPA and its implementing regulations in connection with the R-Project, in order to implement EO 14156 and address a purported emergency that is not contemplated by either the NHPA or its regulations as a basis for emergency procedures, FWS has acted contrary to law, in excess of statutory and regulatory authority, and ultra vires.

163.    By waiving the mandatory procedures contained in Section 106 of the NHPA in connection with the R-Project, despite Congress's express prohibition against waiving those specific procedures due to an emergency, *see* 54 U.S.C. § 306112 (directing that agencies may waive NHPA procedures in genuine emergencies, "except" those procedures contained in "section 306108"—i.e., Section 106), FWS has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory authority, in violation of the NHPA, its implementing regulations, and the APA.

164.    By determining that the EO 14156 constitutes an emergency within the meaning of the NHPA and its regulations, and by applying EO 14156 to the R-Project to waive mandatory procedures, despite the lack of "a major natural disaster or an imminent threat to national security," 54 U.S.C. § 306112, FWS has acted arbitrarily,

70

capriciously, not in accordance with law, and in excess of statutory authority, in violation of the NHPA, its implementing regulations, and the APA.

165.    By invoking EO 14156, applying it to the R-Project, and authorizing NPPD to use emergency NHPA procedures without demonstrating that the R-Project was proposed as, or constitutes, "an essential and immediate response to a disaster or emergency declared by the President . . . or another immediate threat to life or property," 36 C.F.R. § 800.12(b), FWS has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory or regulatory authority, in violation of the NHPA, its implementing regulations, and the APA.

166.    By failing to consider, let alone demonstrate, whether there is a genuine emergency in connection with EO 14156 within the meaning of 54 U.S.C. § 306112 and 36 C.F.R. § 800.12, let alone in the context of NPPD's service area that will be served by the R-Project, especially where EO 14156 states that the energy problems animating the EO "are most pronounced in our Nation's Northeast and West Coast" rather than Nebraska, and despite NPPD's publicly stated ulterior motive to short-circuit what NPPD viewed as a lengthy consultation process, FWS failed to consider important aspects of the problem, failed to articulate a reasoned explanation for its action, and relied on factors Congress did not intend it to consider, and thus FWS acted arbitrarily, capriciously, not in accordance with law, and without observance of procedure required by law, in violation of the NHPA, its implementing regulations, and the APA.

167.    By failing to consider, let alone demonstrate, whether there is any legitimate energy emergency in NPPD's service area during the relatively short time

period during which FWS could have finalized the Section 106 process for the R-Project (estimated by NPPD to be only eighteen months from August 2025—i.e., February 2027), and by ignoring the lack of urgency by NPPD in submitting its renewed ITP application and by FWS in initiating renewed consultation, and also by NPPD waiting seven months before requesting emergency procedures in connection with EO 14156 and by FWS waiting five more months to grant that request, FWS acted arbitrarily, capriciously, not in accordance with law, and without observance of procedure required by law, in violation of the NHPA, its implementing regulations, and the APA.

168.    By authorizing NPPD to use emergency alternative NHPA procedures for more than five decades as part of the R-Project's construction and operation lifespan, rather than for thirty days as specified in the NHPA's implementing regulations as the outer window for emergency procedures absent a project-specific extension from the ACHP, *see* 36 C.F.R. § 800.12(d), let alone limited to the duration of the energy emergency declared in EO 14156, FWS has acted arbitrarily, capriciously, not in accordance with law, and in excess of statutory or regulatory authority, in violation of the NHPA, its implementing regulations, and the APA.

169.    By relying on the ACHP's arbitrary, capricious, and unlawful guidance in connection with EO 14156 to waive the NHPA's mandatory procedures for the R-Project in lieu of emergency procedures, *see* ¶¶ 142-148, and by authorizing NPPD to construct the to the R-Project without satisfying those mandatory procedures, FWS acted arbitrarily, capriciously, and not in accordance with law, in violation of the NHPA, its implementing regulations, and the APA.

72

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully request that the Court enter judgment for Petitioners ordering the following relief:

1.      Declare that Respondents are in violation of the NHPA, its implementing regulations, and the APA, and have acted arbitrarily, capriciously, not in accordance with law, in excess of statutory or regulatory authority, and/or without observance of procedure required by law;

2.      Vacate and remand to FWS the ITP, ROD, FSEIS, and Requirements document for further consideration by the agency;

3.      Vacate and remand to the ACHP the February 25, 2025 emergency procedure guidance for further consideration by the agency and/or for notice-and-comment rulemaking;

4.      Enjoin Respondents from authorizing R-Project construction activities pending the completion of a lawful Section 106 process that, in consultation with Tribes and other consulting parties, properly identifies all historic properties, including TCPs; fully considers the R-Project's direct, indirect, and cumulative effects on those properties; resolves all adverse effects by considering alternatives to avoid, minimize, and mitigate adverse effects; and resolves all disputes arising under that process;

5.      Grant Petitioners such temporary restraining orders or preliminary or permanent injunctions as they may request;

6.      Award Petitioners their attorneys' fees and costs pursuant to the NHPA's attorneys' fees provision, 54 U.S.C. § 307105, and/or any other applicable provision of law; and

7.      Issue Petitioners such other injunctive, equitable, and other relief as the Court may deem just and proper to provide complete relief to Petitioners.

Respectfully submitted,

*/s/ William S. Eubanks II*
William S. Eubanks II
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com

Counsel for Petitioners