**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-00862-NYW-SBP

OREGON-CALIFORNIA TRAILS ASSOCIATION, a nonprofit corporation;
ROSEBUD SIOUX TRIBE, a Sovereign Tribal Nation;
WESTERN NEBRASKA RESOURCES COUNCIL, a nonprofit corporation;
PRESERVE THE SANDHILLS, LLC, a nonprofit corporation;
WHITETAIL FARMS EAST, LLC, a limited liability corporation;
HORSESHOE BAR RANCH, LLC, a limited liability corporation;

       Petitioners,

   v.

MATT HOGAN, in his official capacity;
DOUG BURGUM, in his official capacity;
BRIAN NESVIK, in his official capacity;
TRAVIS VOYLES, in his official capacity;

       Respondents,

and

NEBRASKA PUBLIC POWER DISTRICT,

       Respondent-Intervenor.

---

**PETITIONERS' MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT
*(RULING REQUESTED BEFORE JUNE 8, 2026*)**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................................iv

GLOSSARY......................................................................................................... viii

CERTIFICATE OF CONFERRAL....................................................................ix

MOTION FOR PRELIMINARY INJUNCTION.................................................... 1

MEMORANDUM IN SUPPORT......................................................................... 1

BACKGROUND............................................................................................... 3

      I.      STATUTORY AND REGULATORY FRAMEWORK ..................................... 3

            A. The National Historic Preservation Act....................................................... 3

                1.      *The Section 106 Consultation Process*.................................... 3

                2.      *Special, Heightened Duties to Sovereign Tribal Nations* ........ 5

                3.      *Waiver of the NHPA's Requirements in Narrow Contexts* ...... 7

            B. The Administrative Procedure Act.............................................. 8

      II.      FACTUAL BACKGROUND .......................................................... 9

      ARGUMENT ................................................................................ 13

      I.      PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS ............... 14

            A.  The Agencies Did Not Demonstrate a Genuine Emergency, Let Alone a Lawful and Non-Arbitrary Basis under the NHPA or Its Regulations, Necessitating Waiver of the NHPA's Procedures for the R-Project.......... 15

                1.      *EO 14156 Does Not Satisfy the Relevant Legal Criteria for Waiving the NHPA's Mandatory Procedures* ........................ 16

a.      The Text of EO 14156 Undercuts the "Emergency" and Any
        Waiver of the NHPA's Procedures Based Upon the  EO...... 17

b.      The ACHP's and FWS's Use of the EO to Authorize the
        Waiver of the NHPA's Procedures Was Arbitrary,
        Capricious, and Unlawful....................................................... 20

B.      The ACHP's Guidance Is a Legislative Rule and Violated the APA
        by Altering Substantive Law without Observing Required
        Procedures..................................................................................... 27

C.      FWS's Permitting and Related Decisions Violate the NHPA, Its
        Regulations, and the APA in Numerous, Significant Ways ............. 31

II.     AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE
        HARM ...................................................................................................... 38

III.    THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN
        INJUNCTION ........................................................................................... 42

IV.   NO BOND, OR ONLY A NOMINAL BOND, SHOULD BE REQUIRED......... 44

CONCLUSION............................................................................................... 45

iii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Wild Horse Campaign v. Burgum*,
  768 F. Supp. 3d 1310 (D. Colo. 2025) ....................................................... 27, 30, 31

*Am. Wild Horse Campaign v. Raby*,
  144 F.4th 1178 (10th Cir. 2025) ...................................................................... 21

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ......................................................................................... 38

*Attakai v. United States*,
  746 F. Supp. 1395 (D. Ariz. 1990) ............................................................ 7, 13, 36

*Biden v. Nebraska*,
  600 U.S. 477 (2023) ......................................................................................... 17

*Colo. River Indian Tribes v. Marsh*,
  605 F. Supp. 1425 (C.D. Cal. 1985) ................................................................ 43

*Colo. Wild, Inc. v. U.S. Forest Serv.*,
  523 F. Supp. 2d 1213 (D. Colo. 2007) ............................................................ 44

*Comanche Nation v. United States*,
  No. CIV-08-849-D, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) ........ 7, 13, 34, 42

*Davis v. Mineta*,
  302 F.3d 1104 (10th Cir. 2002) ....................................................................... 45

*Del. Dep't of Nat. Res. v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) .............................................................................. 26

*Diné Citizens Against Ruining Our Env't. v. Berhnardt*,
  923 F.3d 831 (10th Cir. 2019) ........................................................................ 3, 4

*Friends of Astor, Inc. v. City of Reading*,
  No. 98-CV-4429, 1998 WL 684374 (E.D. Pa. Sept. 17, 1998) ........................ 38

*Fund for Animals v. Clark*,
  27 F. Supp. 2d 8 (D.D.C. 1998) ....................................................................... 44

iv

*Hualapai Indian Tribe v. Haaland*,
 755 F. Supp. 3d 1165 (D. Ariz. 2024) ............................................... 6, 13, 35, 42, 43

*Ill. Commerce Comm'n v. ICC*,
 848 F.2d 1246 (D.C. Cir. 1988)................................................................................ 36

*Iowa League of Cities v. EPA*,
 711 F.3d 844 (8th Cir. 2013)............................................................................. 27, 29

*League of Wilderness Defs./Blue Mountains Biodiversity Proj. v.
 Connaughton*,
 752 F.3d 755 (9th Cir. 2014).................................................................................. 42

*Learning Res., Inc. v. Trump*,
 146 S. Ct. 628 (2026)............................................................................... 17, 18, 22

*Loper Bright Enters. v. Raimondo*,
 603 U.S. 369 (2024)................................................................................................ 22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)............................................................................................. 9, 21

*Niz-Chavez v. Garland*,
 593 U.S. 155 (2021)................................................................................................ 38

*Olenhouse v. Commodity Credit Corp.*,
 42 F.3d 1560 (10th Cir. 1994)................................................................................ 37

*Perez v. Mortg. Bankers Ass'n*,
 575 U.S. 92 (2015).................................................................................................. 27

*Pit River Tribe v. U.S. Forest Serv.*,
 469 F.3d 768 (9th Cir. 2006)............................................................................. 33, 35

*Pueblo of Sandia v. United States*,
 50 F.3d 856 (10th Cir. 1995).............................................................................. 6, 35

*Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*,
 755 F. Supp. 2d 1104 (S.D. Cal. 2010)................................ 7, 13, 33, 34, 37, 42, 44

*S. Fork Band Council of W. Shoshone of Nev. v. Dep't of the Interior*,
 588 F.3d 718 (9th Cir. 2009)................................................................................... 44

*Save Strawberry Canyon v. Dep't of Energy*,
 613 F. Supp. 2d 1177 (N.D. Cal. 2009)................................................................... 45

*Scherr v. Volpe*,
   466 F.2d 1027 (7th Cir. 1972) ................................................................. 45

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,
   479 F.3d 1148, 1151 (9th Cir. 2007) ....................................................... 44

*Tohono O'odham Nation v. U.S. Dep't of the Interior*,
   138 F.4th 1189 (9th Cir. 2025) ................................................................. 7

*California ex rel Van de Kamp v. Tahoe Reg'l Plan. Agency*,
   766 F.2d 1319 (9th Cir. 1985) ........................................................... 44, 45

*W. Watersheds Proj. v. Zinke*,
   441 F. Supp. 3d 1042 (D. Idaho 2020) ............................................... 27, 31

*W.V. Highlands Conservancy v. Island Creek Coal Co.*,
   441 F.2d 232 (4th Cir. 1971) ................................................................... 45

*Winter v. NRDC*,
   555 U.S. 7 (2008) .................................................................................... 13

**Statutes**

5 U.S.C. § 553 ............................................................................ 2, 9, 27, 31

5 U.S.C. §§ 701-706 ................................................................................... 1

5 U.S.C. § 706 ....................................................................................... 1, 8

50 U.S.C. §§ 1601-1651 ............................................................................ 11

50 U.S.C § 1622 ................................................................................. 18, 22

50 U.S.C. § 1631 ................................................................................ 19, 20

54 U.S.C. §§ 300101-307108 ...................................................................... 1

54 U.S.C. § 300308 ..................................................................................... 4

54 U.S.C. § 302706 ..................................................................................... 6

54 U.S.C. § 306108 .......................................................................... 4, 15, 35

54 U.S.C. § 306112 ............................................... 2, 7, 15, 18, 21, 23, 28

**Regulations**

36 C.F.R. § 60.1 ....................................................................................................... 4

36 C.F.R. § 61.10 ................................................................................................ 7, 16

36 C.F.R. § 800.1 ...................................................................................... 4, 32, 35

36 C.F.R. § 800.2 ............................................................................. 5, 6, 32, 33, 37

36 C.F.R. § 800.4 ................................................................................. 5, 6, 34, 37

36 C.F.R. § 800.5 ............................................................................................ 5, 37

36 C.F.R. § 800.6 ............................................................................................ 5, 37

36 C.F.R. § 800.7 ............................................................................................ 5, 37

36 C.F.R. § 800.12 ...................................8, 16, 21, 22, 23, 24, 25, 26, 28, 29, 30, 36

36 C.F.R. § 800.14 ........................................................................................... 7, 8

**Other Authorities**

90 Fed. Reg. 8433 (Jan. 29, 2025)...................................................... 11, 16, 19, 20, 25

Advisory Council on Historic Pres., NATIVE AMERICAN TRADITIONAL CULTURAL
LANDSCAPES ACTION PLAN (2011) ............................................................................. 4

Black's Law Dictionary (10th ed. 2014) ...................................................................... 18

Nat'l Park Serv., NAT'L REG. BULLETIN NO. 38, *Guidelines for Evaluating and
Documenting Traditional Cultural Properties* (1998) .................................................... 4

The National Emergencies Act (Pub. L. 94-412), Source Book Legislative
History, Text, and Other Documents (1976)............................................................... 19

## **GLOSSARY**

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| APE | Area of Potential Effect |
| DOI | Department of the Interior |
| EO | Executive Order |
| FWS | U.S. Fish and Wildlife Service |
| NEA | National Emergencies Act |
| NHPA | National Historic Preservation Act |
| NPPD | Nebraska Public Power District |
| NRHP | National Register of Historic Places |
| OCTA | Oregon-California Trails Association |
| PA | Programmatic Agreement |
| SHPO | State Historic Preservation Officer |
| TCP | Traditional Cultural Property |

**CERTIFICATE OF CONFERRAL**

Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel certifies that counsel for Petitioners made reasonable, good faith efforts to confer with opposing counsel for Federal Respondents and Respondent-Intervenor Nebraska Public Power District ("NPPD") before filing this motion. As explained in the parties' Joint Stipulation and Proposed Briefing Schedule Concerning Preliminary Injunction Briefing, counsel for the parties conferred extensively, *see* ECF No. 13 at 2. Although the parties were unable to reach a resolution that would avoid the filing of a preliminary injunction motion in light of NPPD's anticipated construction start date of June 8, 2026, the parties were able through the conferral process to reach agreement as to a briefing schedule. *See id.*

## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to Rule 65, Petitioners move to enjoin all actions by Federal Respondents and Respondent-Intervenor Nebraska Public Power District ("NPPD"), to implement the Advisory Council on Historic Preservation's ("ACHP") and the U.S. Fish and Wildlife Service's ("FWS") authorization of emergency alternative procedures under the National Historic Preservation Act ("NHPA") in furtherance of Executive Order ("EO") 14156, and FWS's related decision permitting NPPD to construct the highly destructive R-Project transmission line, which will slice through the fragile Nebraska Sandhills and irreversibly destroy many iconic Tribal, historic, and cultural landscapes, artifacts, and resources. *Due to imminent construction starting **June 8, 2026**, Petitioners respectfully request that the Court schedule a hearing on this motion as soon as practicable, should the Court determine that a hearing would be helpful to resolve the motion*.

