**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 26-cv-00862-NYW-SBP

OREGON-CALIFORNIA TRAILS ASSOCIATION,
ROSEBUD SIOUX TRIBE,
WESTERN NEBRASKA RESOURCES COUNCIL,
PRESERVE THE SANDHILLS, LLC,
WHITETAIL FARMS EAST, LLC, and
HORSESHOE BAR RANCH, LLC,

      Petitioners,

v.

MATT HOGAN, in his official capacity,
DOUG BURGUM, in his official capacity,
BRIAN NESVIK, in his official capacity, and
TRAVIS VOYLES, in his official capacity,

      Respondents,

and

NEBRASKA PUBLIC POWER DISTRICT,

      Respondent-Intervenor.

_____

**ORDER ON PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION**
_____

      This matter is before the Court on Petitioners' Motion for a Preliminary Injunction and Memorandum in Support (the "Motion"), [Doc. 24, filed on April 16, 2026].[1] Pursuant to Rule 65, Petitioners move to the enjoin the construction of a transmission line in Nebraska (the "R-Project"), which they contend "will slice through the fragile Nebraska

_____

[1] When citing to a filing on the docket in this action, this Court uses the convention [Doc. ___] and the page number assigned by the District's Electronic Case Files system.

Sandhills and irreversibly destroy many iconic Tribal, historic, and cultural landscapes, artifacts, and resources." [*Id.* at 10]. For the reasons set forth herein, the Motion is respectfully **GRANTED in part and DENIED in part**.[2]

**BACKGROUND**

**I.    The Parties**

Petitioners are a coalition of nonprofit organizations dedicated to preservation of the Emigrant Trails and various environmental resources, a federally-recognized Indian tribe, and companies that own real estate in the region proposed to be affected by the R-Project. [Doc. 1 at ¶¶ 15–29]. Respondents Hogan, Burgum, Nesvik, and Voyles (the "Federal Respondents") are public officials who lead or have responsibility over the actions of two federal agencies, the U.S. Fish and Wildlife Service ("FWS") and the Advisory Council on Historic Preservation ("ACHP"). [*Id.* at ¶¶ 32–35]. Nebraska Public Power District ("NPPD") is a public corporation and political subdivision of the State of Nebraska that provides electrical service to all or parts of 84 of Nebraska's 93 counties. [Doc. 9 at 5]. It "owns, operates, and maintains an electrical grid of approximately 5,377 miles of transmission lines to provide service to approximately 530,000 people in Nebraska." [*Id.* at 5–6].

**II.    The R-Project**

In 2012, a regional transmission organization called the Southwest Power Pool "determined the need . . . for a new 345-kV electric transmission line across Nebraska." [Doc. 30 at 13]. The R-Project, "a 226-mile, . . . $835 million electric transmission line," was designed to meet that need. [*Id.* at 10, 13]. The R-Project is planned to go through

---

[2] Petitioners' original Motion for a Preliminary Injunction [Doc. 18] which was superseded by the instant Motion, *see* [Doc. 22; Doc. 23], is **DENIED as moot**.

the Nebraska Sandhills, "an area that, as described by the Nebraska Legislature, 'provide[s] an irreplaceable habitat for millions of migratory birds and other wildlife every year and serve[s] as the home to numerous ranchers and farmers,' as well as to 'priceless' Tribal, historic, cultural, and archaeological artifacts."  [Doc.1 at ¶ 1].

In planning the R-Project, NPPD voluntarily applied for and was issued by FWS an Incidental Take Permit (the "ITP") for an endangered species of burying beetle that will be affected by the transmission line.  [Doc. 30 at 14; Doc. 28 at 17].  In July 2019, Petitioners challenged the issuance of the ITP in an action in this District before the Honorable William J. Martínez, alleging violations of the Endangered Species Act, National Environmental Policy Act, National Historic Preservation Act ("NHPA"), and Administrative Procedure Act ("APA").  *See Or.-Cal. Trails Ass'n v. Walsh*, 467 F. Supp. 3d 1007 (D. Colo. 2020).  The challenge was successful, and Judge Martínez vacated in part the ITP and remanded to FWS for further proceedings.  *See generally id.*

After remand, NPPD revised and resubmitted its ITP application for the R-Project. [Doc. 28 at 20].  Because the R-Project continues to bisect the Nebraska Sandhills, in 2023, FWS initiated the consultation process mandated by the NHPA (the "Section 106" process), which included meeting with several Tribes and other consulting parties such as the Oregon-California Trails Association ("OCTA") to discuss the historic and cultural resources that may be affected or destroyed by the R-Project.  [Doc. 1 at ¶¶ 72–86].  In these discussions, FWS and the consulting parties were identifying the sites and resources potentially affected by the R-Project; assessing and discussing potential resolutions for any adverse effects; and discussing the process for continued consultation and advisement throughout the Section 106 process for the consulting parties.  [*Id.*].  This

3

process was ongoing when, on January 20, 2025, President Donald J. Trump ("President Trump" or "the President") issued Executive Order 14156 (the "EO").  [*Id.* at ¶ 87].

