**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-00862-NYW-SBP

OREGON-CALIFORNIA TRAILS ASSOCIATION, et al.,

Petitioners,

v.

MATT HOGAN, et al.,

Respondents,

and

NEBRASKA PUBLIC POWER DISTRICT,

Respondent-Intervenor.

---

**NEBRASKA PUBLIC POWER DISTRICT'S**
**MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION**

---

On June 8, 2026, the Court granted in part and denied in part Petitioners' Amended Motion for Preliminary Injunction seeking to halt construction of Nebraska Public Power District's ("NPPD") R-Project—a 226-mile transmission line across central Nebraska. [Doc. 45]. The Court's decision was based on its finding that the U.S. Fish and Wildlife Service ("FWS") had not addressed in its decision whether the R-Project meets the "essential and immediate" requirement under 36 C.F.R. § 800.12(b) for application of National Historic Preservation Act ("NHPA") Section 106 alternative procedures. [Doc. 45 at 20]. Because the Court concluded that Petitioners were likely to succeed on the merits of this claim, and finding too that the equities (balance of harms and public interest) weighed in favor of a preliminary injunction, the Court

granted in part Petitioners' motion. The Court denied an injunction halting construction of the entire project but enjoined "FWS's approval for NPPD to use the alternative compliance process described in 36 C.F.R. § 800.12(b) and all actions [FWS] took pursuant to that approval, including the subsequent issuance of the [Incidental Take Permit ("ITP")]." [Doc. 45 at 28].

On July 20, 2026, FWS moved for voluntary remand to correct the error identified in the Court's preliminary injunction order. [Doc. 48]. The Court granted the motion for voluntary remand on July 21, 2026. [Doc. 50]. FWS has now completed the remand process and provided a supplemental memorandum justifying why, under § 800.12(b), the R-Project is an "essential and immediate" response to the energy emergency declared by the President in Executive Order 14156. [Doc. 51]. On this supplemental record, the Court's decision that Petitioners are likely to succeed on the merits of their claims must be reassessed, and the preliminary injunction on FWS's issuance of the R-Project ITP must be dissolved. Now more than ever, having endured yet another harrowing summer season in which the electric grid in central Nebraska was pushed to its limits, the equities tilt strongly toward dissolution of the injunction so that the R-Project can be constructed and the power grid made more reliable throughout central Nebraska.

Respondents support the relief NPPD requests in this motion, and similarly "anticipate filing a motion to lift the injunction shortly." [Doc. 51 at 2]. Respondents take no position on the substantive arguments in NPPD's motion. Petitioners oppose this motion and will file an opposition by the deadline set forth in D.C.COLO.LCivR 7.1(d), unless the Court orders an earlier deadline.

## I. Factual Background

The Court is well versed in the facts of this case. NPPD incorporates by reference the factual background in its opposition to the motion for preliminary injunction [Doc. 30]. Only those facts directly relevant to NPPD's motion to dissolve the injunction are discussed in the arguments below.

## II. Standard for Dissolution of Injunction

A preliminary injunction is an extraordinary remedy. *See, e.g., Colorado v. U.S. EPA*, 989 F.3d 874, 883 (10th Cir. 2021). A movant is entitled to a preliminary injunction by showing: (1) a likelihood of success on the merits, (2) the movant would suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

The decision to dissolve a preliminary injunction is within the sound discretion of the trial court. *Cablevision of Texas III, L.P. v. Oklahoma W. Tel. Co.*, 993 F.2d 208, 210 (10th Cir. 1993). A court will appropriately dissolve an existing injunction where "new circumstances 'threaten to convert a previously proper injunction into an instrument of wrong.'" *Rossi Ventures, Inc. v. Pasquini*, No. 11-CV-02838-CMA-BNB, 2013 U.S. Dist. LEXIS 12554 at *4 n.2 (D. Colo. Jan. 30, 2013) (quoting *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012)); *see also Salazar v. Buono*, 559 U.S. 700, 714–15 (2010) ("Because injunctive relief is drafted in light of what the court believes will be the future course of events, a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong.") (cleaned up and citation omitted). A movant must therefore "demonstrate significant changes in fact, law, or circumstances since the

previous ruling." *Rossi Ventures, Inc.*, 2013 U.S. Dist. LEXIS 12554 at *4 n.2 (quoting *Gooch*, 672 F.3d at 414); *see Verlo v. City & Cnty. of Denver*, 741 F. App'x 534, 542 (10th Cir. 2018) (the trial court's dissolution of a preliminary injunction "implies changed conditions rendered the injunction no longer necessary"). "A significant change in fact occurs when a party demonstrates its compliance with a court's prior order." *Native Ecosystems Council v. Marten*, No. CV 18-87-M-DLC, 2020 U.S. Dist. LEXIS 100974, at *5 (D. Mont. June 9, 2020).