## <u>MEMORANDUM IN SUPPORT</u>

An injunction is essential to maintain the status quo and avoid the desecration of important cultural and historic sites that have provided immense spiritual meaning and value to Native American Tribes for millennia, and that constitute some of the most culturally significant reminders of our nation's westward expansion. Absent a temporary halt through an injunction, many important resources will be irretrievably lost or impaired.

Petitioners challenge decisions by two federal agencies—FWS and the ACHP— that paved the way for NPPD to construct the R-Project, without first complying with the mandatory procedures of the NHPA, 54 U.S.C. §§ 300101-307108, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Those agency decisions violate the NHPA, its implementing regulations, and the APA in numerous respects.

1

The agencies assumed (without substantiating) that President Trump's declaration of a national energy emergency in EO 14156 constitutes a lawful basis under the NHPA and its regulations to waive the NHPA's mandatory prerequisites before authorizing R-Project construction. But they failed to show there is any genuine emergency (nationally or locally) warranting the waiver of NHPA obligations for the R-Project, and FWS ignored the real reason behind NPPD's pretextual waiver request—to bypass the Section 106 process and exclude Tribes and other consulting parties from participation.[1]

Moreover, the ACHP's "guidance" effectuated major, substantive changes to its regulations, by: (1) applying its waiver regulation to EO 14156, without any determination that the emergency declared therein satisfies the criteria of the NHPA's, or the ACHP's, waiver provisions; and (2) extending indefinitely the duration of this purported emergency, allowing agencies (e.g., FWS) to waive NHPA procedures far beyond the 30-day period specified in the ACHP's regulations, without any project-specific finding that an extension is warranted. The ACHP undertook this substantial regulatory revision without satisfying the safeguards that attach to legislative rules of this kind. 5 U.S.C. § 553(b)-(d).

For its part, FWS's waiver of the NHPA's procedures bypassed the final three steps in the Section 106 process—i.e., identifying historic properties, analyzing effects to such properties, and resolving adverse effects by considering how to avoid, minimize, and mitigate adverse effects. In so doing, FWS flouted its statutory and regulatory duties, including: to engage in meaningful, early, good faith consultation with Tribes and other

---

[1] The agencies and NPPD will likely attempt to recast their actions not as "waiving" mandatory procedures, but as complying with the NHPA through alternative procedures. But in the NHPA, Congress described such action as "waiv[ing] in whole or in part" the NHPA's "requirements," when relaxing the NHPA's procedures in response to a natural disaster or other event imminently threatening national security. 54 U.S.C. § 306112.

consulting parties; to complete all four steps of the Section 106 process prior to authorizing construction; to make reasonable, good faith efforts to identify all resources, including Traditional Cultural Properties ("TCPs"), that the R-Project may destroy or impair; and to facilitate dispute resolution in the event of disagreement at each step of the process. By issuing a permit authorizing construction and excusing NPPD from NHPA compliance, FWS not only violated core tenets of the NHPA, its regulations, and the APA, but it placed hundreds (possibly thousands) of iconic Tribal, historic, and cultural resources at grave and imminent risk of permanent destruction or irreversible impairment.

Accordingly, because Petitioners are likely to succeed on the merits and they also satisfy the other applicable factors, Petitioners are entitled to a preliminary injunction.

## BACKGROUND

The Petition for Review contains a detailed background section, explaining the legal framework, *see* ECF No. 1 at ¶¶ 36-66, and the relevant facts, *see id.* at ¶¶ 67-140. Below, Petitioners summarize the detailed background already available to the Court.

## I.    STATUTORY AND REGULATORY FRAMEWORK

### A.    The National Historic Preservation Act

The NHPA "is a procedural statute requiring government agencies to stop, look, and listen before proceeding when their action will affect national historical assets." *Diné Citizens Against Ruining Our Env't. v. Berhnardt*, 923 F.3d 831, 839 (10th Cir. 2019).

#### 1.    The Section 106 Consultation Process

Section 106 is the NHPA's central provision, mandating a detailed consultation process. Its goal is "to identify historic properties potentially affected by the undertaking, assess its effects[,] and seek ways to avoid, minimize[,] or mitigate any adverse effects

3

on historic properties." 36 C.F.R. § 800.1(a). This process requires that agencies, "prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108; *accord* 36 C.F.R. § 800.1(c) (requiring agencies to "complete the Section 106 process 'prior to the approval of . . . the undertaking or prior to the issuance of any license'"). "Historic property" means "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register [of Historic Places ("NRHP")], including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308.[2]

A TCP is a type of historic property "eligible for inclusion in the [NRHP] because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." NAT'L REG. BULLETIN NO. 38 at 1. TCPs include "culturally significant natural landscape[s]," and "the specific location where significant traditional events, activities, or cultural observances [took] place." *Id.* at 9; *see also* Advisory Council on Historic Preserv., NATIVE AMERICAN TRADITIONAL CULTURAL LANDSCAPES ACTION PLAN 1 (2011), https://tinyurl.com/mw6ajpey (describing "traditional cultural landscapes").

Section 106 "sets forth specific processes federal agencies must perform to comply with NHPA." *Diné*, 923 F.3d at 846. The process involves four steps. *Id.* Those

---

[2] The NRHP is a list of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering and culture." 36 C.F.R. § 60.1. "Site" means "the location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself maintains historical or archeological value regardless of the value of any existing structure." *Id.* § 60.3. "[A] property" includes all sites "of a significant event or activity, regardless of whether the event or activity left any evidence of its occurrence." Nat'l Park Serv., NAT'L REG. BULLETIN NO. 38, *Guidelines for Evaluating and Documenting Traditional Cultural Properties* 9 (1998), https://tinyurl.com/347vh98u.

steps are: ***first***, defining the Area of Potential Effect ("APE"), 36 C.F.R. § 800.4(a);

***second***, identifying all historic properties in the APE, *id.* § 800.4(a)(2)-(4), (b), and

assessing them for NRHP eligibility if not previously evaluated, *id.* § 800.4(a)(4), (c);

***third***, evaluating the action's effects to historic properties, *id.* §§ 800.4(d)(2), 800.5; and

***fourth***, resolving adverse effects by evaluating alternatives or modifications to the

undertaking that could avoid, minimize, and mitigate adverse effects to historic

properties, *id.* §§ 800.5(d)(2), 800.6; *see also id.* § 800.5 (defining "adverse effect").

Agencies must "make a reasonable and good faith effort" to identify all historic

properties. *Id.* § 800.4(b)(1). At each stage of the process, an agency must consult with

the State Historic Preservation Officer ("SHPO"), Tribes, and other consulting parties. *Id.*

§§ 800.2, .4(a)(3)-(4), .4(b)(2), .4(c), .4(d)(2), .5(a), .5(c), .6(a), .6(b), .6(c)(2).

"Consultation" means "seeking, discussing, and considering the views of other

participants" and "seeking agreement with them regarding matters arising in the section

106 process." *Id.* § 800.16(f). When consultation results in disagreements, consulting

parties have dispute resolution rights. *Id.* §§ 800.4(c)(2), .4(d), .5(c)-(d), .7.

### 2.    *Special, Heightened Duties to Sovereign Tribal Nations*

While federal agencies owe consultation duties to all consulting parties during the

Section 106 process, agencies owe special, heightened duties to Tribal Nations.

The NHPA's regulations affirm the "unique legal relationship" between the federal

government and "Indian tribes set forth in the Constitution of the United States, treaties,

statutes, and court decisions." 36 C.F.R. § 800.2(c)(2)(ii)(B). Hence, "[c]onsultation with

Indian tribes should be conducted in a sensitive manner respectful of tribal sovereignty,"

and also "must recognize the government-to-government relationship between the Federal Government and Indian tribes." *Id.*, *id.* § 800.2(c)(2)(ii)(C). In particular, agencies:

> shall ensure that consultation in the section 106 process provides the Indian tribe . . . a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects.

*Id.* § 800.2(c)(2)(ii)(A). The agency must "make a reasonable and good faith effort to identify Indian tribes . . . that shall be consulted in the section 106 process," and "shall consult with [Tribes] . . . regarding undertakings occurring on or affecting historic properties" of interest to the Tribe. *Id.; see also id.* § 800.2(c)(2)(i)(A); *id.* § 800.2(c)(2)(ii) (agencies must "consult with any Indian Tribe . . . that attaches religious or cultural significance" to historic properties that may be affected); *accord* 54 U.S.C. § 302706(b). "This requirement applies regardless of the location of the historic property," 36 C.F.R. § 800.2(c)(2)(ii), including sites of "religious and cultural significance" "on ancestral" or "ceded" land outside of a Tribe's reservation boundaries *Id.* § 800.2(c)(2)(ii)(D).

When "assessing the eligibility of historic properties that may possess religious and cultural significance" to a Tribe, the agency must "acknowledge" the Tribe's "special expertise." *Id.* § 800.4(c)(1). In certain situations where disagreements arise, there are dispute resolution mechanisms available only to Tribes. *See, e.g., id.* § 800.4(c)(2).

The special solicitude agencies must pay Tribes is at its apex when resources of cultural significance exist in the APE. In such contexts, courts invalidate decisions where agencies fail to make "a reasonable" or "a good faith" effort to identify such resources, despite "a sufficient likelihood" that they exist within the APE. *Pueblo of Sandia v. United States*, 50 F.3d 856, 860-63 (10th Cir. 1995); *see also Hualapai Indian Tribe v. Haaland*,

6

755 F. Supp. 3d 1165, 1188-91 (D. Ariz. 2024) (enjoining failure to consult in good faith

with Tribe); *Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F.

Supp. 2d 1104, 1109-20 (S.D. Cal. 2010) (same); *Comanche Nation v. United States*, No.

CIV-08-849-D, 2008 WL 4426621, at *18-19 (W.D. Okla. Sept. 23, 2008) (same); *Attakai*

*v. United States*, 746 F. Supp. 1395, 1405-09 (D. Ariz. 1990) (same).

### 3.    *Waiver of the NHPA's Requirements in Narrow Contexts*

There are two ways an agency may avoid the procedures required by the NHPA

and its regulations. First, it may use a Programmatic Agreement ("PA") as an alternative,

phased means of complying with Section 106 in certain contexts. 36 C.F.R. § 800.14(b).