### III.   The Executive Order and Invocation of Emergency Alternative Procedures

The EO declared a national energy emergency and directed all agency heads to "identify and exercise any lawful emergency authorities available to them, as well as all other lawful authorities they may possess, to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources."  90 Fed. Reg. 8433 (Jan. 20, 2025); *see also* [Doc. 1 at ¶¶ 87–90].  The EO discussed the "active threat to the American people from high energy prices," including that "[e]nergy security is an increasingly crucial theater of global competition," and that "[i]n an effort to harm the American people, hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."  90 Fed. Reg. 8433.  The President declared that "[t]he integrity and expansion of our Nation's energy infrastructure—from coast to coast—is an immediate and pressing priority for the protection of the United States' national and economic security."  *Id.*

On February 25, 2025, the ACHP issued guidance that to comply with the EO, "agencies can avail themselves of the expedited emergency provisions in Section 800.12(b)(2) of the Section 106 regulations."  *Section 106 Emergency Provisions and the Executive Order Declaring a National Energy Emergency*, Advisory Council on Historic Pres. (Dec. 10, 2025), https://www.achp.gov/Section_106_and_Energy_Emergency ("ACHP Guidance"); [Doc. 1 at ¶¶ 91–92].  The ACHP explained that for projects that are already in ongoing Section 106 consultations, "agencies should continue the process" but

"may determine the expedited review process is warranted."  ACHP Guidance; [Doc. 1 at ¶ 93].  In the event of the latter, "the agency should clearly articulate the rationale for the change in its approach to compliance[,] share that information with the consulting parties[,] [and] . . . ensure information about the proposed undertaking and its effects already identified and developed in consultation is shared in the expedited review."  ACHP Guidance; [Doc. 1 at ¶ 93].

On April 23, 2025, the Department of the Interior ("DOI") issued related guidance in response to the EO, notifying applicants for projects that are responsive to the EO, as well as any affected parties such as Indian tribes, that the Department "intends to use the emergency provisions in 36 C.F.R. § 800.12 to satisfy compliance with section 106 for those undertakings that respond to the National Energy Emergency."  *Emergency Process for Section 106 Compliance*, Dep't of the Interior (Apr. 23, 2025), https://www.doi.gov/sites/default/files/documents/2025-04/alternative-procedures-section-106-compliance-2025-04-23-signed_1.pdf; [Doc. 1 at ¶¶ 96–98].  The Court takes judicial notice that FWS is a bureau within the DOI.  *See Bureaus & Offices*, U.S. Dep't of the Interior, https://www.doi.gov/bureaus (last visited June 8, 2026); *Buhendwa v. Reg'l Transp. Dist.*, 82 F. Supp. 3d 1259, 1262 & n.1 (D. Colo. 2015).

For the seven months following the President's issuance of the EO, FWS, NPPD, the Tribes, and other consulting parties continued with the Section 106 process in the ordinary course.  [Doc. 1 at ¶ 99].  However, on August 22, 2025, NPPD submitted a request to FWS to use the emergency alternative procedures for the R-Project on the grounds that the R-Project is responsive to the EO.  [*Id.* at ¶ 115].  FWS approved the request on January 13, 2026 and issued the ITP to NPPD on February 10, 2026.  [*Id.* at

¶¶ 119, 133]. In so doing, FWS stopped the ongoing consultation process and identification of historical and cultural resources, "opting instead to let NPPD implement only those actions to which NPPD unilaterally committed in requesting to invoke emergency alternative NHPA procedures." [*Id.* at ¶ 132–38]. FWS also limited the involvement of the Tribes in the R-Project to "construction monitoring" in five discrete locations along the 226-mile route. [*Id.* at ¶¶ 137–38].

Petitioners brought this case on March 3, 2026, arguing that (1) the ACHP's guidance regarding the EO and authorization to use emergency alternative NHPA procedures violated the NHPA, the NHPA's implementing regulations, and the APA ("Claim One"), and (2) FWS's actions in authorizing NPPD to use emergency NHPA procedures based on the EO and issuing an ITP for the R-Project violated the NHPA, the NHPA's implementing regulations, and the APA ("Claim Two"). [*Id.* at ¶¶ 141–169]. On April 16, 2026, Petitioners filed their amended Motion, seeking to enjoin the ITP and the commencement of construction of the R-Project. [Doc. 24]. Federal Respondents and NPPD responded separately, [Doc. 28; Doc. 30], and Petitioners replied, [Doc. 40]. NPPD then filed a Motion for Leave to File Sur-Reply to Petitioners' Reply in Support of their Motion for Preliminary Injunction ("Motion for Leave to File Sur-Reply"), [Doc. 42], which no Party opposed.[3]

## LEGAL STANDARDS

### I.    Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."

---

[3] Given the lack of opposition, and that the sur-reply is limited to the issues Petitioners raised for the first time in their Reply, the Court **GRANTS** NPPD's Motion for Leave to File Sur-Reply [Doc. 42].

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010).  A district court may exercise its discretion to issue a preliminary injunction in accordance with Federal Rule of Civil Procedure 65(a) if the moving party demonstrates that "four equitable factors weigh in favor of the injunction."  *Flood*, 618 F.3d at 1117 (quotation omitted).  The party seeking a preliminary injunction has the burden of demonstrating:

> (1) a substantial likelihood that it will ultimately succeed on the merits of its suit; (2) it is likely to be irreparably injured without an injunction; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) the injunction, if issued, will not adversely affect the public interest.

*Id.* (citing *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)).  Because a preliminary injunction is extraordinary by nature, a movant must demonstrate its right to relief is "clear and unequivocal."  *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) (quotation omitted).

## II.    APA

Under the APA, agency actions are subject to judicial review when they are either made reviewable by statute or a "final" action "for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  "When courts consider such challenges [under the APA], an agency's decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion."  *San Juan Citizens All. v. Stiles*, 654 F.3d 1038, 1045 (10th Cir. 2011) (citations omitted).  But courts can "hold unlawful and set aside agency actions, findings, and conclusions" that they find, among other things, to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law."  5 U.S.C.

§ 706(2)(A), (C), (D).

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). But "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* This means that while an agency "must examine the relevant data and articulate a satisfactory explanation for its action," a court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (quotation omitted); *see also Fabrizius v. Dep't of Agric.*, 129 F.4th 1226, 1236 (10th Cir. 2025) ("When we review an agency action for arbitrariness, our inquiry under the APA must be thorough, but the standard of review is very deferential to the agency." (cleaned up)). The burden is on the petitioner to show that any decision or action was arbitrary and capricious. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

## ANALYSIS

### I. Likelihood of Success

The Tenth Circuit has observed that the first and most important preliminary-injunction factor is the likelihood of success on the merits. *See Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1229 (10th Cir. 2018). Indeed, "[t]he very purpose of an injunction under Rule 65(a) is to give temporary relief based on a preliminary estimate of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case." *Coal. of Concerned Citizens To Make Art Smart*

*v. Fed Transit Admin. of U.S. Dep't of Transp.*, 843 F.3d 886, 901 (10th Cir. 2016)

(quotation omitted).  To meet the likelihood of success factor, the movant "must present

a prima facie case but need not show a certainty of winning." *Id.* (quotation omitted).