## III. Argument

### A. The preliminary injunction should be dissolved because Petitioners are no longer likely to succeed on the merits.

#### 1. FWS's supplemental analysis confirms the R-Project is an "essential and immediate" response to the energy emergency declared in E.O. 14156 under 36 C.F.R. § 800.12(b).

The Court granted a partial injunction after determining Petitioners were likely to succeed on the merits of a single claim: FWS failed to explain that the R-Project is an "essential and immediate" response to the energy emergency declared by the President in E.O. 14156. [Doc. 45 at 20]. The Court found FWS's approval letter for alternative Section 106 procedures was arbitrary and capricious because FWS applied § 800.12(b) "without analyzing whether the R-Project met the relevant regulatory requirements."[1] [*Id.* at 20–21, 26]. On this basis, and finding too that the equitable factors weighed in

[1] While FWS may not have explicitly addressed the "essential and immediate" criteria in its approval letter, the Department of the Interior separately found that projects meeting certain "initial criteria"—including projects for the siting, transportation, and generation of domestic energy resources—would "facilitate an essential and immediate response to the declared national energy emergency." *See* "Emergency Process for Section 106 Compliance" Memorandum (April 23, 2025), *available at* https://www.doi.gov/sites/default/files/documents/2025-04/alternative-procedures-section-106-compliance-2025-04-23-signed_1.pdf. The R-Project fits squarely within those criteria as an energy transmission project.

favor of injunction, the Court enjoined "only FWS's approval for NPPD to use of the alternative compliance process described in 36 C.F.R. § 800.12(b) and all actions taken pursuant to that approval, including the subsequent issuance of the ITP." *Id.* at 28.

Thereafter, FWS moved for and was granted voluntary remand to "conduct additional analysis under the NHPA . . . [to] remedy the deficiencies laid out in the Court's Order granting the preliminary injunction." [Doc. 48 at 5–6; *see* Doc. 50].

On September 17, 2026, FWS issued a supplemental memorandum explaining and confirming the bases for its determination that the R-Project is an "essential and immediate response" to the energy emergency. [Doc. 51-1]. In terms of the "essential" need for the R-Project, FWS provides a detailed discussion of the critical concerns around existing grid stability, active emergency redispatch and system reconfiguration, lack of contingency tolerance, and exhaustion of capacity for energy cooperatives. *Id*. at 1-3. Together, these circumstances, which are supported by information in the record at the time of FWS's January 13, 2026 decision to approve alternative Section 106 procedures, support FWS's finding that the R-Project is an "essential" response to the energy emergency. *Id*. at 1-3. FWS further explains that the failing stopgap mitigation measures and potential for a multi-year construction delay under standard Section 106 procedures support the "immediate" need to pivot to alternative procedures. *Id*. at 3-4. FWS provides specific administrative record references to support its findings. *Id*. at 5-7. Under the Administrative Procedure Act's arbitrary and capricious standard, FWS is entitled to a "presumption of regularity" regarding its determination that the R-Project meets the § 800.12(b) criteria, placing the burden of proof on Petitioners to prove otherwise. *See San Juan Citizens Alliance v. Stiles*, 654 F.3d 1038,

1045 (10th Cir. 2011) ("When courts consider [APA] challenges, an agency's decision is entitled to a presumption of regularity, and the challenger bears the burden of persuasion." (citations omitted)).