The agency "shall ensure that" the PA's development "includes appropriate government-

to-government consultation with affected Indian tribes." *Id.* § 800.14(f). An agency using a

PA must refrain from authorizing construction until it has made all reasonable efforts to

identify resources, assess effects, and resolve adverse effects. Thus, an agency using a

PA must withhold its construction authorization until the permittee demonstrates full

compliance with the terms of the PA (and thus Section 106). *See Tohono O'odham*

*Nation v. U.S. Dep't of the Interior*, 138 F.4th 1189, 1195-96 (9th Cir. 2025).

Second, in very narrow contexts, agencies may be temporarily excused from

compliance with the NHPA's procedures. Congress explained that some "requirements"

of the NHPA "may be waived in whole or in part in the event of a major natural disaster or

an imminent threat to national security." 54 U.S.C. § 306112.[3] Likewise, Congress

---

[3] This provision directs the Department of the Interior ("DOI") to address natural disasters and similar emergencies. That agency exercised its authority by creating a regulation that limits waiver of the NHPA's requirements to situations where "the historic preservation program would benefit from such waiver and the waiver would not compromise the purposes, conditions, and requirements of the [NHPA]." 36 C.F.R. § 61.10.

authorized the ACHP to issue regulations or guidance regarding federal "programs or undertakings [that] may be exempted from any or all of the requirements of [the NHPA]," but only "when the exemption is determined to be consistent with the purposes of [the NHPA], taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic property." *Id.* § 304108(c).

The ACHP promulgated a waiver regulation, which applies only to "an emergency undertaking [proposed] as an essential and immediate response to a disaster or emergency declared by the President . . . or another immediate threat to life or property." 36 C.F.R. § 800.12(b). If an undertaking meets these criteria, an agency may: (1) "[f]ollow[] a [PA] developed pursuant to § 800.14(b) that contains specific provisions for dealing with historic properties in emergency situations"; or (2) notify the ACHP, SHPO, and affected Tribes and "afford[] them an opportunity to comment within seven days of notification." *Id.* § 800.12(b)(1)-(2). The regulation "applies only to undertakings that will be implemented within 30 days after the disaster or emergency has been formally declared," although "[a]n agency may request an extension of the period of applicability from the [ACHP]" where an immediate threat to life or property remains. *Id.* § 800.12(d).

### B.    The Administrative Procedure Act

Under the APA, courts "shall" set aside actions that are arbitrary, capricious, an abuse of discretion, or not in accordance with law; that are issued in excess of statutory authority; or that are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2). An action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency," or if the agency decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA also requires agencies to follow specific procedures before issuing a legislative rule, which facilitates a change in existing law, including: (1) publishing a proposal in the Federal Register, 5 U.S.C. § 553(b); (2) allowing public comment on the proposal, *id.* § 553(c); and (3) publishing the final rule at least 30 days before its effective date, *id.* § 553(d).

## II.    FACTUAL BACKGROUND

Petitioners provided numerous quotes from Petitioners Rosebud Sioux Tribe and Oregon-California Trails Association ("OCTA"), as well as the Nebraska SHPO, objecting to FWS's pervasive mishandling of its NHPA duties in the R-Project Section 106 process. ECF No. 1 at ¶¶ 67-140. Those repeated objections, which strongly support the need for an injunction, establish several salient points directly relevant to the claims in this case.[4]

First, FWS failed to engage early or in good faith with consulting parties—especially Tribes—to ensure their meaningful involvement in each stage of the Section 106 process. In fact, many Tribes were excluded from the consultation process that preceded FWS's original decision authorizing the R-Project. *See, e.g.*, Exh. 2. After this Court remanded to FWS in 2020, the agency again failed to engage early, inexplicably

---

[4] *See* Exhibit ("Exh.") 1 (FWS, App'x I, *Selected Supplemental Section 106 Materials* (Jan. 29, 2026)); Exh. 2 (Rosebud Sioux Tribe Letter (Sept. 17, 2021)); Exh. 3 (OCTA Letter (Dec. 16, 2022)); Exh. 4 (Coalition Letter (Dec. 19, 2022)); Exh. 5 (Rosebud Sioux Tribe Letter (Mar. 1, 2024)); Exh. 6 (Coalition Letter (May 8, 2024)); Exh. 7 (Rosebud Sioux Tribe Letter (Nov. 6, 2024)); Exh. 8 (Rosebud Sioux Tribe Letter (Nov. 15, 2024)); Exh. 9 (Nebraska SHPO Letter (Nov. 18, 2024)); Exh. 10 (Rosebud Sioux Tribe Letter (May 2025)); Exh. 11 (OCTA Letter (June 17, 2025)); Exh. 12 (Coalition Letter (Jan. 20, 2026)); Exh. 13 (Rosebud Sioux Tribe Letter (Jan. 20, 2026)).

waiting more than three years to initiate the new Section 106 process. *See* Exh. 1 at 32-35 (FWS Letter (July 10, 2023)). These substantial delays in consultation by FWS, both by initially excluding indispensable Tribes and by then wasting three years during which properties could have been identified, evaluated, and their adverse effects resolved, hardly supports the subsequent determination that an emergency arose in 2025 and warranted, a full year later, the abrupt termination of the Section 106 process.

Second, FWS's actions in the renewed Section 106 process reflect the opposite of meaningful, good faith efforts to identify, evaluate, and resolve adverse effects to historic properties in close coordination with consulting parties, *see* Exhs. 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, as FWS has acknowledged. Exh. 1 at 73 (FWS Meeting Notes (Feb. 28, 2024)).

Nor do FWS's actions during that renewed process show good faith consultation sensitive to or respectful of Tribal sovereignty, or recognizing the special relationship and unique expertise of Tribes in identifying and evaluating TCPs and other properties that possess religious and cultural significance to Tribes. *See* Exhs. 5, 7, 8, 9, 10, 13. For example, despite Tribes' special expertise in routinely using Tribal Cultural Specialists to survey project corridors like the one at issue here, the Tribes repeatedly encountered resistance from FWS and NPPD about the use of this survey methodology for the R-Project. *See, e.g.,* Exh. 1 at 70-71 (FWS Letter (June 12, 2024)); Exh. 1 at 9 (FWS Meeting Notes (Nov. 2024)); Exh. 1 at 111-12 (FWS Letter (Jan. 9, 2025)); Exh. 1 at 129 (FWS Email (July 15, 2025)); *see also* Exh. 14 at 9, 12, 17 (FWS Draft PA (July 16,

10

2025)).[5] And this occurred despite FWS acknowledging that TCPs very likely exist within the APE. *See* FWS, Final SEIS at 3.10-9, https://www.fws.gov/media/final-seis.

Third, Tribal and SHPO experts told FWS that it was prematurely and improperly moving from earlier stages of the consultation process (i.e., resource identification) to later stages (i.e., effects evaluation and resolution), and that it was doing so on the basis of deceptive, misleading, and incomplete information. *See, e.g.*, Exhs. 7, 9, 10.

Fourth, even for the subset of historic properties that FWS identified, such as our nation's iconic Historic Emigrant Trails, FWS failed to seriously consider R-Project alternatives or modifications that could avoid, or if necessary minimize and mitigate, adverse effects to these culturally significant resources. *See, e.g.*, Exhs. 3, 6, 11.

The highly flawed consultation process took a surprising turn after President Trump issued EO 14156, declaring a national energy emergency under the National Emergencies Act ("NEA"), 50 U.S.C. §§ 1601-1651. ECF No. 1 at ¶¶ 87-90. The ACHP and DOI both issued NHPA guidance to implement EO 14156. *Id.* at ¶¶ 91-98.[6]

Due to the highly flawed consultation to date, NPPD and FWS viewed EO 14156 as a get-out-of-jail-free card from NHPA compliance. Even then, NPPD waited seven months to invoke EO 14156, *see* Exh. 1 at 140-42 (NPPD Letter (Aug. 22, 2025)), and

---

[5] FWS never finalized this draft PA. But this version was close to final form, awaiting one last round of feedback from consulting parties. Although never finalized, the near-final PA is helpful for establishing what FWS viewed as necessary to comply with Section 106.

[6] FWS's decisions and analyses (issued in early 2026) are available on FWS's website. *See* FWS, R-Project Transmission Line, https://www.fws.gov/project/r-project-transmission-line. The ACHP's guidance is available on its website. *See* ACHP, *Section 106 Emergency Provisions and the Executive Order Declaring a National Energy Emergency*, https://www.achp.gov/Section_106_and_Energy_Emergency. EO 14156 is available in the Federal Register. *See* EO 14156, 90 Fed. Reg. 8433 (Jan. 29. 2025), https://www.govinfo.gov/content/pkg/FR-2025-01-29/pdf/2025-02003.pdf.

11

FWS waited five more months before granting that request with sparse documentation in support, *see* Exh. 1 at 135-39 (FWS Letter (Jan. 13, 2026)). Petitioners objected to the abrupt termination of the Section 106 process, *see* Exhs. 12, 13, which fell on deaf ears.

In requesting special dispensation, NPPD made clear that EO 14156 was a pretext to avoid further Section 106 consultation due to its inconvenience. NPPD asserted the Section 106 process "spiraled out of control" due to FWS "approving an unprecedented tribal survey effort and allowing tribal control over the [survey] methodology." Exh. 1 at 141-42. NPPD criticized FWS's draft PA and the unremarkable fact, as is true for every Section 106 process, that the PA "envisions that **before construction begins**, NPPD must develop and conduct multiple reviews of areas within [the APE] with methodologies to be identified by consulting parties and that []FWS will hold a series of review periods on the yet-to-be-developed plans using those yet-to-be-identified methodologies." *Id.* at 142. Hence, far from establishing that the R-Project is necessary to respond to the national energy emergency declared in EO 14156, NPPD affirmed it was seizing upon EO 14156 to bypass the NHPA's procedures and sideline consulting parties.

In response to NPPD's request, FWS obliged. Without addressing Petitioners' comments regarding EO 14156, FWS finalized its environmental analyses and issued a permit to NPPD, accompanied by a document identifying nominal terms and conditions FWS imposed on NPPD (absent consultation with consulting parties)—the satisfaction of which constitutes compliance with FWS's and NPPD's NHPA obligations. *See* FWS, NHPA Requirements Document, https://www.fws.gov/media/nhpa-terms-and-conditions; *see also* No. 1 at ¶¶ 128-138. Nowhere did FWS substantiate how the R-Project is necessary to respond to any genuine emergency, whether nationally or in NPPD's

12

service area, during the eighteen months NPPD estimated would otherwise be required to lawfully complete the remaining steps of the Section 106 process. Exh. 1 at 142.