Petitioners argue that they are likely to succeed on their claims that the ACHP and

FWS violated the NHPA, the NHPA's implementing regulations, and the APA.  They

contend that (1) the agencies did not demonstrate a "genuine emergency" "necessitating

waiver of the NHPA's procedures for the R-Project;" (2) the ACHP's guidance regarding

the EO violated the APA "by altering substantive law without observing required

procedures;" and (3) "[b]ecause FWS lack[ed] a lawful basis for waiving the NHPA's

procedures," FWS's decisions relating to the R-Project—done by "bypassing" the

obligations that the NHPA imposes—violated the NHPA and its regulations.  *See* [Doc.

24 at 24–47 (emphases omitted)].

Before turning to Petitioners' arguments, the Court briefly sets out the statutory

and regulatory framework that governs this dispute.

## A.    Statutory and Regulatory Framework

The NHPA is a "procedural statute requiring government agencies to stop, look,

and listen before proceeding when their action will affect national historical assets." *Coal.*

*of Concerned Citizens*, 843 F.3d at 905 (quotation omitted).  Section 106 of the NHPA

requires that, before issuing any federal license, an agency must "take into account the

effect of the undertaking on any historic property" and "afford the [ACHP] a reasonable

opportunity to comment with regard to the undertaking."  54 U.S.C. § 306108.  The term

"undertaking" means "a project, activity, or program funded in whole or in part under the

direct or indirect jurisdiction of a Federal agency, including . . . those requiring a Federal

permit, license, or approval." *Id.* § 300320(3).  Congress has charged ACHP with promulgating regulations "as it considers necessary to govern the implementation of [Section 106] in its entirety." *Id.* § 304108(a).

ACHP regulations provide that, typically, the Section 106 process must be "initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process." 36 C.F.R. § 800.1(c).  The process begins with an agency determining "whether the proposed Federal action is an undertaking" and whether it "has the potential to cause effects on historic properties." *Id.* § 800.3(a).  As part of this initial step, the agency determines the appropriate State Historic Preservation Officer ("SHPO"), Tribal Historic Preservation Officer ("THPO"), and other affected parties who need to be involved in the Section 106 process.  *Id.* §§ 800.3(c), (f).  The agency then consults with them "in a manner appropriate to the agency planning process for the undertaking and to the nature of the undertaking and its effects on historic properties." *Id.*

Then, the Section 106 process involves four steps:  (1) the agency defines the geographic areas within which an undertaking may cause alterations in the character or use of historic properties; (2) the agency identifies historic properties within those areas; (3) the agency determines whether the proposed undertaking will adversely affect the identified historic properties; and (4) if the agency determines that the undertaking may adversely affect historic properties within the defined geographic areas, it must "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* §§ 800.4, 800.5, 800.6; *see also Diné Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 846 (10th Cir. 2019).

10

"The Section 106 process does not demand a particular result, however, because Section 106 is essentially a procedural statute and does not impose a substantive mandate on the agencies governed by it." *Diné Citizens*, 923 F.3d at 846 (quotation omitted).

Besides this typical way to fulfil the NHPA's requirements, ACHP regulations set out "alternative[]" ways to comply with Section 106 in emergency situations. "In the event an agency official proposes an emergency undertaking as an essential and immediate response to a disaster or emergency declared by the President, a tribal government, or the Governor of a State or another immediate threat to life or property," the ACHP lays out two alternative ways for an agency to comply with Section 106:

> (1) Following a programmatic agreement developed pursuant to § 800.14(b) that contains specific provisions for dealing with historic properties in emergency situations; or
>
> (2) Notifying the [ACHP], the appropriate SHPO/THPO and any Indian tribe or Native Hawaiian organization that may attach religious and cultural significance to historic properties likely to be affected prior to the undertaking and affording them an opportunity to comment within seven days of notification. If the agency official determines that circumstances do not permit seven days for comment, the agency official shall notify the [ACHP], the SHPO/THPO and the Indian tribe or Native Hawaiian organization and invite any comments within the time available.

36 C.F.R. § 800.12(b). This is the process that FWS used here to grant NPPD an ITP for the R-Project.

## B.    The EO

For both Claim One and Two, Petitioners first argue that the EO does not qualify as an event that can trigger the alternative compliance procedures pursuant to 36 C.F.R. § 800.12(b). The plain language of the regulation provides that these alternative procedures are available for projects that are "essential and immediate response[s] to a[n] . . . *emergency declared by the President*." *Id.* (emphasis added). In a parenthetical,

11

Petitioners argue that because the full text of the regulation reads "emergency declared by the President . . . or *another* immediate threat to life or property," the regulation "clarif[ies] that an emergency declaration alone is insufficient in the absence of an imminent threat to life or property." [Doc. 24 at 30]. Petitioners do not support this position with any binding or persuasive authority. *See* [*id.*]. Without more, this Court is respectfully unpersuaded. In the plain reading of the regulations at issue, the Federal Respondents are neither empowered nor required to review the substance of the EO to determine whether it establishes a "genuine emergency" warranting the application of § 800.12(b). The Court thus finds that the President's declaration of a national energy emergency in the EO—and direction to all agencies to exercise any lawful emergency authorities available to them to facilitate the production, transportation, and generation of domestic energy resources—is sufficient on its own to trigger § 800.12(b).