FWS's detailed justification for why the R-Project meets the "essential and immediate" requirement is further supported by NPPD's application for alternative Section 106 procedures, [Doc. 30-6], and NPPD's comment letter regarding the same, [Doc. 30-8]. [*See* Doc. 30 at 38]. NPPD's application expressly invokes E.O. 14156 and explains that the R-Project is eligible for the alternative procedures because it is "designed to transport energy resources" as defined in section 8(a) of that Order. [Doc. 30-6 at 2]. Moreover, the severity of the region's power needs supports the essential and immediate nature of the project "[b]ecause adequate transmission capacity is not currently available" in central Nebraska and a sustained outage from a severe weather event would put "the health and welfare of [Nebraskans] . . . in jeopardy." [Doc. 30-8 at 3]. Further delay of R-Project construction is untenable because "[a]dditional mitigation is no longer viable with existing transmission infrastructure," and NPPD would need to build significant new infrastructure merely to address voltage collapse risks absent the R-Project. [Doc. 30-8 at 3–4]. Both NPPD's application and comment letter informed FWS of the critical need for the R-Project, which in turn, informed FWS's determination that the project is an "essential and immediate" response to the energy emergency. [Doc. 30-6 at 7; Doc. 30-8 at 4].

Thus, as supplemented, FWS's decision that the R-Project meets the requirements to use the emergency procedures under § 800.12 is well supported and is

not arbitrary and capricious, and Petitioners are no longer likely to succeed on the merits of that claim.

**2. FWS's supplemental analysis is a "significant change" in circumstances warranting dissolution of the preliminary injunction.**

FWS's supplemental memorandum confirms and explains that the R-Project is an "essential and immediate" response to the President's declaration of an energy emergency, resulting in a significant change in fact that warrants dissolution of the preliminary injunction. *See Rossi Ventures, Inc.*, 2013 U.S. Dist. LEXIS 12554 at *4 n.2; *Native Ecosystems Council*, 2020 U.S. Dist. LEXIS 100974, at *5; *California by & through Becerra v. U.S. EPA*, 978 F.3d 708, 717 (9th Cir. 2020) ("[T]he weight of authority confirms that, once the legal basis for an injunction has been removed. . . it is an abuse of discretion to not modify the injunction."). This is frequently the result in similar cases where agencies provide additional reasoning and analysis, the absence of which was the basis for the injunction. *See Or. Env't Council v. Kunzman*, 636 F. Supp. 632, 640–41 (D. Or. 1986) (granting motion to dissolve injunction where the agency supplemented the final environmental impact statement, bringing it into compliance with the National Environmental Policy Act ("NEPA")); *Sierra Club v. Mason*, 365 F. Supp. 47, 49, 50 (D. Conn. 1973) (dissolving injunction where error justifying the injunction—lack of a NEPA-compliant environmental impact statement—had been rectified).

In *Sierra Club v. Cargill*, the district court found that the Forest Service's land and resource management plan for the Bighorn National Forest violated the National Forest Management Act and enjoined the Forest Service from acting under the plan. 11 F.3d 1545, 1547 (10th Cir. 1993). After the Forest Service altered the plan in response to the district court's order, it moved to dissolve the injunction, and the Tenth Circuit found that

the district court's refusal to do so was an abuse of discretion. *Id.* at 1550. Here, as in *Sierra Club*, additional analysis corrects the defect identified in the Court's preliminary injunction order, such that the injunction must now be dissolved.

This case is also like *Native Ecosystems Council v. Marten*, where a project was enjoined due to the Forest Service's failure to complete a biological assessment ("BA") for wolverine and for its erroneous calculation of elk hiding cover. 2020 U.S. Dist. LEXIS 100974, at *5–6. In response to the court's order, the Forest Service completed and submitted the missing BA and a supplemental information report ("SIR") with a revised calculation of elk hiding cover. *Id.* at *5. Because the BA and SIR corrected the errors in the preliminary injunction order, the Montana District Court lifted its injunction and allowed the project to go forward. *Id.* at *11–12. Here too, now that FWS has issued a supplemental memorandum confirming that the R-Project meets the requirements for use of the alternative Section 106 procedures, correcting the deficiency identified by the Court, the preliminary injunction should be dissolved.

Accordingly, FWS's additional analysis is a significant change in circumstances warranting dissolution of the preliminary injunction.