FWS's NHPA Requirements Document contained lenient conditions or outright omissions that undercut the NHPA's purposes. For example, FWS let NPPD off the hook for identifying (much less avoiding or minimizing effects to) historic properties—many of which are *unknown*—stating that "[n]o further NHPA identification efforts are required for the R-Project," including in areas that have "not been surveyed to date." NHPA Requirements Document at 2. In a few limited areas of the APE, NPPD must implement a construction monitoring program prior to construction in those areas, allowing at most only three Tribal monitors to monitor construction activities (rather than identify historic properties, evaluate effects, and resolve adverse effects prior to construction). *Id.* at 8-9. Even then, FWS made the monitoring program contingent on a determination by NPPD that implementing such a program is, in NPPD's view, "prudent and feasible." *Id.* at 8.

NPPD may now construct the R-Project, which it intends to commence on June 8, 2026, except in the few areas where it must allow construction monitoring. *Id.* at 9.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Under this standard, numerous courts have preliminarily enjoined activities like those here. *See, e.g.*, *Hualapai Indian Tribe*, 755 F. Supp. 3d at 1188-91; *Quechan Tribe*, 755 F. Supp. 2d at 1109-20; *Comanche Nation*, 2008 WL 4426621, at *18-19; *Attakai*, 746 F. Supp. at 1405-09.

13

Petitioners satisfy each element. They are likely to succeed on the merits of their claims—i.e., that FWS's waiver of the NHPA's procedures and the ACHP's related guidance, as well as FWS's permitting decision, violate the NHPA, its regulations, and the APA. Irreparable harm is also likely (if not certain) in the absence of an injunction; imminent construction threatens to permanently destroy innumerable historic resources that are nationally significant and culturally important both to our nation and sovereign Tribal Nations. Once these hundreds (possibly thousands) of iconic, irreplaceable resources are damaged or destroyed, they cannot be restored. The public interest and balance of equities also tip sharply in Petitioners' favor, especially where resources, such as human remains, would be forever destroyed without relief. The Court should therefore enter a preliminary injunction maintaining the status quo pending resolution of the merits.

## I.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS

There is no legitimate emergency—nationally or in NPPD's service area—that warrants the draconian, abrupt termination of the R-Project's Section 106 process and waiver of the mandatory requirements of the NHPA and its regulations. Yet, the ACHP and FWS made the unsubstantiated, erroneous assumption that EO 14156 satisfies the statutory and regulatory criteria to waive the NHPA's procedures. Each agency then compounded that serious error—the ACHP by extending the duration of waivers related to EO 14156 far beyond the regulatory time period allowed, and FWS by applying EO 14156 to the R-Project in an arbitrary and capricious manner without establishing any justifiable legal or factual basis to waive the remaining steps of the Section 106 process.

In turn, FWS authorized imminent construction and exempted FWS and NPPD from further NHPA compliance, paving the way for pervasive destruction of significant

14

cultural resources in the R-Project APE, including TCPs, without requiring any further identification efforts, let alone efforts to evaluate or resolve adverse effects. The outcome of the abandoned R-Project Section 106 process is fundamentally unjust; FWS neither engaged early or in good faith with consulting parties through meaningful consultation, nor did FWS act in good faith by pulling the plug on the Section 106 process on the basis of a flimsy rationale (EO 14156) that is plainly a pretext to avoid inconvenience for NPPD.

A.     **The Agencies Did Not Demonstrate a Genuine Emergency, Let Alone a Lawful and Non-Arbitrary Basis under the NHPA or Its Regulations, Necessitating Waiver of the NHPA's Procedures for the R-Project**

Before turning to EO 14156, Petitioners highlight the important purposes animating the NHPA. In enacting the NHPA, Congress stated that "the historical and cultural foundations of the nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People." Pub. L. 89-665, 80 Stat. 915 (1966). Congress intended the NHPA to "insure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation," particularly in response to proposals (such as the R-Project) to expand "industrial developments" in historically rich and culturally valuable areas, *id.*, such as the Nebraska Sandhills.

In turn, Congress required that all agencies, "prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. Given the NHPA's vital purposes, Congress specified that its provisions may be waived only in narrow contexts—"in the event of a major natural disaster or an imminent threat to national security," *id.* § 306112, and only if "the exemption is determined to be consistent with the purposes of [the NHPA], taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic

15

property," *id.* § 304108(c). The ACHP's regulations recognize these limits, restricting waivers only to "an emergency undertaking [proposed] as an essential and immediate response to a disaster or emergency declared by the President . . . or another immediate threat to life or property." 36 C.F.R. § 800.12(b); *see also id.* § 61.10 (DOI prohibiting NHPA waivers that would "compromise the purposes, conditions, and requirements of the [NHPA]"). Neither EO 14156, nor the R-Project, satisfies these strict legal criteria.

### 1. *EO 14156 Does Not Satisfy the Relevant Legal Criteria for Waiving the NHPA's Mandatory Procedures*

The challenged agency decisions are predicated on the assumption that the national energy emergency declared in EO 14156 satisfies the narrow criteria for waiving the NHPA's procedures. It does not. As explained below, not only are the justifications for the national energy emergency remarkably tenuous, but the ACHP and FWS neither supplied *any* coherent analysis of the relevant statutory or regulatory factors, nor actually determined that the national energy "emergency" is the type of event that could support waiving the NHPA's important, mandatory, history- and culture-preserving procedures.

To begin, nothing in EO 14156 demonstrates an emergency, much less one that imminently threatens national security or human life. In the EO, President Trump invoked the NEA, declaring an emergency because, in his view, our energy output is "inadequate to meet our Nation's needs," and "diminishe[s] [the United States'] capacity to insulate itself from hostile foreign actors." 90 Fed. Reg. at 8433. Criticizing the "harmful" "policies of the previous administration," EO 14156 states, with zero substantiation, that "[w]ithout immediate remedy, this situation will dramatically deteriorate in the near future due to a high demand for energy and natural resources to power the next generation of

16

technology." *Id.* Likewise, the EO generically asserts that the emergency "poses an imminent and growing threat to the United States' prosperity and national security." *Id.* Nowhere, however, does EO 14156 reference the NHPA (in contrast to other laws), stating instead that the EO "shall be implemented consistent with applicable law." *Id.* at 8437. And, in urging agencies to use "lawful emergency or other authorities available to them" to increase energy output, EO 14156 focused on energy production in "the West Coast of the United States, Northeast of the United States, and Alaska," where President Trump viewed the "problems" as "most pronounced." *Id.* at 8434.

The politically motivated, highly contrived national "emergency" declared in EO 14156—which lacks evidence, points to areas far from Nebraska, and never mentions the NHPA—is hardly sufficient to waive the NHPA's procedures before destroying historic properties. Petitioners first highlight the dubious nature of the purported emergency.

a. <u>The Text of EO 14156 Undercuts the "Emergency" and Any Waiver of the NHPA's Procedures Based Upon the EO</u>

Courts must scrutinize Executive Branch uses of "emergencies" to dispense with statutory requirements. In *Biden v. Nebraska*, the Supreme Court rejected the invocation of a national emergency due to the COVID-19 pandemic as the basis for discharging $430 billion in student loans, finding that the decision amounted to "the Executive seizing the power of the Legislature" by modifying statutory text requiring borrowers to pay those funds. 600 U.S. 477, 503 (2023). And this year, in reviewing two national emergencies (drug trafficking and trade deficit), the Supreme Court rejected the imposition of tariffs despite what President Trump deemed "unusual and extraordinary threats." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 636 (2026). Noting that "[e]mergency powers, after

17

all, tend to kindle emergencies," and thus "emergencies can afford a ready pretext for usurpation of congressional power," *id.* at 641 (citations omitted), the Supreme Court invalidated the Executive's attempt "to unilaterally impose tariffs of unlimited amount, duration, and scope" without "clear congressional authorization to" do so, *id.* at 646.[7]

President Trump likewise lacks congressional authority to waive the important, mandatory procedures of the NHPA. Congress did not, in the NHPA, waive the Act's procedures whenever the President declares an emergency that applies to a project subject to the NHPA. Rather, the event must satisfy certain statutory criteria: (1) there must be a demonstration of "a major natural disaster or an imminent threat to national security"; 54 U.S.C. § 306112, and (2) "the exemption [must be] determined to be consistent with the purposes of [the NHPA], taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic property," *id.* § 304108(c). EO 14156 fails both. The text of the EO neither identifies or substantiates a major natural disaster or imminent threat to national security, nor even purports to explain how the widespread waiver of the NHPA's procedures for highly destructive projects (like the R-Project) is consistent with the NHPA's purposes. That alone is fatal to the government's waiver of the NHPA's procedures based on the EO.

Moreover, EO 14156 does not establish that there is *any* emergency. An emergency requires an urgent response to an unforeseen event. *See* Black's Law Dictionary (10th ed. 2014) (defining "emergency" as "[a] sudden and serious event or an

---

[7] The Supreme Court explained the inherent problem with emergency declarations: "All it takes to unlock [some] extraordinary power is a Presidential declaration of emergency . . . . And the only way of restraining the exercise of that power is a veto-proof majority in Congress." *Learning Res.*, 146 S. Ct. at 640 (citing the NEA, 50 U.S.C § 1622(a)).

unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm" or "[a]n urgent need for relief or help."). EO 14156 cites no sudden, unexpected event curtailing our nation's access to energy resources. Rather, it criticizes unspecified "policies of the previous administration." 90 Fed. Reg. at 8433. Mere policy disputes about energy development are not an emergency, and are best addressed through our system of separation of powers, with built-in checks and balances, not executive fiat declaring a manufactured "emergency." The lack of a genuine emergency dooms the use of EO 14156 to bypass the NHPA's procedures. *See* The National Emergencies Act (Pub. L. 94-412), Source Book Legislative History, Text, and Other Documents 50, 292 (1976), https://tinyurl.com/3h2yp7h9 (noting in the legislative history that the statute was passed to "[e]nsure that the powers now in the hands of the Executive *will be utilized only in time of **genuine** emergency*" (emphases added)).

Even if there were a genuine emergency, EO 14156 does not meet the criteria of the NEA to waive the NHPA's procedures. First, the NEA does not "enlarge or add to Executive power"; it only "establish[es] clear procedures and safeguards for the exercise by the President of emergency powers [already] conferred upon him by other statutes." *Id.* at 292. Hence, the NHPA's restrictions on waiver must be applied strictly even in the face of a declared emergency—i.e., only upon showing a major natural disaster or an imminent threat to national security, and only where the exemption will not undercut the NHPA's purposes. Second, the NEA requires the President, in any EO declaring an emergency, to "specif[y] the provisions of law under which he proposes that he, or other officers will act," to then "exercise" those powers. 50 U.S.C. § 1631. In contrast to the Clean Water Act and the Endangered Species Act, which EO 14156 explicitly identifies,

19

*see* 90 Fed. Reg. at 8434-35, nowhere does the EO mention the NHPA. For this reason as well, EO 14156 fails to supply a lawful basis to waive the NHPA's procedures.