Petitioners spend multiple pages attacking the substance of the EO, arguing that "nothing in [it] demonstrates an emergency" and characterizing it as, among other things, "politically motivated," "highly contrived," "lack[ing] evidence," "dubious," failing to "establish that there is *any* emergency," "unsubstantiated *ipse dixit*," and containing "significant, overarching flaws." *See* [*id.* at 25–30]. But a presidential declaration of a national emergency is "a quintessential political question." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 31 (D.D.C. 2020). Congress has authorized the President to declare national emergencies "during the period of a national emergency." 50 U.S.C. § 1621(a); *see Ctr. for Biological Diversity*, 453 F. Supp. 3d at 32 ("[T]he statute simply allows the President to declare an emergency to activate special emergency powers created by Congress. Nothing else guides how the President should make this

12

decision."). And Congress provided the ways that a presidential declaration of a national emergency can be terminated: if Congress "enact[s] into law a joint resolution terminating the emergency" (which Congress is required to consider every six months after a national emergency is declared) or "the President issues a proclamation terminating the emergency." 50 U.S.C. § 1622(a)–(b).

Nor can this Court substitute its judgment for that of the President in issuing the EO. Petitioners do not identify in their briefing a single case that has reviewed the merits of a presidential declaration of an emergency, and this Court is not aware of any. *See, e.g.*, *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 32–33; *United States v. Amirnazmi*, 645 F.3d 564, 681 (3d Cir. 2011) ("[F]ederal courts have historically declined to review 'the essentially political questions surrounding the declaration or continuance of a national emergency.'" (quoting *United States v. Spawr Optical Rsch., Inc.*, 685 F.2d 1076, 1080 (9th Cir. 1982))); *Sardino v. Fed. Rsrv. Bank of N.Y.*, 361 F.2d 106, 109 (2d Cir. 1966) ("[T]he courts will not review a determination [of the existence of a national emergency] so peculiarly within the province of the chief executive . . . ."). "In part, this is because the declaration of a national emergency raises questions about national security or foreign policy," and "'[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention,' since the Constitution commits those issues to the Executive and Legislative Branches." *Ctr. for Biological Diversity*, 453 F. Supp. 3d at 31–32 (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)). Therefore, the Court respectfully declines Petitioners' invitation to substantively review the President's discretionary judgment.

Petitioners next argue that "[c]ourts must scrutinize Executive Branch uses of

13

'emergencies' to dispense with statutory requirements." [Doc. 24 at 26]. While this is true, Petitioners fail to show any statutory requirements that were "dispensed with" here. Indeed, the EO itself did not reference any NHPA requirements that were being waived or dispensed with, and instead simply instructed agencies to "identify and exercise *any lawful emergency authorities available to them*, as well as *all other lawful authorities they may possess*," to facilitate certain energy projects.[4]  90 Fed. Reg. 8433 (emphasis added).

The lack of any statutory requirements that were waived or even modified distinguishes this case from the two cases that Petitioners cite in support of their argument, *Biden v. Nebraska* and *Learning Resources, Inc. v. Trump*.  In *Biden v. Nebraska*, the Supreme Court did not review President Trump's judgment declaring the pandemic a national emergency on March 13, 2020.  Instead, the Supreme Court addressed whether, based on this declaration of national emergency, the Secretary of Education had the statutory authority to cancel student debt under the Higher Education Relief Opportunities for Students ("HEROES") Act.  600 U.S. at 487, 501 ("The question here is not whether something should be done; it is who has the authority to do it.").  The Supreme Court held that Congress did not authorize mass debt cancellation under the

---

[4] Petitioners argue that the EO's lack of reference to the NHPA is fatal, pointing to the National Emergencies Act's ("NEA") requirement that "the President, in any EO declaring an emergency, . . . 'specif[y] the provisions of law under which he proposes that he, or other officers will act,' to then 'exercise' those powers."  [Doc. 24 at 28–29 (quoting 50 U.S.C. § 1631); Doc. 40 at 28].  The Court is not persuaded by this short, unsupported argument.  The full text of 50 U.S.C. § 1631 instructs that "no powers or authorities *made available by statute* for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposed that he, or other officers will act."  50 U.S.C. § 1631 (emphasis added).  Not only do Petitioners not cite any authority that has analyzed this provision in any context, they also do not explain the applicability of this provision to *regulations* made available in emergency situations, as are at issue here.

HEROES Act, so the Secretary of Education's plan exceeded the Department of Education's statutory authority. *Id.* at 505–06. In *Learning Resources, Inc. v. Trump*, the Supreme Court similarly did not review the substance of President Trump's declaration of a national emergency as to drug trafficking and trade deficits. The Supreme Court's review was limited to whether President Trump had the statutory authority under the International Emergency Economic Powers Act ("IEEPA") to impose tariffs to address the declared national emergency. 146 S. Ct. at 643–44 ("Our task today is to decide only whether the power to 'regulate . . . importation,' as granted to the President in IEEPA, embraces the power to impose tariffs. It does not."). The Supreme Court held that because the President could not "point to clear congressional authorization to justify his extraordinary assertion of the power to impose tariffs," *id.* at 642 (quotation omitted), the President could not impose tariffs under IEEPA, *id.* at 646.

Petitioners point to 54 U.S.C. §§ 306112 and 304108(c) as two statutes that the EO "waived," [Doc. 24 at 27], but this Court respectfully disagrees. Section 306112 authorizes the Secretary of the Interior to "promulgate regulations under which the requirements of this subchapter (*except [Section 106]*) may be waived in whole or in part in the event of a major natural disaster or an imminent threat to national security." 54 U.S.C. § 306112 (emphasis added). Section 106 is thus explicitly excluded from this statutory provision. This makes sense, because, as previously discussed, promulgating regulations relating to the Section 106 process are in ACHP's domain, not in the Department of the Interior's. *See* 54 U.S.C. § 304108(a).