**B. Continuing the preliminary injunction would be an "instrument of wrong."**

The equities, now more than ever, weigh against injunction. For the injunction to remain in effect now that FWS has provided adequate justification for the R-Project's essential and immediate nature would turn the preliminary injunction into "an instrument of wrong." *See Rossi Ventures, Inc.*, 2013 U.S. Dist. LEXIS 12554 at *4 n.2; *Salazar*, 559 U.S. at 714–15; *see also All. for the Wild Rockies v. Savage*, 354 F. Supp. 3d 1185, 1192 (D. Mont. 2018) (finding that because supplemental analysis brought the project

into compliance with various environmental statutes, "it is inequitable for the injunction to remain in place"). The Court's preliminary injunction has served its purpose and is no longer necessary. The Court's order granting the preliminary injunction raised a concern "that as a result of FWS approving NPPD to proceed under § 800.12(b), Petitioners will lose their 'legally-protected procedural interest' in being consulted about the project." [Doc. 45 at 22 (citation omitted)]. The Court further observed that "Petitioners' harms will also be compounded by 'the risk of uninformed decisionmaking' [if] the R-Project is constructed without the benefit of the Section 106 consultation process." [*Id.* at 24–25]. Now that FWS has completed its memorandum on remand, the Court's procedural concerns have been addressed. Though the Court recognized that Petitioners *alleged* potential harm to *unidentified* cultural and historic landscapes, artifacts, properties, and places. [*Id.* at 21–22], such speculative harm alone is insufficient to maintain the preliminary injunction.

### 1. Now that Petitioners' Alleged Section 106 Procedural Errors are Remedied, Petitioners' Remaining Alleged Irreparable Harms Are Illusory or Overblown.

NPPD laid out in detail in its opposition to the preliminary injunction the reasons why Petitioners' alleged irreparable harms were highly exaggerated. [Doc. 30 at 33–38].[2] In summary,

- Visual impacts to historic trails will be minor given existing modern influences in the R-Project corridor. [Doc. 30 at 33–35].

[2] References to docket filings are to internal pagination, not to the pdf pages, unless otherwise stated.

- The 543 identified historical sites within 10 miles of the R-Project are not tribal in nature, but *architectural* sites that will not be physically disturbed and are either outside of the Project viewshed, are too far away to be adversely affected, do not qualify as historic properties, or have been fully addressed through mitigation. [Doc. at 35–36].
- Any allegation of effects to previously undiscovered *tribal* sites is pure speculation. On-the-ground archeological surveys of 93% of the construction corridor did not identify any tribal sites, and after years of consultation, no Tribe (other than the Cherokee Nation) could identify a particular site of concern. Moreover, the R-Project crosses exclusively private land—no Tribe has access to locations within the construction corridor—undermining any allegation of cultural properties in current use by the Tribes.[3] Regardless, NPPD has committed to archeological monitoring of all construction within 0.5 mile of named waterways (dozens of locations) and in proximity to known historic properties to ensure protection of any tribal resource unearthed in these areas of the highest probability for historical tribal use. [Doc. 30 at 36–38].

The Court did not disagree with NPPD's assessment of the limited on-the-ground effects of the R-Project but found instead that Petitioners' loss of their "procedural interest" in Section 106 consultation was a sufficient showing of irreparable

[3] Petitioners acknowledged in their reply that they do not use lands within the construction corridor, and their sole access is by public highways. [Doc. 40 at 32]. Access and the visual character along these highways (already influenced by modern transportation infrastructure) will not change as result of the R-Project. Further, Petitioners still fail to identify a single historic property of concern that has not previously been accounted for and either avoided or mitigated.

harm. [Doc. 45 at 22]. But procedural injury alone is neither a sufficient basis for constitutional standing, *Summers v. Earth Island Inst*., 555 U.S. 488, 496 (2009) (holding in a NEPA case that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing), or for a showing of irreparable harm necessary for extraordinary injunctive relief, *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987) (finding that presumption of irreparable harm for failure to comply with NEPA's procedures was "contrary to traditional equitable principles"). To be cognizable, procedural injury must be coupled with actual concrete injury—injury that is not speculative or based on conjecture—which is precisely what Petitioners lack here.

Regardless, Petitioners participated in years of Section 106 consultation procedures, dozens of meetings and calls, requests for information, and weighed in on multiple turns of the draft programmatic agreement. Though repeatedly asked, the Tribes (other than the Cherokee Nation) either could not or would not identify any historic site of particular tribal concern. Thus, there is no reason to believe that pursuing months or years of additional Section 106 consultation would have identified any additional historic properties for further mitigation. Procedure alone is not an end in itself and cannot be the basis for an injunction.