In sum, EO 14156's energy emergency declaration is simply an unsubstantiated *ipse dixit* by President Trump and fails to meet the NHPA's strict waiver criteria.

      b.      <u>The ACHP's and FWS's Use of the EO to Authorize the Waiver of the NHPA's Procedures Was Arbitrary, Capricious, and Unlawful</u>

Despite its glaring problems, the ACHP and FWS uncritically assumed President Trump's declaration of a national energy emergency in EO 14156, standing alone, was a sufficient basis to waive the NHPA's procedures. Neither agency actually analyzed the relevant statutory and regulatory factors or considered important aspects of the problem.

We start with the ACHP. Without acknowledging that EO 14156 failed to identify the NHPA as required by the NEA, 50 U.S.C. § 1631, the ACHP arbitrarily assumed in its guidance that the EO's generic call for all agencies to exercise their emergency powers means that the EO unlocked and activated the NHPA's emergency provisions. But the NEA itself forecloses that result, given the EO's failure to reference the NHPA. *Id.*

The ACHP also deflected responsibility for any NHPA procedures waived in response to EO 14156, stating that "[i]t is the federal agency's responsibility to determine whether a proposed undertaking is subject to EO 14156 and responsive to the declared emergency." ACHP Guidance, *supra* note 6. The ACHP's "advice" made clear, however, that the ACHP views EO 14156 as triggering waiver of the NHPA's procedures "for any proposed undertaking that falls within the scope of the [EO]." *Id*. Thus, while deferring the determination to an agency as to whether a project is subject to EO 14156 or responsive to the energy emergency declared therein, the ACHP determined—and advised federal

20

agencies—that EO 14156 ostensibly satisfies the ACHP's waiver regulation, despite the significant, overarching flaws with the EO's declaration of a national emergency.

The problem is that the ACHP did not grapple *at all* with the relevant statutory or regulatory criteria, much less coherently apply them. Its guidance never demonstrated that there is "a major natural disaster or an imminent threat to national security," 54 U.S.C. § 306112, or addressed the sparse information in the EO that fails to establish *any* national security risk. Nor did the ACHP determine, or consider, whether the far-reaching implications of waiving the NHPA's procedures for projects subject to EO 14156 is "consistent with the purposes of [the NHPA], taking into consideration the magnitude of the exempted undertaking[s] . . . and the likelihood of impairment of historic property," *id.* § 304108. Nor did the ACHP analyze whether EO 14156 demonstrates an "immediate threat to life or property," which is a requirement of the ACHP's own waiver regulation before agencies may use emergency procedures. 36 C.F.R. § 800.12(b); *see id.* (stating that the regulation applies to a Presidentially declared emergency or "*another* immediate threat to life or property," thereby clarifying that an emergency declaration alone is insufficient in the absence of an imminent threat to life or property (emphasis added)). In sum, the ACHP's determination that EO 14156 allows agencies to waive the NHPA's procedures "relied on factors which Congress has not intended it to consider [and] entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43; *Am. Wild Horse Campaign v. Raby*, 144 F.4th 1178, 1191 (10th Cir. 2025) (same, in the context of an agency "[i]gnoring . . . a requirement of the Wild Horse Act").[8]

---

[8] If Congress wanted to authorize agencies to waive the NHPA's procedures merely upon a Presidential declaration of an emergency—without a showing that it threatens national security and would be consistent with the NHPA's purposes—it could have done so. But

Compounding its serious error of assuming EO 14156 meets the criteria to waive the NHPA's procedures, the ACHP indiscriminately exempted *all* projects subject to EO 14156 for the emergency's indefinite duration. This is highly troubling because under the NEA, President Trump is unlikely to back down and terminate an emergency he declared, and "the only way of restraining the exercise of that power is a veto-proof majority in Congress." *Learning Res.*, 146 S. Ct. at 640 (citing 50 U.S.C § 1622(a)(1)). Hence, this so-called "emergency"— even if entirely illegitimate—might be in place for many years.

And more than merely troubling, the ACHP's indefinite extension is unlawful. Its own regulation limits waivers to 30 days after a natural disaster, declaration of an emergency, or another immediate threat to life or property. *See* 36 C.F.R. § 800.12(d) (limiting waivers "to undertakings that will be implemented within 30 days after the disaster or emergency has been formally declared"). Although an agency may request a project-specific extension from the ACHP "prior to the expiration of the 30 days," *id.*, there must remain an "immediate threat to life or property," *id.* § 800.12(b), which is a prerequisite for *any* waiver. But in its guidance, the ACHP jettisoned these requirements.

Under the ACHP's extension, for any project an agency asserts is subject to EO 14156, the agency is *automatically* entitled to a *permanent* waiver of the NHPA's procedures while the EO remains in effect. Especially because the ACHP concedes that this extension will affect many projects—i.e., "[m]ost actions proposed by agencies in accordance with the [EO] will likely constitute federal undertakings requiring compliance with Section 106," ACHP Guidance, *supra* note 6—the breadth of historic properties that

---

it did not. *See Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 395 (2024) ("[T]he role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits.").

22

will be destroyed in the absence of Section 106 compliance is immense. Yet, the ACHP gave this issue short shrift, stating only that it was creating this loophole because it is consistent with the manner in which emergencies are declared and terminated under the NEA. *Id*. ("Such an extension is consistent with the [NEA], where an emergency declaration remains in effect until rescinded by the President or through a concurrent resolution by Congress."). But consistency with the NEA is irrelevant; this unbounded extension is fundamentally incompatible with *the NHPA* and its history-preserving purposes, as well as 36 C.F.R. § 800.12(d)'s 30-day limitation. Thus, the ACHP's guidance does not remotely pass muster under the NHPA, its regulations, and the APA.

Picking up where the ACHP left off, FWS's invocation of EO 14156 for the R-Project is also arbitrary, capricious, and unlawful for several independent reasons.

First, like the ACHP, FWS failed to demonstrate in its January 2026 R-Project waiver decision (or elsewhere) that there is, in fact, a national energy emergency, relying instead on EO 14156 that is devoid of any evidence showing a genuine emergency. *See* Exh. 1 at 135-39. In line with the ACHP, FWS merely assumed—without analyzing or ultimately substantiating—that a Presidential declaration of an emergency, standing alone, is sufficient to confer authority to waive the NHPA's procedures. *Id.* Because FWS failed to apply the relevant statutory and regulatory criteria to EO 14156, which would have readily led to the conclusion that there is no "imminent threat to national security," 54 U.S.C. § 306112, or an "immediate threat to life or property," 36 C.F.R. § 800.12(b), FWS's approval cannot withstand scrutiny due to its lack of reasoned decisionmaking.

Second, FWS failed to demonstrate, as even the ACHP said it must, that the R-Project is responsive to the "emergency" declared in EO 14156. In fact, nowhere in

23

FWS's five-page waiver approval did FWS scrutinize that issue or ultimately answer this important question. *See* Exh. 1 at 135-39. Had it done so, it is clear that the R-Project once again fails the relevant criteria. For example, as explained, there is no emergency and thus the R-Project, by definition, is therefore not responsive to *any* real emergency.

Moreover, the ACHP's regulations require that to waive the NHPA's procedures, an undertaking must be *both* "an essential and immediate response to a disaster or emergency." 36 C.F.R. § 800.12(b). The R-Project fails both criteria. Even if there was a legitimate emergency, FWS did not establish that the R-Project (in contrast to other projects) is *essential* to alleviate the national energy emergency declared in EO 14156. *See* Exh. 1 at 135-39. Nor did FWS demonstrate any *immediate* need for the R-Project (at the expense of the NHPA), especially where NPPD first proposed the R-Project over a decade prior to President Trump issuing EO 14156. *Id*. Indeed, the R-Project was conceived without any knowledge of EO 14156 or any articulation of an emergency—nationally or in Nebraska. Thus, FWS's failure to address the pertinent regulatory criteria is arbitrary and unlawful. The EO, therefore, does not serve as a free pass to short-circuit the NHPA's procedures merely because the R-Project involves energy transmission.

FWS also failed to examine another important aspect of the problem—whether, given the lack of any genuine national emergency, there is an emergency in NPPD's service area that might warrant the extraordinary approach of waiving the NHPA's procedures. Had FWS evaluated that issue, it is clear no local emergency exists. NPPD stated in its waiver request only that it has resorted to "interim measures" to enhance grid reliability, and there are generic, *long-term* potential risks to grid reliability in its service area in the absence of the R-Project. Exh. 1 at 142-45. But nowhere did NPPD quantify

24

the purported "increased risk of controlled power outages," much less substantiate any *short-term* risk during the brief time period of "eighteen months" that NPPD estimated R-Project construction would be "delay[ed]," *id.* at 142, if the Section 106 process were to continue. Coupled with the fact that FWS did not establish (or even purport to establish) that the R-Project is an "essential" or "immediate" response to a local emergency (which does not exist)— criteria that must be satisfied to waive the NHPA's procedures, 36 C.F.R. § 800.12(b)—FWS's arbitrary waiver decision fails for this reason as well.

FWS's failure to demonstrate an emergency in NPPD's service area is especially flagrant given that EO 14156 pointed to the places President Trump views the energy emergency as "most pronounced"—i.e., "in our Nation's Northeast and West Coast." 90 Fed. Reg. at 8434. As such, the EO directs agencies to exercise emergency authorities "to facilitate" energy projects in "the West Coast of the United States, Northeast of the United States, and Alaska." *Id.* The Nebraska Sandhills are *more than a thousand miles* from the focal points identified in the EO. Thus, it was incumbent on FWS to recognize this fact and articulate a non-arbitrary basis to waive the NHPA's mandatory procedures by explaining how the R-Project satisfies the pertinent legal criteria. It did not do so.

Third, FWS failed to consider yet another important aspect of the problem. In overlooking the lack of any genuine emergency nationally or locally that could supply a lawful basis for waiving the NHPA's procedures, FWS ignored that NPPD's waiver request laid bare the fact that EO 14156 is plainly a pretext to circumvent the NHPA's procedures and expedite construction at the expense of historic properties. Rather than quantify any actual, short-term risk during the estimated eighteen-month remainder of the Section 106 process, NPPD clarified that the real reason for invoking EO 14156 is to

25

avoid inconvenience. *See* Exh. 1 at 141-42 (NPPD criticizing a process that "spiraled out of control" due to "tribal survey effort[s]" and disputes about "methodology," and protesting FWS "hold[ing] a series of review periods" with consulting parties). Given this admission, it was patently arbitrary for FWS to accept at face value NPPD's purported need to invoke EO 14156 to address an emergency, when the reality facing FWS (and NPPD) looked far different. Nor is a permittee's inconvenience a factor Congress made relevant in waiving the NHPA's important procedures. This, too, fails to pass muster.