Section 304108(c) permits the ACHP to "promulgate regulations or guidelines, as appropriate, under which Federal programs or undertakings may be exempted from any

15

or all of the requirements of this division when the exemption is determined to be consistent with the purposes of this division."  Petitioners do not explain how this grant of rulemaking authority was *waived* by the EO.  *See* [Doc. 24 at 27].  After all, Petitioners' allegations in this case are that the regulations that the ACHP promulgated, specifically 36 C.F.R. § 800.12(b), were improperly *invoked* with respect to the R-Project.  Petitioners make no argument that the ACHP improperly *promulgated* regulations or failed to consider the "purposes" of the NHPA when promulgating § 800.12(b).  Thus, the Court finds that Petitioners did not show that the President "dispense[d] with" any statutory requirements through the EO.

### C.    Claim One:  The ACHP's Use of the EO

In support of their position that they are likely to succeed on Claim One, Petitioners argue that the ACHP's use of the EO as reflected in the ACHP Guidance was "arbitrary, capricious, and unlawful."  [Doc. 24 at 29 (emphasis omitted)].  Specifically, Petitioners take issue with the ACHPA "arbitrarily assum[ing] in [the ACHP Guidance] that the EO's generic call for all agencies to exercise their emergency powers means that the EO unlocked and activated the NHPA's emergency provisions."  [*Id.*].

The Court has already addressed and rejected each of the arguments Petitioners advance in support of this claim, i.e., that the NEA required the EO to specifically reference the NHPA; that the EO is itself flawed and fails to state a genuine emergency; that 54 U.S.C. §§ 306112 and 304108(c) impose criteria that the ACHP failed to satisfy; and that 36 C.F.R. § 800.12(b) requires an EO to demonstrate an immediate threat to life or property in order to trigger the alternative procedures provided in that regulation.  *See* [*id.* at 29–30].  For the reasons set forth above, the Court finds these arguments

16

unavailing and declines to find that the ACHP acted arbitrarily and capriciously in issuing the ACHP Guidance.

Petitioners also argue that in the ACHP Guidance, "the ACHP indiscriminately exempted *all* projects subject to EO 14156 for the emergency's indefinite duration," which is "unlawful" and "marks a radical departure from the agency's regulations." [*Id.* at 31, 37]. Petitioners point to 36 C.F.R. § 800.12(d) limiting the applicability of § 800.12(b) "to undertakings that will be implemented within 30 days after the disaster or emergency has been formally declared" by the appropriate authority. [*Id.* at 31 (citing 36 C.F.R. § 800.12(d))]. While Petitioners acknowledge the regulation goes on to state that an agency may request an extension from the ACHP "prior to the expiration of the 30 days," they argue that the ACHP's indefinite extension is unlawful because it "jettison[s]" the requirement that "there . . . remain an 'immediate threat to life or property," which they again characterize as a prerequisite for the application of § 800.12(b). [*Id.*]. Further, Petitioners argue that this indefinite extension is unlawful because it is without regarding for "how many projects are implicated or how severe the resulting effects [are] to historic properties." [*Id.* at 37].

The Court has already rejected Petitioners' interpretation of § 800.12(b) as requiring an immediate threat to life or property for a presidential proclamation of an emergency. Moreover, § 800.12(d)'s extension mechanism is permissive and does not prohibit the ACHP from granting an extension on its own initiative, particularly where, as here, the underlying emergency is national and of an indeterminate duration. The ACHP Guidance does not change any of the requirements under § 800.12(b)—any undertaking seeking to employ the alternative procedures still must establish that it is subject to the

EO and responsive to the declared emergency.  The ACHP Guidance simply extends the period of applicability of the provision so that agencies do not have to keep requesting an extension from the ACHP.  Petitioners do not cite any authority that prohibits the ACHP from granting an indefinite extension of the period of § 800.12's applicability.  Nor do Petitioners cite any authority that the ACHP is required to consider "how many projects are implicated or how severe the resulting effects to historic properties" in granting extensions.

The Court thus finds that Petitioners have not carried their burden of establishing that there is a substantial likelihood on the merits of Claim One.[5]

### D.    Claim Two:  FWS's Use of the EO

In support of their position that they are likely to succeed on Claim Two, Petitioners argue that FWS's invocation of the EO for the R-Project was "arbitrary, capricious, and unlawful" by again referencing the agencies' failure to demonstrate that "there is, in fact, a national energy emergency" and "rel[iance] instead on EO 14156 that is devoid of any evidence showing a genuine emergency."  [*Id.* at 32].[6]  For the reasons set forth above,

---

[5] Petitioners reference these same arguments in the portion of their Motion arguing that "ACHP's Guidance is a legislative rule and violated the APA by altering substantive law without observing required procedures."  [Doc. 24 at 36 (emphasis omitted)].  Based on the analysis above, the Court disagrees that "[t]he ACHP's guidance clearly created 'new rights'" and "is a legislative rule."  [*Id.* at 38].  The ACHP Guidance did not create any new rights; if the ACHP Guidance was never issued, no rights would be different save for the fact that agencies would have to request from the ACHP an extension of the time period of § 800.12(b)'s applicability.

[6] Petitioners raise this argument again later in their briefing, arguing that "given the lack of any genuine national emergency," FWS had to—and failed to—examine whether there is a local emergency in NPPD's service area.  [Doc. 24 at 33–34].  It is rejected in this context as well.

the Court respectfully rejects this argument.

Petitioners next argue that "FWS failed to demonstrate, as even the ACHP said it must, that the R-Project is responsive to the 'emergency' declared in EO 14156." [*Id.*]. They contend that "nowhere in FWS's five-page waiver approval did FWS scrutinize that issue or ultimately answer this important question." [*Id.* at 32–33 (citing Doc. 24-2 at 135–39)]. Relatedly, Petitioners argue that FWS did not establish that the R-Project is an "essential and immediate response" to the emergency, which is similarly arbitrary and capricious. [*Id.* at 33]. An undertaking must be "an essential and immediate response to a[n] . . . emergency declared by the President" in order to be eligible for the § 800.12(b) process.