**2. The Balance of Harms Tips in Favor of NPPD and Against a Preliminary Injunction.**

NPPD's opposition to the preliminary injunction highlighted two categories of harms it would suffer if construction of the R-Project were enjoined—monetary losses and unacceptable ongoing risks to the central Nebraska electricity grid. [Doc. 30 at 38-40]. Because the Court chose not to enjoin construction of the R-Project and to tailor its

remedy to the challenged ITP, NPPD so far has been able to avoid staggering economic damages of up to $100 million to NPPD and its ratepayers. Declaration of Thomas Kent, ¶ 4, attached as **Ex. A** ("Kent Decl."). This is because NPPD was able to redirect its primary contractor to begin R-Project construction between Gerald Gentleman Station and Stapleton—the southwestern portion of the line outside of the ITP area. *Id*. Based on the results of American burying beetle trapping surveys conducted in August 2026 along Highway 83, NPPD chose to extend those construction activities into a 26-mile portion of the ITP area north of Stapleton where the species was not present. *Id*. ¶ 7. And NPPD decided to proceed with lattice tower assembly in existing fly yards during the beetle's inactive winter season. *Id*. Finally, NPPD was also able to complete work within existing substations. *Id*. ¶ 4. During construction, NPPD has honored all archeological monitoring commitments in areas committed to tribal monitoring in the ITP. *Id*. ¶ 5. It also provided landowner and public notice of its construction activities. *Id*. ¶¶ 4, 8.

Work outside the ITP area and in the portion north of Stapleton with negative trapping results will be completed in stages, starting with access road improvements, matting, and fencing, followed by helical pier foundation work and finally helical pier installation. *Id*. ¶ 8. NPPD currently anticipates that these construction activities will be complete in February 2027. *Id*. At that point, NPPD will be severely limited in its ability to further the progress of R-Project construction. *Id*. Further construction activities within the ITP area (aside from lattice tower assembly in fly yards) will remain unavailable while the preliminary injunction is in place, which will result in significant monetary losses and increased project costs the longer the injunction lasts. Those

monetary damages remain a significant concern, as they will be borne by the ratepayers in the Southwest Power Pool ("SPP").

While the Court characterizes these damages as partially "self-inflicted," [Doc. 45 at 23], R-Project construction is intended to meet a transmission need identified by the SPP over 14 years ago. Given the critical state of the central Nebraska grid, NPPD does not have the luxury of waiting to see whether and how Petitioners plan to mount the next legal attack on the Project or to await the conclusion of months of litigation, lest the petition itself be treated as a de facto preliminary injunction. NPPD's reality is that without the R-Project it risks liability and penalties for non-compliance with mandatory Federal Energy Regulatory Commission standards for grid reliability. To the extent NPPD's losses are the result of pushing forward on a critical infrastructure project, they are in that sense "self-inflicted," but NPPD can hardly be blamed for attempting to meet its regulatory obligations.[4] In other words, there are monetary and legal risks to NPPD of failing to construct the R-Project as well.

But more important than navigating potential monetary losses, Nebraskans deserve a safe and reliable power supply. The risk to the central Nebraska grid alone is sufficient to tip the scales against injunction. The 2026 summer season offered a nail-biting master class in the limits of an already-overtaxed grid. Kent Decl. ¶ 11. Record-

[4] One of the cases cited by the Court in this portion of its Order [Doc. 45 at 23–24] deals with a private, for-profit business that made decisions designed to enrich the coffers of the company. *See Bar Method Franchisor LLC v. Henderhiser LLC*, 580 F. Supp. 3d 979, 996 (D. Colo. 2022). Not so for NPPD, which is a not-for-profit regulated governmental entity. And in the other case cited by the Court, the defendants "jumped the gun" by prejudging the outcome of the NEPA process before it started, which is not the case here. *Davis v. Mineta*, 302 F. 3d 1104, 1112, 1116 (10th Cir. 2002). NPPD should not be penalized for deciding to proceed with construction of a critically needed infrastructure project despite the filing of a petition.

setting high temperatures in the service area resulted in record-setting peak demand for municipal and agricultural users. *Id*. NPPD was forced to run all mobile emergency diesel generators deployed over the last 14 years and add new diesel generation at a constrained site to meet demands. *Id*. ¶ 12. NPPD called on adjacent service areas in South Dakota to provide voltage support. *Id*. And NPPD worked closely with local customers to request voluntary load reductions during critical timeframes. *Id*. ¶ 13. If these measures had been insufficient, NPPD was prepared to implement rotating outages to avoid grid collapse. *Id*. NPPD was one contingency event away from losing power for customers across a 111-mile swath of Nebraska during a period of extreme high temperatures, which would have had severe public health and safety consequences. *Id*. Next summer promises to be even more harrowing, with El Niño on the horizon. *Id*. ¶ 14. Every day counts for R-Project construction, and halting construction will only delay the final in-service date, putting real Nebraskan homes, towns, and farms at greater risk.