Fourth, FWS also violated the APA by failing to respond to substantive comments Petitioners and others provided to FWS about the use of EO 14156 for the R-Project. *See* Exhs. 12, 13. FWS never responded to those concerns, let alone took them into account in issuing a final permit to NPPD and waiving the NHPA's procedures so that NPPD may construct the R-Project on the basis of lax alternative procedures far different from what the NHPA requires. Because the failure to engage with, and respond to, substantive comments on an issue this important renders the comment opportunity provisions of 36 C.F.R. § 800.12(b)(2) meaningless, FWS acted arbitrarily and capriciously by soliciting comments but then ignoring them. *See, e.g.*, *Del. Dep't of Nat. Res. v. EPA*, 785 F.3d 1, 13-16 (D.C. Cir. 2015) (holding under the APA that where "petitioners presented their concerns" about an action but the agency "did not[] respond properly to their well-founded concerns," the "action [i]s arbitrary and capricious on that ground alone").

Accordingly, the glaring omissions and the tenuous rationales underlying the ACHP's guidance and FWS's R-Project decisions doom both agencies' efforts to waive the important, mandatory, history-preserving procedures of the NHPA in connection with EO 14156. For this reason, Petitioners are very likely to succeed on the merits.

26

**B.     The ACHP's Guidance Is a Legislative Rule and Violated the APA by Altering Substantive Law without Observing Required Procedures**

Petitioners are also likely to succeed on their claim that the ACHP violated the

APA by issuing a legislative rule that ran afoul of the APA's rulemaking procedures.

The APA's rulemaking requirements apply to legislative rules, but not interpretative

rules. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citing 5 U.S.C. §

553(b)(A)). Interpretative rules "are issued by an agency to advise the public of the

agency's construction of the statutes and rules which it administers." *Id.* at 97. "The

critical distinction between legislative and interpretative rules is that, whereas

interpretative rules simply state what the [] agency thinks the statute means, and only

remind affected parties of existing duties, a legislative rule imposes new rights or duties."

*Iowa League of Cities v. EPA*, 711 F.3d 844, 873 (8th Cir. 2013) (cleaned up). Labeling a

rule as "guidance" or "non-binding" does not shield it from the APA's obligations. Thus,

courts must carefully evaluate an agency's statement—regardless of the agency's label—

to ascertain whether it is a legislative rule. *See, e.g.*, *W. Watersheds Proj. v. Zinke*, 441

F. Supp. 3d 1042, 1067-68 (D. Idaho 2020) (concluding that non-binding agency

guidance was a legislative rule) (rev'd in part on other grounds); *Am. Wild Horse

Campaign v. Burgum*, 768 F. Supp. 3d 1310, 1317 (D. Colo. 2025) (Martinez, J.) (same).

Here, it is beyond legitimate dispute that the ACHP's "guidance" interpreting and

applying the agency's NHPA implementing regulations to EO 14156 is more than just

advice; in three distinct ways, the ACHP substantively modified its regulations.

First, while deferring to agencies project-specific determinations for a particular

undertaking (i.e., whether the undertaking is subject to EO 14156 and responsive to it),

27

the ACHP's "guidance" determined that the emergency declared in EO 14156, despite

the lack of an "immediate threat to life or property" or "a major natural disaster or an

imminent threat to national security," constitutes the type of triggering event in the NHPA

and its regulations for agencies to waive the NHPA's procedures. *See* ACHP Guidance,

*supra* note 6. This marks a fundamental change from both the statutory and regulatory

waiver criteria. It requires no showing of "a major natural disaster or an imminent threat to

national security," 54 U.S.C. § 306112, nor does it require agencies to show an

"immediate threat to life or property," as mandated by the ACHP's own waiver regulation,

which applies even where there is a Presidential declaration of an emergency. *See* 36

C.F.R. § 800.12(b) (utilizing the phrase "*another* immediate threat to life or property,"

thereby clarifying that an emergency declaration alone is insufficient in the absence of an

imminent threat to life or property (emphasis added)). Thus, the guidance materially

modifies the NHPA and its regulations by making the mere Presidential declaration of an

emergency, standing alone, a permissible basis to waive the Act's procedures.

Second, the ACHP's guidance marks a radical departure from the agency's

regulations by indiscriminately and indefinitely extending the time frame during which

agencies are authorized to waive the NHPA's procedures, no matter how many projects

are implicated or how severe the resulting effects to historic properties. This flies in the

face of the ACHP's own, longstanding regulation that expressly restricts waivers "to

undertakings that will be implemented within 30 days after the disaster or emergency has

been formally declared." 36 C.F.R. § 800.12(d). If the ACHP wants to change the

acceptable duration for waivers (assuming Congress conferred such authority in the

NHPA), it must make that consequential decision subject to the APA's requirements.

Third, in preemptively extending the waiver duration in connection with EO 14156 to be co-extensive with the national energy emergency (which will last years), the ACHP also substantively changed its regulations by dispensing with the mandatory project-specific extension request process, once the initial 30-day waiver period expires. 36 C.F.R. § 800.12(d) ("An agency may request an extension . . . from the [ACHP] prior to the expiration of the 30 days"). This change is far from harmless; rather than requiring agencies, both when initially seeking to waive the Act's procedures and in the event of an extension request, to show a demonstrable, "immediate threat to life or property," *id.* § 800.12(b), the ACHP's guidance lets agencies entirely off the hook from requesting extensions in connection with EO 14156 or making the required showing to obtain one.

The ACHP's guidance clearly created "new rights." *Iowa League of Cities*, 711 F.3d at 873. Before the guidance, agencies could not waive the NHPA's procedures unless they established a major natural disaster, an imminent threat to national security, or an immediate threat to life or property. Now, without any oversight by the ACHP, an agency may waive the same procedures merely by stating its view that an undertaking is subject to EO 14156 and responsive to it. Likewise, whereas agencies were limited to waiving the Act's procedures for 30 days—which the ACHP could extend only if there remained an immediate threat to life or property—agencies may now waive the same procedures with impunity as long as the EO is in place, and without the need for any project-specific extension request or demonstration of any emergency need for the waiver. This change in rights leaves no doubt that the guidance is a legislative rule.

Moreover, despite being dressed up as "guidance" and "advice," the ACHP's decision is anything but advisory. In fact, "there is no record evidence evincing a belief

29

by" agencies, such as FWS, that this guidance is "anything but mandatory in practice."
*Am. Wild Horse Campaign*, 768 F. Supp. 3d at 1314. Indeed, DOI—FWS's parent agency—made clear in its own guidance that Interior agencies, such as FWS, could lawfully rely upon the ACHP's determinations: (1) that the mere declaration of a national energy emergency in EO 14156 satisfies the criteria to waive the NHPA's procedures, and (2) that agencies may disregard the ACHP's regulatory 30-day waiver time limit and the need to request an extension before its expiration if an immediate threat remains.

Specifically, DOI noted: "[t]he ACHP's guidance implicitly interprets its Section 106 regulations regarding emergencies, identified in the regulations as a 'disaster or emergency declared by the President . . ., or another immediate threat to life or property,' 36 C.F.R. § 800.12(b), as applying to the energy emergency declaration," and "also extends the time in which an agency may use the emergency provisions for an applicable undertaking relating to EO 14156 from 30 days to a period coinciding with the duration of the emergency declaration." Dep't of the Interior, *Emergency Process for Section 106 Compliance* (Apr. 23, 2025), https://tinyurl.com/32wzdavb. DOI thus relied directly on the ACHP's determinations in instructing FWS and other agencies to indefinitely waive the NHPA's procedures for all undertakings that can be characterized as responding to the EO. *Id.* In this way, the ACHP's guidance has a binding effect by excusing agencies from demonstrating that the national energy emergency satisfies the pertinent statutory or regulatory waiver criteria, and by excusing agencies from the time limit imposed by the regulations or the requirement to demonstrate a legitimate need for an extension.

In sum, the ACHP's guidance at issue here is indistinguishable from agency guidance this Court and others have found to be legislative rules. For instance, as in

30

*Western Watersheds Project*, the guidance here was "effective immediately"; "had an immediate and practicable impact" on agencies, as shown through DOI's subsequent guidance and FWS's R-Project decision; conferred new rights to agencies and project proponents; and "does not clarify existing policy as much as it creates it." 441 F. Supp. 3d at 1066-68; *see also Am. Wild Horse Campaign*, 768 F. Supp. 3d at 1316-17.

Accordingly, Petitioners are likely to prevail on their claim that the ACHP made far-reaching, substantive modifications to its regulations without notice-and-comment rulemaking, in violation of the APA's mandatory safeguards, 5 U.S.C. § 553(b)-(c).[9]

### C.  FWS's Permitting and Related Decisions Violate the NHPA, Its Regulations, and the APA in Numerous, Significant Ways

As explained, FWS predicated its R-Project decision to waive mandatory NHPA procedures on a sham "emergency" that neither satisfies the relevant legal criteria nor involved an analysis of relevant factors by FWS or the ACHP, and FWS also relied upon the ACHP's unlawful rule. Because FWS lacks a lawful basis for waiving the NHPA's procedures, Petitioners are also likely to succeed on their claims challenging FWS's violations of the NHPA and its regulations in bypassing the obligations imposed by each.

To begin, FWS did not satisfy its duty to consulting parties, and especially Tribes, to ensure meaningful consultation *early* in the R-Project's decisionmaking process, in

---

[9] Perhaps the reason the ACHP evaded notice-and-comment rulemaking is that it would be impossible for the agency to demonstrate, as it must, that its waiver of the NHPA's procedures for hundreds (or possibly thousands) of energy projects subject to the EO—thereby destroying or impairing tens of thousands of historic properties—is somehow "consistent with the purposes of [the NHPA], taking into consideration the magnitude of the exempted undertaking or program and the likelihood of impairment of historic property." 54 U.S.C. § 304108(c). This is precisely *why* the APA requires formal rulemaking, so that the ACHP's compliance with the NHPA's requirements and the agency's rationales for modifying its regulations can be subjected to judicial review.

31

order to ensure the broadest range of options to avoid adverse effects at the end of the process. *See* 36 C.F.R. § 800.1(c) (agencies must "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking"); *id.* § 800.1(a) (consultation shall "commenc[e] at the early stages or project planning"); *id.* § 800.2(c)(2)(ii)(A) (agencies must commence Tribal consultation "early in the planning process, in order to identify and discuss relevant preservation issues" so that a Tribe has "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects").

It is hard to conceive of a worse effort to engage early (or meaningfully) with consulting parties. Here, many Tribes were excluded from FWS's Section 106 process that culminated in 2019. *See* Exh. 2. Then, once the Rosebud Sioux Tribe and others learned of the R-Project's anticipated impacts, FWS belatedly included them in the renewed Section 106 process, but inexplicably delayed that renewed process for *more than three years* from this Court's remand to FWS. *See* Exh. 1 at 56-59 (FWS Letter (Jul. 10, 2023)). Now, after the consulting parties expended significant effort consulting from July 2023 to January 2026 during the renewed process, FWS has washed its hands of the Section 106 process by proclaiming there is an emergency that warrants abandoning the efforts to date by the consulting parties and waiving the mandatory obligations of the NHPA and its regulations. If ever there were severe prejudice to the interests of Tribes or other consulting parties from an agency failing to engage with them early in the process,

32

this is it. This alone counsels in favor of injunctive relief. *See, e.g.*, *Quechan Tribe*, 755 F. Supp. 2d at 1108 (explaining that "the timing of required review processes [under the NHPA] can affect the outcome and [delay] is to be discouraged" (citing *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785-86 (9th Cir. 2006)); *id.* at 1119 (issuing injunction in part because the agency failed to "begin early" in its consultation with a Tribe and thus trampled on the Tribe's "consulting rights").