Federal Respondents counter that FWS's decision to authorize the § 800.12(b) procedures for the R-Project was not a final agency action and therefore not reviewable under the APA. The Court respectfully disagrees. An agency action is final for APA purposes where (1) it "mark[s] the consummation of the agency's decisionmaking process," i.e. "it must not be of a merely tentative or interlocutory nature," and (2) it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). "To be final, an agency action must itself be the source of the parties' obligations, modifying the applicable legal landscape," and "render[ing] its last word on the matter in question." *Sinclair Wyo. Refin. Co., LLC v. EPA*, 72 F.4th 1137, 1143 (10th Cir. 2023) (cleaned up).

Here, FWS's determination that the R-Project may use the expedited emergency review process is not "merely tentative or interlocutory [in] nature." Instead, NPPD

19

applied for this determination, sending a request with numerous documents in support, and FWS granted it months later—a consummation of its decisionmaking process on this question. *See* [Doc. 24-2 at 135–139]. There is no administrative appeal right. Further, FWS's approval of the use of § 800.12(b), instead of the typical Section 106 process, by NPPD to meet its obligations under Section 106 undoubtedly determines the Parties' rights and obligations. The application of § 800.12(b) exempts NPPD from the consultation process set out in Section 106, and divests the Petitioners' right to participate in the Section 106 process. *See, e.g.*, 36 C.F.R. 800.3(f). FWS itself recognized that because it was approving this process, it could cease "[t]he consultation process of developing and executive a [programmatic agreement] for the Project, including finalization of" the programmatic agreement that was already being drafted between the Parties. [Doc. 24-2 at 138]. Thus, this Court respectfully concludes that FWS's authorization of the use of the alternative process as described in § 800.12(b) for the R-Project constitutes a final agency action.

NPPD responds that "FWS's decision to apply § 800.12(b) was correct, and its implementation was proper." [Doc. 30 at 37 (emphasis omitted)]. But NPPD barely addresses Petitioners' concern that FWS did not establish that the R-Project meets the "essential and immediate" requirement for using the procedures under § 800.12(b). NPPD cites its own submissions and declarations to prove that the R-Project meets this requirement, *see* [*id.* at 38], but it does not point to any language in FWS's approval letter that even discusses whether the R-Project is an essential and immediate response to the declared emergency. A review of the approval letter reveals that there was no such discussion at all. *See* [Doc. 24-2 at 135–39]. This means that FWS applied a regulation

20

to the R-Project without analyzing whether the R-Project met the relevant regulatory requirements.

An agency failing to "consider an important aspect of the problem" and "articulate a satisfactory explanation for its action," as FWS did here, is arbitrary or capricious, and a violation of the APA. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Therefore, the Court finds that Petitioners have proven a substantial likelihood of success on Claim Two, their claim that FWS violated the APA, the NHPA, and the NHPA's implementing regulations in approving the R-Project to use 36 C.F.R. § 800.12(b) to meet its Section 106 obligations. *See* [Doc. 1 at ¶¶ 165, 169].

## II. Irreparable Harm

To satisfy the irreparable harm prong, a party must demonstrate that an injury is "certain, great, actual and not theoretical." *Schrier*, 427 F.3d at 1267 (quotation omitted). The harm may not merely be "serious or substantial," it must be so serious and so imminent that there is a clear and present need for equitable relief to prevent the harm. *Id.* (quotation omitted). A party can establish irreparable harm by demonstrating that a court could not effectively grant monetary relief for the injury in the absence of preliminary injunctive relief. *Exec. Consulting Grp. v. Baggot,* No.18-cv-CMA-MJW-00231, 2018 WL 1942762, at *8 (D. Colo. Apr. 25, 2018).

According to Petitioners, the R-Project threatens the "desecration and permanent destruction of culturally important landscapes, other [tribal cultural places], Historic Emigrant Trails, artifacts, and other properties that play a significant role in the history and culture of both the United States (and its westward expansion) and for numerous sovereign Tribes." [Doc. 24 at 47 (citing declarations from Petitioners' representatives)].

Respondents admit that there will be "minor adverse effects" to certain of these properties, though they contend that Petitioners' concerns are overblown. [Doc. 30 at 42, 44]. They also argue that the consultation efforts to date, the mitigation measures NPPD has agreed to take to address adverse effects, the construction monitoring program, the reporting requirements, and other procedures required by the ITP are sufficient to address any potential harms to Petitioners. *See* [Doc. 28 at 48–50; Doc. 30 at 44–47].

But Respondents ignore the fact that as a result of FWS approving NPPD to proceed under § 800.12(b), Petitioners will lose their "legally-protected procedural interest" in being consulted about the project. 36 C.F.R. §§ 800.3–800.12; *see Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010); *Dartmouth-Hitchcock Clinic v. Toumpas*, 856 F. Supp. 2d 315, 325 (D.N.H. 2012) (finding irreparable harm in a case where a state government official ignored statutory obligation to provide notice and an opportunity to comment on the State's planned reduction of medical reimbursement rates, reasoning that "[d]eprivation of the opportunity to be heard is not compensable by money damages in this context" and "the rights being denied are the rights to participate and potentially influence an administrative decision of great importance").

Petitioners having the ability to monitor the construction—as it is already ongoing—at a few discrete locations along a 226-mile route is not the same as having the right to identify properties and having a role in resolving adverse effects prior to construction. And the Court does not find that this construction monitoring program, or the other procedures NPPD has agreed to, adequately protect against harm to currently undiscovered or unidentified resources. After all, FWS acknowledges that "[traditional

22

cultural places] to which Tribal Nations ascribe traditional religious or cultural significance are likely to be in the" area affected by the R-Project.  [Doc. 24 at 43; Doc. 30-4 at 11]. At minimum, the Petitioners no longer having the regulatory rights to identify those places/resources and participate in discussions about how to avoid adverse effects constitutes irreparable harm.