### 3. The Public Interest Now Weighs Against a Preliminary Injunction.

The Court acknowledged that both sides of this case represent compelling, and potentially competing, public interests. [Doc. 45 at 25-26]. NPPD's interest is in a reliable grid to provide safe and affordable power to serve existing and potential new users in central Nebraska. The Petitioners, and the Rosebud Sioux Tribe, in particular, have a sovereign interest in protecting their "cultural patrimony," which is met in part by the Section 106 procedures of the NHPA. [*Id*. at 25]. But as the Court also recognized, the Advisory Council on Historic Preservation had found that the public interest weighs in favor of dispensing with the typical NHPA procedures in some circumstances—i.e.,

when a project is determined to be "an essential and immediate response" to an emergency declared by the President. [*Id*. at 25–26 (quoting 36 C.F.R. § 800.12)]. In the Court's injunction order it found that because FWS had not adequately explained why the R-Project fit within this category for alternative NHPA procedures, the public interest "weighs slightly in favor of issuance of a preliminary injunction." [*Id*. at 26].

But now that FWS has provided a detailed and rigorous justification for the "essential and immediate" nature of the R-Project, the Court must reevaluate the weight of the public interest. NPPD respectfully submits that the needs of Nebraska's citizens far exceed any tribal concern in more process, particularly when the Tribes can point to no particular place or site that will be injured by the R-Project construction and any asserted harms are speculative.

## IV. Conclusion

A preliminary injunction remains an extraordinary remedy, only permitted when a Court finds Petitioners have met their burden on all four pillars of the injunction test. The removal of one pillar means that the injunction cannot stand. Here, where FWS has corrected the sole error on which the Court's finding of likelihood of success rested, the preliminary injunction is no longer justified. Moreover, the balance of harms and public interest weigh against an injunction. Thus, NPPD respectfully requests that the Court dissolve the preliminary injunction and that NPPD be permitted to proceed in reliance on the ITP for American burying beetle.

DATED this 25th day of September, 2026.

Respectfully submitted,

*/s/ Tina R. Van Bockern*
Tina R. Van Bockern
Holland & Hart LLP

555 17th Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
Fax: (720) 545-9952
trvanbockern@hollandhart.com

Hadassah M. Reimer
Holland & Hart LLP
P.O. Box 68
Jackson, WY 83001
Phone: (307) 739-9741
Fax: (307) 739-9744
hmreimer@hollandhart.com

Murray D. Feldman
Holland & Hart LLP
800 W. Main Street, Suite 1750
Boise, ID 83702
Phone: (208) 342-5000
Fax: (208) 343-8869
mfeldman@hollandhart.com

Sarah C. Bordelon
Holland & Hart LLP
5441 Kietzke Lane, 2nd Floor
Reno, NV 89511
Phone: (775) 327-3011
Fax: (775) 786 6179
scbordelon@hollandhart.com

**ATTORNEYS FOR NEBRASKA PUBLIC POWER DISTRICT**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2026, I have caused the foregoing to be electronically filed with the Clerk of Court using CM/ECF system which will send notification of such filing to the following:

William Stewart Eubanks, II
Riley Chapman Varner
Eubanks & Associates, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com
riley@eubankslegal.com

Gabriel Lopez
Trial Attorney
Environment and Natural Resources Division
U.S. Department of Justice
999 18th St., Suite 370
Denver, CO 80202
(202) 598-0881
Gabriel.Lopez2@usdoj.gov

*/s/ Tina R. Van Bockern*

## CERTIFICATION RE: USE OF GENERATIVE ARTIFICIAL INTELLIGENCE ("AI") FOR DRAFTING

The undersigned counsel certify that generative artificial intelligence was not used to draft this filing.

*/s/ Tina R. Van Bockern*
Tina R. Van Bockern

*/s/ Murray D. Feldman*
Murray D. Feldman

*/s/ Hadassah M. Reimer*
Hadassah M. Reimer

*/s/ Sarah C. Bordelon*
Sarah C. Bordelon

**ATTORNEYS FOR NEBRASKA PUBLIC POWER DISTRICT**

38958274