Likewise, during the renewed Section 106 process, FWS acted in the *opposite* manner required by the NHPA's regulations, which instruct agencies to respect the "unique legal relationship" between the federal government and "Indian tribes set forth in the Constitution of the United States, treaties, statutes, and court decisions," and to conduct consultation with Tribes "in a sensitive manner respectful of tribal sovereignty" that "recognize[s] the government-to-government relationship between the Federal Government and Indian tribes." 36 C.F.R. § 800.2(c)(2)(ii)(B), (C).

In sharp contrast, FWS repeatedly resisted the Tribes' expert objections and recommendations, based on the Tribes' significant NHPA experience, regarding the proper sequence of the Section 106 process, appropriate survey methodologies to identify TCPs and other Tribal resources, and the need for complete and accurate information regarding historic properties prior to evaluating and resolving adverse effects. *See, e.g.*, Exhs. 5, 7, 8, 9, 10, 13. FWS's repeated refusal to treat the Rosebud Sioux Tribe (and other Tribes) as the co-equal, sovereign Nations they are—indeed, the only parties to the Section 106 process with *any* expertise in identifying culturally significant landscapes, other TCPs, or other important Tribal resources—is not only disgraceful, but patently unlawful. Far from receiving the "special consideration in the course of [FWS's]

33

fulfillment of its consultation obligations" to which they are "entitled," *Quechan Tribe*, 755 F. Supp. 2d at 1109, the Tribes were largely dismissed, sidelined, muzzled, and outright ignored by FWS and NPPD. It is hard to imagine an outcome more flagrantly inconsistent with either the NHPA or the "fiduciary duty" BLM owes "to all Indian tribes." *Id.* at 1110.

In addition, FWS's actions in the renewed Section 106 process reflect the opposite of meaningful, good faith efforts to identify, evaluate, and resolve adverse effects to historic properties in close coordination with consulting parties. *See* Exhs. 5, 6, 7, 8, 9, 10, 11, 12, 13; *see also* Exh. 1 at 73. Even before the so-called "emergency" arose, consulting parties repeatedly identified serious concerns with FWS's efforts to identify historic properties within the APE, let alone evaluate and resolve adverse effects to properties once identified. *See* Exhs. 6, 7, 8, 9, 10. This stands in stark contrast to FWS's unequivocal duty to "make a reasonable and good faith effort" to identify all historic properties and then satisfy the remaining steps of the Section 106 process. 36 C.FR. § 800.4(b)(1). This, too, violated the NHPA, its regulations, and the APA, and warrants an injunction. *See, e.g.*, *Comanche Nation*, 2008 WL 4426621, at *19 (issuing an injunction where the agency "turned a deaf ear to warnings of adverse impact" from Tribes and thus its "efforts fell short of the reasonable and good faith efforts required by the law").

By the same token, FWS's failure to identify (or resolve effects to) historic properties is especially egregious here because FWS concedes the *likely* existence of TCPs within the APE. *See* FWS, Final SEIS at 3.10-9 ("Consultation indicates that TCPs to which Tribal Nations ascribe traditional religious or cultural significance are likely to be in the APE."). Not only did FWS refuse Tribes' repeated requests to allow Tribal Cultural Specialists to survey the APE using standard methods to identify culturally significant

34

landscapes and other TCPs, but FWS's abrupt termination of the Section 106 process and its authorization of construction in most of the APE without any surveys (or even construction monitoring) by Tribes permanently doomed untold numbers of culturally significant landscapes and other TCPs to permanent destruction.

This slap in the face to Tribes by FWS is neither good faith consultation required by the NHPA, nor consistent with FWS's overarching duty to undertake meaningful, good faith efforts to identify, evaluate, and resolve adverse effects to historic properties. *See, e.g., Pueblo of Sandia*, 50 F.3d at 860-63 (holding both that the agency "did not make a reasonable effort to identify historic properties" and "did not put forth a good faith effort to identify historic properties"); *Hualapai Indian Tribe*, 755 F. Supp. 3d at 1188-91 (issuing an injunction where the agency failed in good faith to identify affected historic properties where a Tribe repeatedly pointed to the existence of a TCP in the APE).

Moreover, in authorizing R-Project construction on the basis of unilaterally determined, nominal "conditions" imposed on NPPD via FWS's NHPA Requirements Document, FWS violated the NHPA and its regulations in several, distinct ways.

For one, FWS permitted NPPD to bulldoze ahead with highly damaging construction activities while stating that "[n]o further NHPA identification efforts are required for the R-Project," including in areas that have "not been surveyed to date." NHPA Requirements Document at 2. This contravenes the NHPA's paramount mandate that agencies, "*prior to the issuance of any license*, shall take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108 (emphasis added); *accord* 36 C.F.R. § 800.1(c); *see also Pit River Tribe*, 469 F.3d at 787 ("hold[ing] that the agencies violated NHPA by failing to complete the necessary review before" issuing

35

extended leases); *Attakai*, 746 F. Supp. at 1409 (enjoining action where the agency "did not adequately take into account the effect of the undertakings on historic properties").

Further, despite stating that "[a]dverse effects on Tribal resources [including TCPs] will be addressed through the implementation of alternative procedures for compliance with Section 106 (36 C.F.R. § 800.12(b)(2))," Final SEIS at 3.10-9, FWS's NHPA Requirements Document does nothing to identify, evaluate, or resolve adverse effects to Tribal resources (including TCPs), instead requiring only that NPPD allow Tribal monitors to observe resource destruction in real time during construction, and only then in a tiny fraction of the APE where FWS believes Tribal resources are most likely to exist. *See* NHPA Requirements Document at 8-9. This violates FWS's duties to identify properties, evaluate effects, and resolve adverse effects prior to the issuance of any license—or *at all* in this circumstance—as well as the special duty FWS owes to engage in good faith, meaningful consultation where important Tribal resources of this kind are involved.

And, as to several "conditions" FWS imposed, including the Tribal monitoring program, FWS stated that NPPD must implement them only if NPPD determines (without any consultation) that implementing those conditions is "prudent and feasible." NHPA Requirements Document at 8. By washing its hands of *its* NHPA duties, and instead issuing a permit to NPPD that delegates significant discretion to the self-interested project proponent to forgo even the extremely modest conditions that FWS imposed, FWS acted arbitrarily, capriciously, and contrary to the letter and purpose of the NHPA. *Cf. Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1258 (D.C. Cir. 1988) (holding that an agency "may not delegate to parties and intervenors its own [statutory] responsibility to independently investigate and assess [a project's] impact" on affected resources).

36

Finally, FWS's decision authorizing imminent R-Project construction without further identifying, evaluating, or resolving effects to historic properties violates the NHPA and its regulations by extinguishing: (1) the rights of consulting parties, including Tribes, to participate and consult in each stage of the Section 106 process, *see* 36 C.F.R. §§ 800.2, .4(a)(3)-(4), .4(b)(2), .4(c), .4(d)(2), .5(a), .5(c), .6(a), .6(b), .6(c)(2); and (2) the rights of consulting parties, including Tribes, to invoke dispute resolution mechanisms in the event of disagreements that likely would have continued to occur if FWS had not terminated the process. *See* 36 C.F.R. §§ 800.4(c)(2), .4(d), .5(c)-(d), .7. In both of these concrete ways, FWS's permitting decision ran roughshod over specific, express rights FWS must respect and honor under federal law. *See, e.g.*, *Quechan Tribe*, 755 F. Supp. 2d at 1119 ("[A]gencies are not free to glide over requirements imposed by Congressionally-approved statutes and duly adopted regulations," and finding that "[t]he Tribe's consulting rights should have been respected"; "[i]t is clear that did not happen here.").

Accordingly, FWS's decisions violate the NHPA, its regulations, and the APA in numerous ways, to the severe detriment of the Rosebud Sioux Tribe, OCTA, and other consulting parties, as well as the American public that treasures these irreplaceable resources. As the Tenth Circuit has explained, "[a]gency action will also be set aside if the administrative process employed violated basic concepts of fair play." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1583 (10th Cir. 1994) (citation omitted). FWS's abrupt, unlawful termination of the R-Project Section 106 process is the *opposite* of fair play, discarding the multi-year effort by consulting parties merely to lessen the regulatory burdens on NPPD—at the expense of nationally and culturally iconic historic properties.

37

This inequitable result cannot stand. "If men must turn square corners when they deal with the government, it cannot be too much to expect the government to turn square corners when it deals with them." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021). Because FWS flouted its legal duties, Petitioners are likely to prevail on the merits.

## II.  AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM

The harm caused by the R-Project's imminent desecration and permanent destruction of culturally important landscapes, other TCPs, Historic Emigrant Trails, artifacts, and other properties that play a significant role in the history and culture of both the United States (and its westward expansion) and for numerous sovereign Tribes is, by its very nature, irreparable. *See Friends of Astor, Inc. v. City of Reading*, No. 98-CV-4429, 1998 WL 684374, at *12 & n.35 (E.D. Pa. Sept. 17, 1998) (noting that the destruction of a historic property would "clearly . . . result in irreparable harm" that is "irrevocable" because "[o]ne cannot unring the ping of the wrecking ball"); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable."). Absent an injunction, Petitioners and their members will suffer irreversible harm, as explained in the attached declarations. *See* Exh. 15 (Decl. of John Winner); Exh. 16 (Decl. of Benjamin Young).

For instance, Declarant John Winner, a long-time member of OCTA, explains that the R-Project will irreparably harm the National Emigrant Trails, including segments "of the Oregon-California National Historic Trail" that are "irreplaceable and unparalleled historical resource[s]," Exh. 15 at ¶ 10. This is because the R-Project will "permanently devastate the historic and rural character of the areas where these iconic segments of

38

the Oregon-California National Historic Trail and the Mormon Pioneer National Historic Trail are located." *Id.* at ¶ 12. For this reason, Mr. Winner explains that:

> The character, feeling, and historic value of the Trails will be forever and irreparably damaged. In my opinion, the R-Project's physical and visual impacts would so severely damage the character and historic value of the Trails that they would be tantamount to the permanent destruction of these unique and extremely important historical resources, and it would jeopardize the ability of these trail segments to remain at a Class 1 ranking status.

*Id.* ¶ 12. Thus, "[b]y physically destroying and/or fundamentally degrading the historic character of the Oregon-California National Historic Trail and the Mormon Pioneer National Historic Trail," the R-Project "will irreparably injure the interests of OCTA, OCTA's members, and [Mr. Winner] in preserving these unique and irreplaceable historic resources for future generations of Americans." *Id.* ¶ 16. This irreparable harm to these nationally significant historic properties and OCTA's interests in them is only exacerbated by the fact that OCTA, despite being a consulting party, "was largely excluded from most of the process under the NHPA," leading to Mr. Winner's expert conclusion that "the important historic resources in this area merit more (or at least some) serious consideration of alternative ways to avoid, or at least minimize and mitigate, harms from reasonably foreseeable development of this magnitude." *Id.* ¶ 14.