### III.    Balance of Equities

NPPD[7] argues that if a preliminary injunction is granted, it will suffer numerous damages.  [Doc. 30 at 47–49].  First, NPPD will have over $100 million in economic damages, "from demobilization efforts for contract work staff and equipment, interest during construction, escalation of material and labor expenses moved to a future purchase and use date, and costs to continue to employ diesel generators to mitigate customers effects during peak loads and subsequent line outages."  [*Id.* at 48; Doc. 30-1 at ¶ 66].  NPPD bases this projection on the injunction setting the R-Project back approximately one year.  [Doc. 30-1 at ¶ 65].  Second, the mitigation measures that NPPD implemented for its customers while the R-Project has been in the planning stage are strained and the immediate construction of the R-Project is needed to "prevent damage to [NPPD's] transmission system and the customers it serves."  [Doc. 30 at 49].

On the first claimed damages category, the Court agrees with Petitioners that certain portions of the claimed damages appear to be "self-inflicted."  [Doc. 40 at 12 n.1]. NPPD has already been in litigation regarding the issuance of an ITP for the R-Project and was aware that the newly-granted ITP was being challenged at least as of March 3,

---

[7] As to Federal Respondents, because the balance of equities and public interest factors "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009); [Doc. 28 at 50], the Court considers both factors in the next section.

2026 when this case was filed.  Costs from "demobilization efforts" appear to be as a result of NPPD "jump[ing] the gun" on construction, and "[i]n this sense, [NPPD] [is] largely responsible for [its] own harm."  *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002), *abrogated on other grounds by Diné Citizens*; *see also Bar Method Franchisor LLC v. Henderhiser LLC*, 580 F. Supp. 3d 979, 996 (D. Colo. 2022) ("[A]lthough an injunction may impose serious harms on Defendants . . . that injury may be discounted by the fact that the defendants brought that injury upon themselves." (cleaned up)).  Further, Petitioners have agreed to exclude certain work from the scope of the preliminary injunction if it is granted, *see* [Doc. 40 at 12, 45 n.9], so NPPD will be able to start construction in certain areas and mitigate some of its damages.  Still, the Court credits and is mindful of the hardships that NPPD attests it will face if a preliminary injunction is issued.

Regarding the claimed damages related to the stability of the mitigation measures, NPPD admits that these measures "so far have allowed it to meet energy needs and avoid catastrophic collapse in this area."  [Doc. 30 at 48].  While the Court does not doubt that the R-Project would assist NPPD in "deliver[ing] reliable and sufficient power to Nebraskans," NPPD does not demonstrate that if the R-Project is not constructed immediately, there will be significant adverse effects to the mitigation measures and to NPPD's transmission system.  [*Id.* at 48–49].

Meanwhile, as previously found, Petitioners have identified irreparable harm to historic and cultural resources, including currently unknown resources likely to be present in the areas affected by the R-Project.  Petitioners' harms will also be compounded by "the risk of uninformed decisionmaking" as the R-Project is constructed without the benefit

24

of the Section 106 consultation process.  *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233, 1242 (D. Colo. 2009).  The Court concludes that the balance of the equities tips in favor of issuing the preliminary injunction.

## IV.    Public Interest

The Parties advance multiple compelling public interest arguments.  The Court agrees with Respondents that there is a strong public interest in a secure, affordable, reliable, domestic energy source.  [Doc. 28 at 51].  The State of Nebraska, and its people, also have an interest in increasing energy infrastructure in the state, especially in areas that currently lack adequate capacity.  [Doc. 30 at 48, 50].

On the other hand, as Federal Respondents acknowledge, one of the Petitioners, the Rosebud Sioux Tribe, "is a sovereign, and both it and its members have an interest in protecting their cultural patrimony.  The culture and history of the Tribe and its members are also part of the culture and history of the United States more generally."  [Doc. 28 at 51].  Federal Respondents further acknowledge that, in enacting and modifying the NHPA, Congress has decided that the preservation of historic properties and the rights of Indian tribes to consultation is in the public interest.  [*Id.*]; *see also* [Doc. 24 at 52–53].  "Congress could have, but didn't, include exemptions for . . . energy projects such as this one."  *Quechan Tribe of Fort Yuma Indian Rsrv.*, 755 F. Supp. 2d at 1122.  And "Congress could determine this particular project is in the public interest and sweep aside . . . requirements under NHPA . . . to get it built."  *Id.*  Further, while Congress delegated to the ACHP the authority to promulgate regulations to exempt certain projects from these requirements when consistent with the NHPA's purposes, the ACHP did not use that authority to dispense with consultation requirements wholesale based purely on a

25

presidential declaration of emergency.    Instead, it required that a project first be determined that it is "an essential and immediate response" to such an emergency.  *See* 36 C.F.R. § 800.12.  The public has a strong interest in ensuring that federal officials act within the bounds set by Congress.

On balance, the Court finds that the public interest weighs slightly in favor of the issuance of a preliminary injunction.  The Court therefore finds that all four factors weigh in favor of granting a preliminary injunction.

## V.        Scope of Preliminary Injunction

The Parties dispute what the appropriate scope of the preliminary injunction may be:  Petitioners argue that they can enjoin the construction of the R-Project, [Doc. 40 at 45–46]; and Respondents argue that the Court can "only enjoin reliance on FWS's ITP," [Doc. 30 at 53].[8]

In this Order, the Court has found that Petitioners are likely to succeed on Claim Two, that FWS violated the APA and the NHPA regulations by approving NPPD to use § 800.12(b) to comply with Section 106 without first finding that the R-Project is an essential and immediate response to the national energy emergency declared by President Trump.  The R-Project then continued past the Section 106 phase—including, ultimately, the grant of the ITP—because of this decision.