Likewise, Declarant Benjamin Young, a member of the Rosebud Sioux Tribe and its Tribal Historic Preservation Officer, explains that FWS's illegal short-circuiting of the Section 106 process is out of line with precedent, best practices for NHPA compliance, and the NHPA's animating principles. If FWS is allowed to proceed as planned, Mr. Young estimates that the detour around the NHPA's requirements will result in the destruction of hundreds of Tribal resources in the R-Project APE. *See* Exh. 16 at ¶ 5.

39

Specifically, Mr. Young states that the existence of TCPs in the APE, such as the remains of Tribal ancestors and ceremonial artifacts, is a "virtual certainty" and failing to survey the area for TCPs, as required by Section 106, is FWS's newest action in a pervasively deficient R-Project process that will irreversibly destroy properties valuable to Tribal heritage and culture. *Id.* at ¶ 5. In fact, 543 significant sites have already been identified within the R-Project APE before the requested (but not allowed) Tribal surveys could study the APE. *Id*. In Mr. Young's assessment of his experience with the R-Project, FWS prefers "the consistent exclusion of Tribal involvement" through the "repeated dismissal and disparagement of Tribal concerns" to allowing Tribal surveys in the R-Project APE, despite the fact that Tribes have repeatedly presented FWS with the 543 existing sites and the threat of irreparable harm to Tribal Interests. *Id*. at ¶¶ 5, 13.

The surveys requested by the Rosebud Sioux Tribe in the Section 106 process are "standard survey practice" and would, if allowed, help the Tribe determine if more TCPs, including ceremonial artifacts, cultural landscapes, and human remains, lie within the R-Project APE. *Id*. at ¶¶ 5, 6, 7, 19. Mr. Young explains that the Tribe's ancestors:

> followed Buffalo across the plains, moving as far south as the Smoky Hills and moving north through the R-Project APE. During these travels, the Rosebud Sioux set up winter camps and performed ceremonial rituals like the Sun Dance. These camps and rituals have associated historic properties that almost certainly were left behind on the landscape, like ceremonial tools and hunting implements. The sites of these winter camps and rituals are sacred to the Rosebud Sioux. These places represent family, spiritual connection, and connection to the Earth. I, and other members of our Tribe (based on my conversations with many Tribal members), routinely return to many of these sites to connect with our ancestral culture and religion, and the loss of these sites would be devastating for our culture, history, and religion.

*Id.* at ¶ 5. As a result of the Tribe's extensive use of the R-Project APE, Mr. Young explains that the APE inevitably contains countless TCPs and other historic properties, such as human remains, ceremonial tools, hunting implements, and other artifacts. *See*

40

*id.* at ¶¶ 5-7. The APE also overlaps with the Ogallala Aquifer—a likely TCP itself—which is a vitally important, sacred Tribal water source. *Id.* at ¶ 8. The decreased availability of clean aquifer water due to the R-Project will diminish the ability of the Rosebud Sioux to continue their traditions and directly threatens the continued viability of their culture.

In Mr. Young's professional opinion, "the R-Project decisions indisputably demonstrate a lack of consideration for the Tribe and its sovereign interests in the R-Project APE and the culturally significant objects, sites, and landscapes located therein." *Id*. at ¶ 30. The decisions (and the lack of process) endanger vitally important remains and artifacts; the destruction of these properties will cause irreparable harm that cannot be understated. *See id.* at ¶¶ 3, 28. Such destruction, irreversible once it occurs, only compounds harms that the U.S. Government has already wrought upon the Rosebud Sioux; much of the Tribe's history "has already been erased through thoughtless development, poor communication, and rushed expansion west by previous generations of Americans, often with the express approval of the U.S. Government." *Id.* at ¶¶ 3, 7.

Given the detailed, specific allegations of harms to historic properties located within the APE, and the plainly irreparable (i.e., permanent and irreversible) nature of these harms in the absence of an injunction, Petitioners have amply demonstrated irreparable harm sufficient to obtain a preliminary injunction to maintain the status quo.

Indeed, this case is indistinguishable from those where courts issued preliminary injunctions in comparable contexts—i.e., "[t]he parties agree there are hundreds of known historical sites on the land, and the Tribe attaches cultural and religious significance to many if not most of these. . . . Damage to or destruction of any of them would constitute irreparable harm"; in addition, "if the [T]ribe hasn't been adequately consulted and the

41

project goes ahead anyway, this legally-protected procedural interest would effectively be lost." *Quechan Tribe*, 755 F. Supp. 2d at 1120; *see also id.* (finding that the irreparable harm "requirement is *easily met*" (emphasis added)); *Comanche Nation*, 2008 WL 4426621, at \*19 ("The construction of a permanent structure on a site considered sacred by the Comanche people . . . would constitute irreparable harm."); *Hualapai Indian Tribe*, 755 F. Supp. 3d at 1197 ("Plaintiff meets the irreparable harm requirement because it has shown that damage to Ha'Kamwe', a culturally significant site for the Tribe, is likely.").

Accordingly, in line with its sister courts that have reviewed functionally identical facts, this Court should find irreparable harm warranting a preliminary injunction.

### III.    THE EQUITIES AND PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION

The balance of the equities tips sharply in Petitioners' favor. Once construction occurs, the National Emigrant Trails, culturally significant landscapes, artifacts, human remains, other TCPs, and historic properties within the APE will be irretrievably lost not only for the Tribes, OCTA, and the members of each, but to the detriment of American and Tribal society at large. Such harms "are permanent" and outweigh any harm to FWS or NPPD from a "temporary delay." *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014); *see also Comanche Nation*, 2008 WL 4426621, at \*19 ("The Court is not insensitive to the economic harm Defendants estimate will occur in the event of further delay, or termination, of the TSC project. However, the monetary damages Defendants may incur if an injunction issues pale in comparison to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief."); *Quechan Tribe*, 755 F. Supp. 2d at 1121 ("[T]he balance of equities tips heavily in the Tribe's favor," although the

42

project proponent "has already spent millions of dollars preparing this project, and faces difficulties obtaining investment and financing if the project is held up.").[10]

Moreover, Petitioners were harmed, and continue to be harmed, by FWS's failure to engage in a meaningful, lawful, good faith Section 106 process, perpetuated by FWS's approval of construction—which forever restricts the availability of measures to avoid, minimize, and mitigate impacts to historic properties—without the benefit of Petitioners' input. *See, e.g.*, *Hualapai Indian Tribe*, 755 F. Supp. 3d at 1198 (finding that the "important public interest" in "lithium exploration" "does not outweigh the potential damage the Phase 3 drilling project may cause to Ha'Kamwe', which is central to the Hualapai Tribe life-way," "[n]or does it permit a federal agency to short-cut its regulatory consultation obligations or reasoned evaluation of the effects of its undertaking").

Preliminary relief is also squarely in the public interest. In amending the NHPA, Congress concluded that "historic properties significant to the Nation's heritage are being lost or substantially altered, often inadvertently, with increasing frequency" and that "the preservation of this irreplaceable heritage *is in the public interest*." National Historic Preservation Act of 1966, Pub. L. No. 89-665, *amended by* National Historic Preservation Act Amendments of 1980, Pub. L. No. 96-515 (emphasis added). Accordingly, Congress long ago decided that the identification and preservation of cultural resources serves an important public interest, which favors a preliminary injunction here. *See Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) ("The importance of

---

[10] Any equitable argument from NPPD must account for the fact that while NPPD talks about "long-term" grid vulnerabilities that the R-Project might help address as NPPD's interim solutions become less effective over time, *see* ECF No. 9-1 at ¶ 11, nowhere has NPPD demonstrated an *immediate* need, in 2026, to construct the R-Project to avoid any *likely* (let alone imminent) emergency that actually threatens the Nebraska energy grid.

Case No. 1:26-cv-00862-NYW-SBP    Document 24    filed 04/16/26    USDC Colorado
pg 53 of 55

these sites transcends their spiritual value to the Tribes and, instead, evidences their cultural significance to the general public."); *Quechan Tribe*, 755 F. Supp. 2d at 1122 ("[I]n enacting [the] NHPA Congress has adjudged the preservation of historic properties and the rights of Indian tribes to consultation to be in the public interest. Congress could have, but didn't, include exemptions for renewable energy projects such as this one.").

It necessarily follows that "[s]uspending a project until [legal] consideration occurs comports with the public interest." *S. Fork Band Council of W. Shoshone of Nev. v. Dep't of the Interior*, 588 F.3d 718, 728 (9th Cir. 2009); *see also id.* (finding that the public interest favored an injunction and preservation of the status quo pending legal compliance); *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 479 F.3d 1148,1151 (9th Cir. 2007) (noting that "the whole point of the injunction" is to maintain the status quo pending further evaluation). This is because "[t]he public has an undeniable interest in" agencies' "compliance" with federal law. *Colo. Wild, Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007); *see also Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998) (issuing an injunction including because "the public has a general interest in the meticulous compliance with the law by public officials").

Hence, maintaining the status quo pending review of FWS's and the ACHP's compliance with the NHPA and the APA—based on a full administrative record—furthers the overwhelming public interest in historic and cultural resource preservation and prevents irreparable harm to important resources in the fragile Nebraska Sandhills.

**IV.    NO BOND, OR ONLY A NOMINAL BOND, SHOULD BE REQUIRED**

Under Rule 65, the Court may dispense with the security requirement or require only a nominal bond. *See California ex rel Van de Kamp v. Tahoe Reg'l Plan. Agency*,

766 F.2d 1319, 1325-26 (9th Cir. 1985); *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("[W]here a party is seeking to vindicate the public interest . . . , a minimal bond amount should be considered" when granting an injunction) (abrogated on other grounds); *Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972) (affirming an order of no bond); *W.V. Highlands Conservancy v. Island Creek Coal Co.*, 441 F.2d 232, 236 (4th Cir. 1971) (affirming an order of a $100 bond); *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1191 (N.D. Cal. 2009) (ordering no bond).

This Court should waive the bond requirement. Petitioners—primarily resource-limited nonprofit organizations and a Tribe that faces substantial financial hardships—seek to protect irreplaceable historic and cultural resources that will be lost once NPPD begins construction. Accordingly, a waiver of security or a nominal security is justified.

## CONCLUSION

Petitioners respectfully request entry of a preliminary injunction—before June 8, 2026—to temporarily preserve the status quo pending resolution of the merits.

Respectfully submitted,

*/s/ William S. Eubanks II*
William S. Eubanks II
(970) 703-6060
bill@eubankslegal.com

Riley C. Varner
(804) 461-8479
riley@eubankslegal.com

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006

Counsel for Petitioners

46