It is undisputed that Section 106 of the NHPA was only triggered in this case because NPPD applied for an ITP.  *See, e.g.*, [Doc. 40 at 16–17 ("Petitioners explained

---

[8] Petitioners and NPPD agree that any injunction expressly excludes three existing substations that require improvement, i.e, the Gerald Gentleman Station, Holt County, and Thedford, that are located on land owned by NPPD and the proposed work as part of the R-Project is wholly within the boundary of previously disturbed land and existing facilities.  *Compare* [Doc. 30 at 53] *with* [Doc. 40 at 45 n.9].  Accordingly, the Court expressly adopts this parameter.

they are likely to succeed on the merits of their claims that FWS . . . violated the NHPA and its regulations, and acted arbitrarily and capriciously under the APA, by . . . relaxing and flouting the NHPA's procedures when FWS issued the R-Project ITP . . . ."); *id.* at 19 ("Once FWS made the decision to depart from the NHPA's normal, mandatory procedures, as memorialized in the ITP and NHPA Requirements document, *there was nothing left for FWS to do and this marked the consummation of the NHPA process*." (emphasis added)); *id.* at 29–30 (Petitioners' list of alleged defects by FWS all concern FWS "invoking EO 14156 for the R-Project and issuing its ITP subject to emergency procedures under the NHPA"); Doc. 1 at ¶ 73 ("[A] renewed Section 106 consultation process . . . was plainly necessary before FWS could issue a new ITP in compliance with the NHPA.")].  Petitioners do not provide any other basis for the NHPA's application in this case.

And the harms that Petitioners allege in this case, as well as the relief that they seek to redress those harms, are all based on the issuance of the ITP.  *See, e.g.*, [Doc. 1 at ¶ 30 ("FWS's decision to approve an ITP is both a 'but for' and a proximate cause of the effects of the R-Project that threaten to irreversibly, irreparably harm Petitioners' and their members' interests in imminent, concrete ways."); *id.* at ¶ 31 ("A court order vacating the ITP, ROD, and related agency decisions challenged in this case . . ., or an injunction halting FWS's implementation of the ITP or NPPD's construction and operation activities pursuant to the ITP and related decisions, will redress Petitioners' injuries . . . ."].  While Petitioners insist that the entire R-Project must be ceased, they do not explain how the allegedly defective ITP infects the entirety of the construction project.  In addition, the Court respectfully agrees that an injunctive relief must be narrowly tailored.  *See Garrison*

*v. Baker Hughes Oilfield Operations, Inc.*, 287 F.3d 955, 962 (10th Cir. 2002).[9]

Therefore, Petitioners have not carried their burden of establishing that the entire construction project should be enjoined.  The Court thus enjoins only FWS's approval for NPPD to use the alternative compliance process described in 36 C.F.R. § 800.12(b) and all actions it took pursuant to that approval, including the subsequent issuance of the ITP. The Court's finding, however, is not intended to rule on or predict any legal consequences to NPPD if it proceeds with the R-Project without an ITP in place.

## VI.    Bond

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c). District courts enjoy "wide discretion in setting the amount of the preliminary injunction bond," *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1158 (10th Cir. 2001) (quotation omitted).

Petitioners urge the Court to impose no bond, or only a nominal bond.  [Doc. 40 at 47–52].  Petitioners emphasize that this is a public interest case and they "have no pecuniary interest in its outcome."  [*Id.* at 47–48].  Petitioners' counsel also represents that as "three nonprofit organizations dedicated to historic and environmental protection, a Tribe, and two LLCs that manage perpetual conservation easements and other property-based conservation benefits," any bond amount greater than $5,000 "would

---

[9] To the extent that this case proceeds to the merits, the Parties may address in that briefing whether broader injunctive relief is appropriate.  But it appears to the Court, based on the allegations in the Petition [Doc. 1], that vacating the ITP is the extent of the relief that can be granted in this case even if Petitioners substantively prevail.  Accordingly, the Court respectfully declines to grant preliminary injunctive relief that appears to exceed that scope.

impose a serious financial hardship on Petitioners." [*Id.* at 47–49]. More than that, Petitioners state they "may well be forced to walk away" from this case if bond in excess of $5,000 is ordered. [*Id.* at 49]. NPPD points to the damages it will endure if the preliminary injunction is granted, and requests that the Court grant "a bond sufficient to cover all, or a meaningful portion of, NPPD's potential costs and damages." [Doc. 30 at 54].

While the Court is sympathetic to NPPD's hardships, Petitioners' counsel has represented that Petitioners cannot cover anywhere near the more than $100 million that NPPD contends it will suffer from the issuance of the preliminary injunction and having to delay construction on the R-Project. "It would frustrate the purpose of [the NHPA] to require a [large] bond in this case, where [Petitioners] ha[ve] shown a likelihood of success on the merits, and a bond requirement effectively could preclude [Petitioners'] request for review of administrative action." *Colo. Wild v. U.S. Forest Serv.*, 299 F. Supp. 2d 1184, 1191 (D. Colo. 2004); *see also Colo. Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1231 (D. Colo. 2007) ("Imposition of a bond requirement in this case would preclude Plaintiffs' request for review of the Forest Service's access decision and frustrate the policies underlying NEPA and the APA.").

But because NPPD will be monetarily harmed if it cannot begin construction on the R-Project, the Court finds it is proper to set a nominal bond amount of $5,000.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)    Petitioners' Motion for a Preliminary Injunction [Doc. 24] is **GRANTED in part as described herein, expressly conditioned upon Petitioners**

29

**posting with the Court a bond of $5,000, and DENIED in part**; and

(2)    A Telephonic Status Conference is **SET** for **July 7, 2026 at 10:00 a.m.** to discuss how this case will proceed to the merits, including the submission of an administrative record and the setting of a briefing schedule.  Counsel shall participate using the following dial-in information:   571-353-2301; Access Code: 783456374.

DATED:  June 8, 2026                          BY THE COURT:

_____
Nina Y. Wang
United States District Judge

30